SHAW, DEBORAH V. SOCIAL SECURITY ADMINISTRATION, 2022 WL 1448513 (2022)

2022 WL 1448513 (PERSONNET)

Merit Systems Protection Board - Initial Decisions

**SHAW, DEBORAH**

V.

SOCIAL SECURITY ADMINISTRATION

No. PH-1221-21-0091-W-1
May 6, 2022

Before: BERG, CRAIG A., AJ

```
+------------------------------------------------+
' CAUTION! '
' MSPB INITIAL DECISIONS ARE NOT PRECEDENTIAL '
' AND CANNOT BE CITED AS SUCH IN SUBMISSIONS '
' TO THE BOARD OR THE FEDERAL COURTS. '
+------------------------------------------------+
UNITED STATES OF AMERICA
MERIT SYSTEMS PROTECTION BOARD
NORTHEASTERN REGIONAL OFFICE
_____
                                       )
                                       )
DEBORAH SHAW, ) DOCKET NUMBER
Appellant, ) PH-1221-21-0091-W-1
                                       )
v. )
                                       )
SOCIAL SECURITY )
ADMINISTRATION, ) DATE: May 6, 2022
Agency. )
                                       )
_____
```

<u>Daniel Clark</u>, Esquire, Washington, D.C., for the appellant.

<u>Michael Kator</u>, Esquire, Washington, D.C., for the appellant.

, Esquire, Atlanta, Georgia, for the agency.

, Esquire, New York, New York, for the agency.

**BEFORE**

```
Craig A. Berg
Administrative Judge
```

**INITIAL DECISION**

**INTRODUCTION**

SHAW, DEBORAH V. SOCIAL SECURITY ADMINISTRATION, 2022 WL 1448513 (2022)

The appellant, currently a non-supervisory Attorney Advisor, GS-0905-14 with the agency's Office of Inspector General (OIG), filed a timely individual right of action (IRA) appeal alleging that the agency had taken several personnel actions against her in retaliation for her whistleblowing disclosures. Initial Appeal File (IAF), Tab 1. I found that the Board has jurisdiction over this appeal pursuant to 5 U.S.C. §§ 1214(a)(3), 1221(a), (e). A hearing was held from September 28-30, 2021. Hearing Transcripts (Tr.) I-III. For the reasons discussed below, the appellant's request for corrective action is GRANTED as to all four personnel actions under review.

## ANALYSIS AND FINDINGS

Background

The appellant began working in the agency's OIG in 2006. She was on an unpaid sabbatical during 2018, and when she returned, from December 2018 to June 23, 2019, she was a GS-14, Attorney Advisor in the Office of Counsel to the Inspector General (OCIG). In OCIG, the appellant largely performed duties related to Civil Monetary Penalty (CMP) cases, which involve civil penalties imposed upon beneficiaries of Social Security programs who have committed fraud.

There are two types of CMP cases, one falling under section 1129 and one under 1140 of the statute. [1] 1140 cases involve consumer protection from individuals/entities that misrepresent themselves as affiliated with Social Security, while section 1129 cases concern fines against subjects who obtain, or continue to receive, benefits to which they are not entitled through false statements or omissions.

The appellant explained the 1129 CMP process, as it existed prior to her sabbatical. An 1129 CMP case originated as a referral to the IG's Office of Investigations (OI), and an investigator reviewed it and presented it to the U.S. Attorney's Office. Tr. I at 9. The cases were typically declined for prosecution, and were then referred to OCIG to impose a civil penalty. [2] The purpose was to recover the money improperly paid out to the beneficiary, also referred to as a "subject," for the Social Security fund. The case would be assigned to an attorney, who would cause the subject of the investigation and the determination that s/he may have made misrepresentations/false statements/omissions in order to receive benefits to which the subject was not entitled. A financial disclosure form was sent out with the initial letter, and the subject would be notified that any information provided would be considered in determining a penalty and assessment. Id. at 9-10.

At that point, efforts were made to reach a settlement with the subject, but if the individual ignored the initial letter or a settlement could not be reached, a penalty letter, or demand letter, was sent out. In this letter the agency advised the subject of the specific charges against them and how the applicable factors were being considered, and a penalty would be proposed. In response, if the subject contacted the office, settlement could be discussed, and information regarding the procedures for requesting a hearing before the Departmental Appeals Board (DAB) [3] would be provided. If the individual failed to respond to the penalty letter within 65 days, he/she would be sent a default letter notifying the subject that he/she is now liable for the penalty and assessment that had been proposed. Id. at 10-12.

During the period the appellant was on sabbatical, Joseph Gangloff, Chief Counsel to the IG, was in charge of the CMP program. According to the appellant, the amount of money recovered by the CMP in 2016 and 2017 plummeted, and when she returned in December 2018, Gangloff had made a number changes in the procedures followed in the 1129 cases.

The appellant and several others expressed concern with some of the procedural changes, as well as a drastic increase in penalties assessed in 1129 cases. The appellant believed that these changes violated regulations governing the CMP program, and she began to express these concerns. In February 2019, she reported the issues to Jocelyn Funnie, who was the acting Assistant Inspector General for Communications and Resource Management at the time. Funnie communicated the concerns to several higher level management officials, including Inspector General Gail Ennis. The appellant continued to raise the same issues over several months, and into the spring 2019, to other employees and management officials, including Michele Williamson, Senior Attorney for Personnel and Whistleblower Protection and Deputy Inspector General Ben Alpert.

SHAW, DEBORAH V. SOCIAL SECURITY ADMINISTRATION, 2022 WL 1448513 (2022)

On May 31, 2019, IG Ennis announced the formation of a new Office of the Counsel for Investigations and Enforcement (OCIE), effective June 3, 2019, to be directed by Funnie, who would serve as the Counsel for Investigations and Enforcement. OCIE was to oversee OIG's CMP functions. The appellant was offered, and accepted, effective June 23, 2019, the position of Supervisory General Attorney, GS-0905-15, in charge of the Section 1129 CMP program, subject to a one year probationary period.

Shortly before the appellant officially became the Supervisory General Attorney in OCIE, on June 10, 2019, she filed a "Revised Notice of Entry of Appearance" in a case pending before an administrative law judge in the DAB. The appellant entered her own appearance in the case, and also entered the appearances of David Rodriguez, Deputy Counsel for Section 1140 Enforcement, and Alex Rzasa and Peter Johnson, attorneys in OCIE. The case involved an SSA OIG CMP complaint against respondent *Weans*.

Funnie had agreed to handle the *Weans* case, including the responsibility to file a pre-hearing brief, due on July 22, 2019. When Funnie concluded on the due date that she would need an extension of time, she and the appellant discussed making such a request. The appellant, who was teleworking in California at the time, drafted and ultimately filed the request, with Funnie's input.

Subsequently, a whistleblower made a confidential disclosure alleging that the request for an extension had been less than candid and/or misleading, and on July 24, 2019, OIG referred the allegations against Funnie and the appellant to be investigated by its Office of Investigations. IG Ennis delegated the authority to review and take further action, if warranted, on the investigative findings to Michael Robinson, a member of the Senior Executive Service (SES) within OIG who was, at the time, detailed to the Council of the Inspectors General on Integrity and Efficiency, and thus completely removed from the day-to-day management of OIG and outside Appellant's chain of command.

On September 23, 2019, Robinson placed the appellant on administrative leave, pending further investigation and review of the findings, and on October 4, 2019, Robinson changed the leave to investigatory. On December 18, 2019, Robinson notified the appellant that she had failed to satisfactorily complete her supervisory probationary period, and was being reassigned to a non-supervisory Attorney-Advisor position in OIG. On December 21, 2019, he issued the appellant a proposal to suspend her for 45 days, for lack of candor and neglect of duties, and a proposal to remove Funnie from federal service. The appellant's investigative leave was terminated and she returned to a position as an Attorney-Advisor in OIG, effective January 6, 2019. The proposed 45-day suspension remains pending.

On November 8, 2019, the appellant filed a complaint with the Office of Special Counsel (OSC) alleging that the agency had retaliated against her for her protected whistleblowing disclosures regarding the CMP program by placing her on administrative and investigatory leave, and she later amended her complaint to add the reassignment to a non-supervisory GS-14 Attorney-Advisor position and the proposed suspension. On November 25, 2020, OSC notified the appellant that it was closing its investigation into her complaint, and informed her of her right to file an IRA appeal with the Board. This appeal followed.

### The Merits

The Whistleblower Protection Act of 1989 (WPA) prohibits government personnel actions taken against an employee in reprisal for whistleblowing. 5 U.S.C. § 2302(b)(8); *Mintzmyer v. Department of the Interior*, 84 F.3d 419, 422 (Fed. Cir. 1996). An appellant may be entitled to corrective action if she shows by preponderant evidence [4] that she made a protected disclosure under 5 U.S.C. § 2302(b)(8) and that the protected disclosure or activity was a contributing factor in the personnel action. 5 U.S.C. § 1221(3)(1); 5 C.F.R. §1201.57(c)(4). However, the Board will not order corrective action if the agency then demonstrates by clear and convincing evidence that it would have taken the same personnel action in the absence of the protected disclosure. 5 U.S.C. § 1221(e)(2); *Shannon v. Department of Veterans Affairs*, 121 M.S.P.R. 221, ; 24 (2014).

### Disclosures

A protected disclosure under the Whistleblower Protection Act (WPA) is defined as a disclosure of information that the individual reasonably believes evidences a violation of law, rule, or regulation, gross mismanagement, gross waste of funds, abuse of authority, or substantial and specific danger to public health or safety. *See* 5 C.F.R. § 1209.4(b). The test to determine whether a putative whistleblower has a reasonable belief in the disclosure is an objective one: Whether a disinterested observer, with knowledge of the essential facts known to and readily ascertainable by the employee, could reasonably conclude that the actions of the agency evidenced one of these categories of wrongdoing. *Lachance v. White*, 174 F.3d 1378, 1381 (Fed. Cir. 1999). If the reasonable belief test has been met, the personal motives of the whistleblower are irrelevant. *Johnson v. Department of Defense*, 87 M.S.P.R. 454, ; 10 (2000).

### *First Group of Disclosures*

The appellant alleges that she reported improper procedures being followed in the CMP program to a number of people between January and May, 2019, and she contends that she reasonably believed that she was disclosing violations of law, rule, or regulation, and/or abuses of authority. IAF, Tabs 6, 60, 76. More specifically, she argues that she disclosed OCIG's failure to consider the beneficiaries' financial condition as a result of discontinued use of initial letters, which had included a financial form provided to beneficiaries for submitting such evidence, imposition of excessive penalties in relation to the amount of the overpayment, and change in the method of service used to send letters to beneficiaries from the required certified mail to regular U.S. mail along with UPS delivery. *Id.*

The agency argues that the appellant has failed to show that she had a reasonable belief she was disclosing violations of law, rule, or regulation, or abuses of authority because the evidence shows that the matters the appellant reported were simply disagreements over policy-a new way of doing things under Gangloff, the Chief Counsel. IAF, Tab 77. The agency further argues that Gangloff did not gain personally from the changes he made to the program, and because appellant did not point to any legal requirements that were being violated she could not have believed that the changes were adversely affecting the rights of any person. Thus, the agency concludes, the appellant could not have reasonably believed Gangloff or OCIG were abusing their authority. *Id.*

The agency also argues that the appellant's disclosures regarding the changes Gangloff made either did not actually violate any specific regulations, or that any violation was *de minimis*, and therefore not "protected" under the statute. IAF, Tab 77. In this regard, the agency contends that the change in the method of service of letters to beneficiaries was very minor, and that the appellant admitted the discontinuation of the financial disclosure form and cessation of the use of initial letters to beneficiaries did not violate the regulations. Finally, the agency contends that the appellant failed to establish that she disclosed any penalty assessments that exceeded the maximum levels prescribed by law, and thus her disclosures were not protected. *Id.*

The appellant testified that she spoke out at meetings attended by upper management officials stating her view that the penalties being assessed against beneficiaries had become exorbitant. Tr. I at 37. In a January 11, 2019 email to David Rodriguez, the appellant expressed her concern with the high penalty in a particular case, and proposed discussing the penalty-setting policy at the next meeting. IAF, Tab 63 at 101-03. [5] In a January 15, 2019 email chain that succeeded the January 11 email, Rodriguez and Kristen Fredericks, Special Counsel, suggested scheduling a meeting to discuss appellant's concerns, and appellant sent a follow-up email the same day to Rodriguez, Fredericks, Deborah Stover-Springer, Deputy Counsel to IG, and Gangloff. *Id.* The appellant testified that, at the meeting, Gangloff told her she should not refer to a penalty in writing as "unconscionable." Tr. I at 41-48; IAF, Tab 63 at 104-06.

The appellant testified further that she felt her concerns were not being addressed, so, as noted above, she raised them to Michele Williamson later in January 2019. Tr. I at 50. First, she spoke with Williamson in the hallway, and then on another occasion she went to Williamson's office to reiterate the issues she had raised. *Id.* at 50-51. Williamson suggested that the appellant tell Funnie of her concerns, and the appellant took her advice. Both the appellant and Williamson emailed and spoke with Funnie regarding the matters the appellant had previously disclosed. *Id.* at 52.

SHAW, DEBORAH V. SOCIAL SECURITY ADMINISTRATION, 2022 WL 1448513 (2022)

Williamson testified that, in 2018-19, she had been part of a Whistleblower Protection Unit, and she corroborated that the appellant had made disclosures twice regarding the CMP procedures-regarding the financial form, the CMP attorneys failing to serve initial notices or to employ proper service of other notices, not taking all required factors into consideration when making penalty determinations, and assessing excessive penalties. Tr. I at 166-72, 182-83. She stated that she had treated her conversations with appellant as protected disclosures, but did not put them into the system so appellant's name would not be searchable. *Id.* at 176.

Funnie also corroborated the appellant's testimony that the appellant had raised issues regarding the CMP program to her, and Funnie believed it occurred on February 6 or 7, 2019. Tr. II at 10. The appellant expressed concern that initial letters were no longer being issued and the financial disclosure had also been eliminated from use, and she stated that the beneficiaries' financial condition was not being considered, penalties were excessive, and the penalty and default letters were not being served properly. *Id.* at 11. Funnie reported these points to Ennis, Gail Stone, Executive Officer Steve Schaffer, and later to Alpert (on approximately February 20, 2019). [6] *Id.* at 12.

Finally, Alpert confirmed that the appellant had cited issues with some of the CMP practices between March and May 2019. He testified that she stated her disagreement with the discontinuation of the financial disclosure form and her belief that penalties being assessed were excessive. Tr. II at 173-77.

I find, and the agency does not appear to dispute, that between January and May 2019, the appellant disclosed her belief that there were issues with some of the procedures OIG was employing in the CMP program under Gangloff to numerous agency officials, including Rodriguez, Fredericks, Stover-Springer, Funnie, and Alpert. These disclosures included the practice of no longer sending initial letters or the financial disclosure form to beneficiaries, and as a result failing to take into account all of the factors required by regulation in assessing penalties, imposing excessive penalties, and failing to serve notices in accordance with regulatory requirements.

The question remains whether the appellant's disclosures were "protected" under the meaning of the Whistleblower Protection Act, as amended. In other words, I must determine whether she had a reasonable belief that she was disclosing wrongdoing that fell within section 2302(b)(8)-in particular a violation of law, rule or regulation, or an abuse of authority.

At the outset, I find no merit in the agency's argument that the appellant's differences of opinion as to the above-referenced CMP procedures were not protected disclosures because they were "mere debatable disagreements with the agency's policy decisions," over which reasonable minds could differ. The Board's reviewing court has held that, "in enacting the WPEA in 2012, Congress made clear that policy decisions and disclosable misconduct under the WPA are not mutually exclusive." *See Hessami v. Merit Systems Protection Board,* 979 F.3d 1362, 1371 (Fed. Cir. 2020) (citing S. REP. NO. 112-155, at 7-8 (2012), as reprinted in 2012 U.S.C.C.A.N. 589, 595-96). Thus, disclosing a policy disagreement where the whistleblower reasonably believes she is reporting wrongdoing that falls in one of the categories in 5 U.S.C. § 2302(b)(8) *is* a protected disclosure. 5 U.S.C. § 2302(a)(2)(D).

I find it appropriate to discuss each type of disclosure individually below.

*Discontinuation of financial form/failure to consider financial condition*

The appellant testified that the applicable regulations required the agency to consider a subject's financial condition in assessing the penalty. Tr. I at 26-27; 20 C.F.R. § 498.106(a)(4). [7] She believed the failure to send the financial disclosure form, which had been included with the initial letter, coupled with procedures that prevented the attorneys from calling the subjects or the investigating agents, interfered with the ability to take the individual's finances into account determining a penalty. *Id.* at 27. The penalty letters contained a statement indicating that the subject's financial condition had been taken into account, and she believed that was a false statement. *Id.* at 27-28.

The appellant admitted on cross examination that there was no regulatory requirement for the agency to issue an initial letter to the subject or to employ a particular financial disclosure form. Tr. I at 127-28. Disclosure of one's financial condition was voluntary, she agreed, and these changes to the procedures were not outside Gangloff's authority. *Id.* at 129-131.

Funnie stated that previously, if the subject failed to submit the financial disclosure form, the practice had been to have the investigative agent dig for information, or contact the person. Tr. II at 15-16. The appellant reported to her that Gangloff was not considering financial information, as required by the regulation. *Id.* at 17

Alpert testified that, when he reported this concern to Gangloff, Gangloff asserted that the subjects still had an opportunity to submit financial information, and that there was an additional process whereby an attorney would check with the investigative agent to see if they had any financial information. Tr. II at 179-80. The notice of penalty disclosed to the subjects that the agency was required to consider their financial condition, and they were provided the ability to provide such information to the Office of Counsel. *Id.* at 180.

Gangloff explained that he directed the attorneys to stop using the financial disclosure form because it was misleading, and if the subject provided false information s/he could be committing a felony. Tr. III at 219. He felt that the forms were not helpful to the subject, that they created the appearance that the form was required, and the form was burdensome. *Id.* at 220. He did not instruct the staff not to consider the subject's financial situation, but he did tell them to obtain documentation in support of any claims. *Id.* at 221. In fact, he did intend the staff to consider a subject's financial condition in assessing the penalty, where appropriate. *Id.*

The regulation at issue in this disclosure states: "In determining the amount or scope of any penalty and assessment ... the Office of the Inspector General will take into account... [t]he financial condition of the person committing the offense." 20 C.F.R. § 498.106(a)(4). It is clear from this record, and the appellant admitted, that the agency was not required by any rule or regulation to use the financial disclosure form that had been utilized before Gangloff took over the CMP program, and discontinuing use of the form was within Gangloff's authority. I find, however, that the appellant's disclosures on this issue were broader than simply stating a disagreement over the discontinuation of the use of the form and the initial letter that Gangloff also had the attorneys cease using. Instead, she was also disclosing what she believed to be procedures that resulted in elimination of the use of the letter and form, which she believed to be a general failure to consider the financial condition of the subjects, as required by the regulation.

As cited above, the regulation states that the OIG will take into account the financial condition of the subject. Although Gangloff testified that he did intend for his staff to consider a subject's financial condition, he did not testify that he instructed the attorneys to seek out such information from the subject and the record is otherwise devoid of evidence that the information was actively solicited from the subjects after he made the changes to the program. Essentially, based on this record, the attorneys were to consider the information if the subject had provided it directly to them, or, according to Alpert's testimony, if such information could be obtained from the investigative agent. [8]

The agency's failure to provide any specific vehicle for provision of the financial information after the disclosure form was no longer being used could reasonably be interpreted as an abrogation of the affirmative duty to take into account the financial condition of the person committing the offense. Accordingly, I find the appellant has shown that she had a reasonable belief that the elimination of the financial form and initial notification letter to subjects, coupled with the failure to implement a systematic approach to obtain financial information for consideration, violated the requirement to consider the financial condition of the subject. Thus, I find that she has demonstrated that this disclosure was protected.

*Service of Default Notices* [9]

SHAW, DEBORAH V. SOCIAL SECURITY ADMINISTRATION, 2022 WL 1448513 (2022)

It is undisputed that, in early 2019, the appellant expressed concerns about the change in service methods of default letters sent to subjects. Tr. I at 53, Previously, the letters had been served using certified mail, return receipt requested, but Gangloff had the staff serving the notices by both regular U.S. mail and UPS service instead. The appellant asserted that she believed she was disclosing a violation of regulation when she reported the change in service methods.

The regulation governing service of default letters states: "The Office of the Inspector General shall notify the respondent by certified mail, return receipt requested, of any penalty and assessment, as applicable, that has been imposed and of the means by which the respondent may satisfy the amount owed." 20 C.F.R. § 498.110.

The appellant testified that the regulation requires service of the default letters by certified mail, in order to ensure that the subject has delivery before his social security benefits could be cut off to satisfy the debt. Tr. I at 29-30. And, in a June 25, 2019 email exchange with Funnie, the appellant clearly stated her belief that service of the default notices must be made by certified mail, return receipt requested. IAF, Tab 63 at 187. Rodriguez testified that others in the office were also concerned with the method of service being used, though he was not. Tr. III at 34-35.

The agency points to the statute governing the CMP process and contends that it may "initiate an action under this section by serving notice of the action in any manner authorized by Rule 4 of the Federal Rules of Civil Procedure." IAF, Tab 77 (agency closing argument); *see* 42 U.S.C.A. § 1320a-8(b)(1). Gangloff testified that service by certified mail was not required by the Federal Rules, but he was unable to identify the statute as the source of the method of service he was requiring. Tr. III at 221-24.

Reading the statute in combination with the regulations, it is arguable that the above-quoted statutory section pertains only to penalty letters, since it specifies service required when the agency moves to "initiate" the action, while subsection 498.110 of the regulations involves notice of the penalty and assessment "that has been imposed." In any event, even assuming section 1320a-8(b)(1) of the statute does apply to default letters, the agency presented no evidence or specific argument showing that service by UPS and regular U.S. mail is authorized by Rule 4 of the Federal Rules of Civil Procedure. [10]

Nonetheless, even further assuming the agency is correct that the statute allowed the default notice to be served by any means allowed under Federal Rule 4, and that service by a combination of U.S. Mail and UPS meets Rule 4 service requirements, there is no evidence that the appellant believed this to be the case at any point during the period in which she made her disclosures. Again, the issue is whether the appellant's belief that the agency was violating the regulation when she made the disclosure was reasonable, and I find that she has met her burden.

In addition to arguing that the statute allowed the change in service methods, even if the regulations did not, the agency also argues that, "[a]t most, Appellant's complaint about the manner of service implicates the kind of 'minor and inadvertent miscues' that the U.S. Court of Appeals for the Federal Circuit has found insufficiently severe to invoke the protection of the Whistleblower Protection Act...." IAF, Tab 77 at 9 (*citing Frederick v. Department of Justice*, 73 F.3d 349 (Fed. Cir. 1996)). The agency further cites Board case law for the proposition that a "trivial, technical violation[s] of regulation" does not implicate the WPA. IAF, Tab 77 (*citing Briley v. National Archives and Records Administration*, 71 M.S.P.R. 211, 220 (1996)).

Several years after issuance of the decisions the agency cites [11] in support of its argument, however, the Board considered whether this *de minimis* threshold was applicable where the alleged disclosure concerned a violation of law, rule, or regulation. *See Ganski v. Department of the Interior*, 86 M.S.P.R. 32, ;; 8-11 (2000) (hereafter referred to as "*Ganski* II"). [12] In *Ganski* II, the Board recognized a distinction between disclosures implicating 5 U.S.C. § 2302(b)(8)(A)(i), which allege violations of law, rule, or regulation, and those that involve 5 U.S.C. § 2302(b)(8)(A)(ii), allegations of gross mismanagement, a gross waste of funds, or substantial and specific danger to public health or safety. The Board noted that the latter contain qualifying language, such as gross and substantial, while the former language requires only a reasonable belief that any law, rule or regulation was violated. The Board concluded that there is no *de minimis* exception for the violation of any law, rule or regulation aspect of the WPA's protected disclosure standard. *Id. See also Mogyorossy v. Department of Air Force*, 96 M.S.P.R. 652, ; 14 (2004).

I recognize that the *Frederick* decision cited by the agency was issued by the Board's reviewing court, and therefore even though it pre-dated *Ganski* II, the Board is bound by the precedent of the Federal Circuit. *Fairall v. Veterans Administration,* 33 M.S.P.R. 33, 39, *aff'd,* 844 F.2d 775 (Fed. Cir. 1987).

I do not believe the Board is bound by *Frederick* on this issue, however, for the reasons stated in a dissenting opinion filed in *Ganski* I by then-Vice Chair Beth S. Slavet:

I would note that portions of the court's opinion in *Frederick v. Department of Justice,* 73 F.3d 349 (Fed.Cir.1996), imply that some disclosures of violation of law, rule, or regulation are not protected whistleblowing. *Id.* at 353 (a disclosure involving a purported violation of law is not protected whistleblowing if it involves "a minor transgression" or a "trivial lapse in ... behavior"). However, the court ultimately found that "there was no substantial evidence to support a reasonable belief by [the individual who made the disclosure] that a violation [of law, rule, or regulation] occurred." *Id.* at 352. Given this finding, the implication in the court's opinion that a *de minimis* violation of law cannot be the subject of a whistleblowing disclosure should be treated as dictum. Moreover, the court supported its "minor transgression" language with a quotation from the legislative history of the CSRA of 1978, *id.* at 353 (quoting "S.Rep. No. 95-969, 95th Cong., 2d Sess. 8 (1978), U.S. Code Cong. & Admin. News 1978, 2723"), but in doing so it erroneously said it was relying on "the legislative history of the WPA." *Id.* In fact the *Frederick* court did not discuss the legislative history of the WPA, in which Congress amended the operative language of the CSRA based on an explicit concern that section 2302(b)(8) was being interpreted too narrowly. The "minor transgression" language also does not square with the plain language of 5 U.S.C. § 2302(b)(8). Accordingly, I would not follow the "minor transgression" language in *Frederick* without further clarification from the court on the coverage of section 2302(b)(8)(A)(i).

In addition, it appears that the Federal Circuit itself is not bound by *Frederick.* Instead, under Federal Circuit doctrine it appears that the court must follow its earlier decision in *Horton,* which holds that "[w]hether or not the reported violations [of rule or regulation in that case] were trivial ... does not deprive the discloser of the benefit of having made a protected disclosure" under section 2302(b)(8). 66 F.3d at 283; *see Bosley v. Merit Systems Protection Board,* 162 F.3d 665, 672 (Fed.Cir.1998) (if there is a conflict between decisions of the Federal Circuit, the precedential decision is the first decision that was issued).

*Ganski* I, 83 M.S.P.R. at 312 n.4 (1999) (dissent of Vice Chair Slavet).

Although Vice Chair Slavet's dissent to the Board's first *Ganski* opinion is not precedential, the Board essentially adopted her reasoning on the dispositive issue in *Ganski* II, finding that disclosures alleging violations of law, rule, or regulation are not subject to any *de minimis* threshold.

Based on the above, I find that the Board does not view the language in *Frederick* cited by the agency in the instant appeal to be binding precedent. Accordingly, I find that *Frederick* does not compel a finding that the violation of regulation the appellant disclosed was trivial or minor, or subject to a *de minimis* exclusion of coverage under the WPA.

In conclusion, the appellant explained in a straightforward manner why she believed CMP default letters were required by regulation to be served by certified mail, return receipt requested, and all of the record evidence supports a finding that her belief was reasonable at the time she made the disclosures. I therefore find that she has established that her disclosures regarding the change in service method are protected.

*Excessive Penalties*

The appellant raised her concerns regarding what she believed to be excessive penalties being imposed on subjects early after her return from her sabbatical, often, and to numerous OCIG employees during the period she made her initial disclosures. As

explained below, I find that she has demonstrated that she had a reasonable belief that she was disclosing an abuse of authority by Gangloff and the CMP program in OCIG when she made these disclosures.

First, I note that the appellant is not arguing that she was disclosing violations of law, rule, or regulation when she raised issues with the inflated penalties being assessed. [13] Instead, she is arguing that the exorbitant penalties set in many cases by the CMP program were an abuse of authority.

The appellant testified that many of the penalties being assessed when she returned from sabbatical were astronomical, for example $100,000 to $200,000 penalties for $10,000 to $20,000 overpayments. Tr. I at 28. Penalties had never been so high, and it was alarming to her. *Id.* As noted above, the appellant spoke out at meetings with upper management about the exorbitant penalties and sent emails on the issue. She recalled one specific case in which the beneficiary had not made a false representation, simply an omission, and the penalty on a $26,000 overpayment had been $176,000. *Id.* at 38-39.

The appellant further testified that when she informed Alpert of the exorbitant penalties, he expressed shock. Tr. I at 53-54. Alpert admitted that, when he was still employed by SSA proper, [14] before he moved to OCIG, Chad Bungard, an SSA Deputy Commissioner had told him about OCIG staff concerns regarding the high penalties being assessed in CMP, compared to historical averages. Tr. II at 223-26. David Rodriguez also testified that he had "significant concerns about the amount we were proposing and ultimately imposing for penalties in the section 1129 program." Tr. II at 33. Peter Johnson, another OCIG employee who worked on CMP cases during the relevant time, also testified that he concurred in the recommendation in mid-2019 that a number of cases be reopened, in part because the penalties were too high. Tr. II at 71-72.

The appellant did not dispute that Gangloff had the authority to determine the manner in which his attorneys made penalty determinations, and she has not argued that she believed any of the penalties assessed exceeded the statutory cap. Tr. I at 140-42. However, contrary to the agency's argument on this issue, the appellant need not show that she believed Gangloff took any actions, or instructed his subordinates to take actions, that were in violation of a specific legal provision in order to establish that she had a reasonable belief that he was abusing his authority. *See, e.g., Traynor v. Department of Air Force,* 64 M.S.P.R. 386, 391-92 (1994) (although appellant alleged that order to undergo psychiatric examination violated regulations, Board held that issue was not whether agency had legal authority to order examination but whether appellant reasonably believed agency had abused its authority).

The Board has held that an abuse of authority occurs when there is an arbitrary or capricious exercise of power by a federal official or employee that adversely affects the rights of any person or that results in personal gain or advantage to himself or to preferred other persons. *See Wheeler v. Department of Veterans Affairs,* 88 M.S.P.R. 236, 241, ; 13 (2001).

The record is replete with evidence that, around the time Gangloff instituted the changes in the CMP program, and continuing through the period the appellant made her disclosures, Gangloff was under pressure from acting Inspector General [15] Gale Stone to increase the penalties being assessed on subjects. Tr. I at 175 (Williamson); Tr. II at 14-16 (Funnie); Tr. II at 66 (Johnson); Tr. II at 178-79 (Alpert). Williamson testified that she was aware, from personal knowledge, that Stone and upper management were displeased with Gangloff. *Id.* Thus, while Gangloff testified, without rebuttal, that he was not subject to any performance metric that measured the size of penalties being assessed, the systematic increase in penalties benefitted him in that he was satisfying an expectation of those in his supervisory chain-of-command. Moreover, an increase in penalties assessed by the CMP program under Gangloff protected OCIG from removal of the program from OCIG's purview, or from SSA IG altogether.

Furthermore, it is inarguable that the increase in penalties adversely affected the rights of any subject assessed a significantly higher civil monetary penalty than s/he would have been given prior to the changes Gangloff made to the program. Record evidence supports a finding that some of the penalties being levied were many multiples of the dollar amount subjects had improperly received, and SSA was authorized to collect the penalties directly from the social security or other government benefits owed to the beneficiary. Tr. I at 14-15, 83-85; IAF, Tab 63 at 227-28.

I find that the appellant has shown that she had a reasonable belief she was disclosing an abuse of authority when she raised issues with the drastic increase in penalties the CMP program was assessing under Gangloff's leadership. [16] The appellant was well-versed in the history of the CMP program, and its past practices, and was in an ideal position to come to an informed opinion regarding the change in penalty-setting policy. *See Kalil v. Department of Agriculture*, 96 MSPR 77, 84 ; 16 (2004) (attorney with position requiring expertise in matters that he reported reasonable belief in disclosures). In addition, the fact that many others shared her concern with the extreme increase lends some support to the reasonableness of her belief. *See Kinan v. Department of Defense*, 87 M.S.P.R. 561, ; 13 (2001) (fact that whistleblower's view regarding truth in disclosures was shared by others is of some relevance in determining the reasonableness of appellant's belief).

In conclusion, I find that the appellant has met her burden to show, by preponderant evidence, that each of the three types of disclosures in her first group of disclosures was protected under the statute.

*Second Group of Disclosures*

The second group of communications the appellant alleges constituted disclosures covered essentially the same topics as the initial set, and were made to many of the same individuals beginning in June 2019. These included appellant and Funnie's recommendation to upper management that a number of cases that had been closed should be reopened and referred to SSA for administrative recovery, in order to address potential issues in the penalty determinations and service of default letters- issues appellant had raised.

As noted above in the background section, effective June 3, 2019, the agency reorganized and the new office, OCIE, was formed, under the direction of Funnie. OCIE was to oversee OIG's section 1129 CMP functions, and the appellant accepted the Supervisory General Attorney position, effective June 23, 2019. IAF, Tab 63 at 18.

The appellant testified that, on June 6, 2019, OCIE held a meeting with the managers from the Immediate Office, including Inspector General Ennis and Deputy IG Alpert, and Executive Officer Schaeffer to discuss priorities for the CMP cases now that OCIE was taking them over. The meeting was attended by Funnie, Rodriguez, and possibly Johnson and Rzasa. HT I at 71. They divided the workload into three categories, which they termed "buckets." Bucket one consisted of 23 cases set for hearing before the DAB. In the bucket two cases, a penalty letter had been issued but the subject had not yet requested a hearing. The bucket three cases had been processed and closed by settlement or default by OCIG under Gangloff between October 2018 and May 31, 2019. The appellant and others expressed concern with the bucket three cases because of service issues, exorbitant penalties, and failure to consider all of the regulatory factors, including the individuals' financial condition. *Id.* at 72. There were over 80 bucket three cases that they wanted to reopen to determine whether they needed to remedy deficiencies, and potentially rescind the penalties and send the cases to main SSA proper for administrative collection. *Id.*; IAF, Tab 63 at 19.

Funnie testified that, during meetings with the Immediate Office between June 6 and July 30, 2019, she raised the issue of the bucket 3 cases and was continually asked for more information, which she provided, but was never authorized to reopen the cases. Tr. II at 31-33; IAF, Tab 63 at 20. This continued through a meeting in early August 2019. Tr. II at 33-35. Alpert testified that, even after the creation of OCIE, the appellant continued to raise the same concerns as she had previously, in particular regarding the service method and the high penalties, and Funnie brought the issue regarding the bucket three cases up at meetings. Tr. II at 186-91.

In addition to her disclosures to upper management, in June 2019, the appellant engaged in a detailed email exchange with Funnie reporting that the default letters were being sent by UPS and regular mail, when the regulation required them to be sent by certified mail, return receipt requested. Tr. I at 74-75; IAF, Tab 63 at 186-87 (Ex. Z). Around the same time, the record shows, the appellant stated that from then on they would only be using certified mail, return receipt requested. IAF, Tab 63 at 184 (June 24, 2019 email from appellant to Bloom).

For the same reasons stated above, in the section addressing the first set of disclosures, I find that the appellant's disclosures between June and August 2019 are also protected. Moreover, applying the same reasoning, I find that the appellant had a reasonable belief that her attempts to obtain authorization to reopen the bucket 3 cases constituted disclosures of abuse of authority.

<u>Contributing Factor</u>

An employee may demonstrate that protected disclosures/activity was a contributing factor in a personnel action through circumstantial evidence, such as the acting officials' knowledge of the activity and the timing of the personnel action. 5 U.S.C. § 1221(e)(1); *Scott v. Department of Justice*, 69 M.S.P.R. 211, 238 (1995), *aff'd*, 99 F.3d 1160 (Fed. Cir. 1996) **(Table)**. Thus, an appellant's submission of evidence that the official taking the personnel action knew of the activity and that the personnel action occurred within a period of time such that a reasonable person could conclude that the activity was a contributing factor in the personnel action, i.e., evidence sufficient to meet the knowledge/timing test, satisfies the contributing factor standard. *See Horton v. Department of the Navy*, 66 F.3d 279, 283 (Fed. Cir. 1995), *cert. denied*, 516 U.S. 1176 (1996). An appellant may also satisfy the contributing factor test by reference to other evidence, such as that pertaining to the strength or weakness of the agency's reasons for taking the action, whether the protected activity was personally directed at the proposing or deciding officials, and whether those individuals had a desire or motive to retaliate against the appellant. *See Powers v. Department of the Navy*, 69 M.S.P.R. 150, 156 (1995).

Michael Robinson was delegated authority to take any actions deemed appropriate following the investigation into the appellant and Funnie, and as noted above, the appellant alleges that the agency took four personnel actions against her in retaliation for her protected disclosures, and: (1) Placing her on administrative leave, effective September 23, 2019; (2) converting that leave to investigatory leave, effective October 8, 2019; (3) reassigning her from her position as Supervisory General Attorney, GS-0905-15, to a non-supervisory Attorney Advisor, GS-0905-14, in the Office of Counsel for Investigations and Enforcement, based on alleged failure to satisfactorily complete the supervisory probationary period; and, (4) a December 21, 2019 proposal to suspend her for 45 days.

The agency argues that Robinson had no knowledge of the appellant's disclosures, and that the only information he was aware of regarding any issues she had with the CMP program came from the Report of Investigation (ROI) prepared by OI. IAF, Tab 77. The agency asserts that the appellant's concerns with the CMP program recounted in the ROI did not include the size of the penalties or the service of the notices. *Id.* The agency further argues that Robinson did not have "constructive" notice of the appellant's disclosures, as he testified that he received no input into his decisions to take the actions at issue, and Alpert's concurrences occurred after the fact. *Id.*

The appellant argues that Robinson was aware of the appellant's disclosures from the ROI, and because her disclosures were made within months of the actions taken against her, the knowledge/timing test is satisfied. IAF, Tab 76 at 16. The appellant further notes that the allegations against her that led to the investigation were passed on from Gangloff to Alpert, both of whom were aware of the disclosures; thus, the investigation that led to the personnel actions was initiated by those with "knowledge" of the protected activity.

As noted by the agency, during the appellant's interview with the agents investigating the allegations against her, she did mention some of the concerns she had with the CMP program, but she did not explicitly refer to the issue with excessive penalties nor did she tell the investigators that she believed the method of service being used for default letters was incorrect/violated regulations. IAF, Tab 11 at 26. In her responses to the investigator's questions, however, the appellant asserted that the attorneys were no longer allowed to consider mitigating factors in assessing penalties, including their ability to pay, IAF, Tab 11 at 26, and one of her disclosures encompassed this concern. Nonetheless, even assuming this put Robinson on notice that the appellant took issue with this particular change in policy, there is no indication in the ROI that the appellant mentioned having reported this concern to management or any other official. Robinson's awareness that the appellant disagreed with the policy does not mean that he had knowledge she had made disclosures regarding it.

Likewise, the ROI does not appear to contain any information that would have put Robinson on notice that the appellant had reported her belief that the CMP program was assessing excessive penalties. As to the service of the default letter, however, copies of the June 25, 2019 email exchange between the appellant and Funnie regarding the requirement in the regulation to serve default letters by certified mail were attached to the ROI. *Id.*, Tab 13 at 66-67. This includes the appellant's email opining that the agency had been violating the regulation by serving the default letters by regular mail and UPS. I have found that the communications were a protected disclosure, and as a result, Robinson had actual knowledge of one of the disclosures from the first group of disclosures the appellant made. [17]

More importantly, as explained below, Ennis and Alpert were aware of all of the disclosures the appellant made in both the first and second "groups," and they made the decision to refer the allegations against the appellant and Funnie for investigation. The personnel actions at issue in this appeal were based on findings in the ROI, or, in the case of the leave-related actions, were taken to afford time for Robinson to review the ROI; thus, as explained below, under Board precedent, the protected disclosures were a contributing factor in all four personnel actions.

It is undisputed that the complaint alleging that the appellant and Funnie made misrepresentations in the request for an extension in the *Weans* case was made on or about July 23, 2019. The individual who made the allegation is unidentified, as the SSA OIG is precluded from revealing his/her identity pursuant to the Inspector General Act of 1978, § 7(b), 5 U.S.C.A. App. 3. [18] Alpert testified that he recalled Gangloff bringing him the allegations while reviewing the *Weans* file, and Gangloff stated that he had a concern statement in the request for extension regarding the broken Air-Conditioning was untrue. Tr. II at 196-99. On that same date, Alpert recommended that the Inspector General refer the matter for investigation, and she made the decision to do so. *Id.* at 200. Alpert explained that, later, he, IG Ennis, Schaeffer, and Michelle Murray, Senior Attorney in the Office of Strategy and Performance, decided to bring in an outside management official to review the investigation. *Id.* at 212. As a result, Alpert requested that Robinson take over the investigation in September 2019.

The Board has held that an appellant may establish constructive knowledge of disclosures by demonstrating that an individual with actual knowledge influenced the official accused of taking a retaliatory action. *See Marchese v. Department of the Navy*, 65 M.S.P.R. 104, 108-09 (1994). In *Russell v. Department of Justice*, 76 M.S.P.R. 317, 323 (1997), the Board held that, where the subject of a protected disclosure made the allegations that led to an investigation into the appellant, and the investigation was very closely tied to the reasons for the personnel action at issue, the appellant had established that the disclosure was a contributing factor in the action.

Here, while the allegations that led to the investigation were made by an individual who has not been identified, Gangloff passed the allegations on to Alpert, and Alpert and Ennis made the decision to have the matter investigated. Gangloff, Alpert and Ennis all had knowledge of the appellant's disclosures, and all had some involvement in the decisions that were implicated by the appellant's disclosures, either directly or through delegated authority. Moreover, the agency has not presented any evidence or argument showing that the referral for investigation by OI was required by any law, rule, regulation, or other policy, and thus I find that the above referenced officials had discretion over whether to make the referral. Finally, as noted above, Robinson based the personnel actions under review on information in the ROI, or in the case of the leave-related actions, on the need for more time to review the Report while determining what actions to take.

In addition to the aforementioned basis for a finding that the disclosures were a contributing factor in the personnel actions, Murray, who was a Senior Attorney in 2019 and became Deputy Counsel in early 2020, testified that Gangloff brought her the *Weans* request for extension in July 2019, and she was assigned to provide legal support during the investigation into the allegations that the appellant and Funnie had made false statements. Tr. II at 95. Murray memorialized the delegations of authority from IG Ennis to Robinson to put the appellant on administrative and investigative leave, and to take corrective action against her. *Id.* at 116-118; IAF, Tab 15 at 8-9. Murray further admitted that she had made handwritten notes regarding some of the appellant's disclosures, on September 23, 2019, after Schaeffer informed her at a meeting that the appellant claimed she was being placed on administrative leave in retaliation for her whistleblowing disclosures. *Id.* at 120-34; IAF, Tab 63 at 261-63.

She believed that Alpert was at that meeting, and they discussed the issue of whether there had been proper service in some of the closed cases. Tr. II at 123-29. Gangloff was not at the meeting, but Murray testified that she followed up with him "a lot" regarding the service issues raised. *Id.* at 130-34. Thus, Murray was involved in both looking into the service issue and evaluating emails collected by the OI investigators in the investigation into the appellant. *Id.* at 130, 138.

Based on the above, I find that Murray was aware of at least some of the appellant's disclosures,[19] and was in fact tasked with performing some review of the bucket three cases to aid in determining whether there had been any due process violations. At the same time, she was a conduit between IG Ennis and Robinson with respect to the delegation of authority to place the appellant on administrative and investigatory leave, and she aided in the investigation into the appellant's conduct at issue in the decisions to take or threaten the additional personnel actions.

Based on the foregoing, I conclude that the appellant has established by preponderant evidence that individuals with knowledge of her disclosures influenced Robinson's decision to take or threaten to take the personnel actions at issue.

Furthermore, the appellant's disclosures were all made less than one year before the latest personnel action at issue in this appeal, a period of time such that a reasonable person could conclude that the disclosures were a contributing factor in the personnel action. *See, e.g., Ayers v. Department of the Army,* 123 M.S.P.R. 11, ; 26 (2015) (finding timing component of test satisfied where contested personnel action was taken slightly more than one year after the protected disclosure); *Redschlag v. Department of the Army,* 89 M.S.P.R. 589, ; 87 (2001) (finding that the appellant's disclosures were a contributing factor in her removal when they were made approximately 21 months and then slightly over a year before the agency removed her).

I conclude that the appellant has established that her disclosures were a contributing factor in the four personnel actions under review.

Clear and Convincing Evidence

Because the appellant proved her *prima facie* case of whistleblower reprisal, the burden of persuasion shifts to the agency to prove by clear and convincing evidence that it would have taken the same actions in the absence of the appellant's disclosures. 5 U.S.C. § 1221(e)(2); *Shannon v. Department of Veterans Affairs,* 121 M.S.P.R. 221, ; 24 (2014). "Clear and convincing evidence" is defined as "that measure or degree of proof that produces in the mind of the trier of fact a firm belief as to the allegations sought to be established." 5 C.F.R. § 1209.4(e).

In determining whether the agency has met this burden, the Board will consider all the relevant factors, including the following: (1) the strength of the agency's evidence in support of its actions; (2) the existence and strength of any motive to retaliate on the part of the agency officials involved in the decision; and (3) any evidence that the agency takes similar actions against employees who did not make disclosures/engage in such protected activity, but who are otherwise similarly situated. *Carr v. Social Security Administration,* 185 F.3d 1318, 1323 (Fed. Cir. 1999).

The Board does not view the "*Carr* factors" as discrete elements, each of which the agency must prove by clear and convincing evidence, but rather weighs them together to determine whether the evidence is clear and convincing as a whole. *Lu v. Department of Homeland Security,* 122 M.S.P.R. 335, ; 7 (2015). Accordingly, while I discuss each factor separately below, my conclusion is based on the totality of the evidence bearing on the issue of whether the agency would have taken the personnel actions in the absence of the disclosures.

Strength of The Evidence

The agency argues that there was strong evidence supporting Robinson's decision to take the December 2019 personnel actions, and points to specific record evidence in support of its argument.[20] IAF, Tab 77. The appellant, however, contends that the relevant issue is the strength of the agency's evidence that it would have initiated an investigation against a non-whistleblower

under similar circumstances. IAF, Tab 76 at 19 (*citing Russell*, 76 M.S.P.R. at 324). She asserts that the agency adduced no evidence on this issue, and thus, under *Russell*, even if the agency had shown that there was strong evidence that the appellant committed the charged conduct, her request for corrective action must be granted. *Id.* at 19-20.

In *Russell*, the Board stated:

[Where] an investigation is so closely related to the personnel action that it could have been a pretext for gathering evidence to retaliate, and the agency does not show by clear and convincing evidence that the evidence would have been gathered absent the protected disclosure, then the appellant will prevail on his affirmative defense of retaliation for whistleblowing. That the investigation itself is conducted in a fair and impartial manner, or that certain acts of misconduct are discovered during the investigation, does not relieve an agency of its obligation to demonstrate by clear and convincing evidence that it would have taken the same personnel action in the absence of the protected disclosure. *See* 5 U.S.C. § 1221(e)(2).

76 M.S.P.R. at 324.

The Board in *Russell* found that, because the multiple investigations of appellant's conduct gave rise to five of the six specifications and all of the charges underlying the agency's action demoting the appellant, the investigations were so closely related to the action that it would consider the appellant's claim of 'retaliation by investigation.' *Russell*, 76 M.S.P.R. at 325.

Here, the agency placed the appellant on both administrative and then investigative leave, on September 23, 2019 and October 4, 2019, respectively, because she was the subject of the OI investigation. IAF, Tab 15 at 10-13. On December 21, 2019, Robinson issued a Memorandum recalling the appellant from investigative leave and reassigning her to the non-supervisory Attorney Advisor position at a lower grade. Although the Memorandum states only that the action was taken because the appellant had failed to satisfactorily complete her supervisory probationary period, in a December 18, 2019 Memorandum to Alpert requesting concurrence in the decision, Robinson explicitly stated that his recommendation was made as a result of information in the OI ROI he had reviewed. *Id.* at 6-7. He provided one specific example in the concurrence request-the appellant's alleged failure to properly maintain the OI investigative file in the *Weans* matter.

The proposed 45-day suspension, also issued on December 21, 2019, was based on charges of Lack of Candor (two specifications) and Neglect of Duties, and all of the alleged misconduct was the subject of the OI investigation. Thus, all of the actions at issue herein were very closely connected to the investigation, and I find it appropriate to consider the appellant's claim of "retaliation by investigation."

In evaluating the strength of the evidence, the Board will look at the evidence that the agency had before it when it took the allegedly retaliatory actions. *See Geyer v. Department of Justice*, 70 M.S.P.R. 682, 694, *aff'd*, 116 F.3d 1497 (Fed. Cir. 1997) (Table). Here, as in *Russell*, it is appropriate to look at the strength of the evidence in support of the agency's decision to initiate the OI investigation. On this issue, I agree with the appellant that the agency failed to adduce any evidence explaining the decision to refer the matter for investigation. The agency did not point to any specific internal rule or policy under which it was required to refer every allegation of wrongdoing against an OIG employee for investigation. Further, other than Alpert's testimony that, upon receiving the allegations that the *Weans* motion for extension contained false statements, Gangloff expressed concern with the accuracy of the statements in the filing regarding the air conditioning problems, the agency did not provide any evidence showing that it had a legitimate reason for the decision to refer the matter for investigation.

Considering Gangloff's apparent concern regarding the truthfulness of the statement in the motion for extension regarding the broken air conditioning on the date the pre-hearing brief was due, and the problems allegedly caused by the lack of air conditioning, I note that, although the investigators gathered extensive evidence on the issue, the agency has not shown that Gangloff, Alpert, Ennis, or any other employee involved in making the decision to refer the allegations for investigation had similar evidence when they made their decision. In fact, there is no way to determine from this record what, if any, evidence was considered regarding the air conditioning issue at the time the referral was made.

I find that, at the time the decision was made to initiate the investigation of the appellant and Funnie, the agency's evidence supporting the misconduct ultimately charged in the proposed suspension, and used as a basis for the reassignment, was extremely weak. Similarly, the agency failed to provide evidence showing that it had legitimate concerns with the accuracy of any of the statements in the motion for extension that would justify the determination that the matter should be investigated by OI.

Even if I consider the strength of the evidence supporting the agency's charges of misconduct in the proposed 45-day suspension as it existed following the investigation I would find that the agency's evidence is, at best, questionable, and in some cases it is weak.

As noted above, Robinson did not include any specific reason for the decision to reassign the appellant to a non-supervisory position in the Memorandum informing her of the action. In the concurrence Memorandum he sent to Alpert, however, he stated that his recommendation was made as a result of the information in the OI ROI he had reviewed, and he explicitly referenced the appellant's alleged failure to properly maintain the OI investigative file in the *Weans* matter. IAF, Tab 63 at 287-88. At the time of the reassignment, the agency did not point to any grounds supporting Robinson's reassignment decision that were distinct from the charges in the proposed suspension. Accordingly, in considering the strength of the evidence, I find it appropriate to limit consideration to the evidence bearing on the conduct underlying the charges. [21]

The Notice of Proposed Suspension charged as follows:

Charge 1: Lack of Candor

Specification 1: On or about July 22, 2019, you filed a motion for extension of time to file a prehearing brief with the Department of Health and Human Services, Departmental Appeals Board (DAB) in the *Weans* case that contained incomplete information. You represented to the DAB that there were rather unusual circumstances creating a temporary shortage of staff, necessitating the request. Further, you represented that only two attorneys were transferred to the Office of the Counsel for Investigations and Enforcement's (OCIE) Section 1129 enforcement program. You then requested leniency with filing deadlines in consideration of this temporary staffing constraint. You knew those statements were less than candid.

Specification 2: On or about July 25 and 26, 2019, OIG agents interviewed you concerning an allegation that you filed a motion with the DAB that contained materially false and misleading information. You represented to the OIG agents that Attorney Bloom will start working on 1129 CMPs as soon as human resources clears her to start. You also represented that Attorney Bloom will be given new cases and has not yet official started. You knew those statements were less than candid.

Charge 2: Neglect of Duties

Specification 1: You failed to maintain custody of the Office of Investigations (OI) investigative case file for the *Weans* case.

IAF, Tab 10 at 47-54.

In the Lack of Candor charge, under the first specification, Robinson testified that the statements in the motion for an extension that lacked candor were the claim of unusual circumstances creating a temporary staffing shortage, contributing to the need for the request for additional time, and that only two attorneys had transferred to OCIE's 1129 enforcement program. Tr. III at 157-64. In the motion, the exact language the appellant and Funnie used was "unusual circumstances have created a temporary shortage of staff necessary to manage the current CMP workload, necessitating this request." IAF, Tab 11 at 12. They proceeded to explain that, effective June 3, 2019, OCIE had been created, and though all CMP cases had been transferred from OCIG to OCIE, only two attorneys were transferred to OCIE's Section 1129 enforcement program. *Id.*

SHAW, DEBORAH V. SOCIAL SECURITY ADMINISTRATION, 2022 WL 1448513 (2022)

The agency argues that this was misleading, despite the fact that it was true that only two attorneys had been transferred "on paper" to the OCIE 1129 program, because additional attorneys had been assigned 1129 CMP work, and more than two attorneys were available to work on the 1129 cases. IAF, Tab 77. The agency points to the DAB Notice of Appearance that the appellant had filed in the *Weans* case several weeks earlier, which listed four attorneys, (appellant, Rodriguez, Johnson, and Alex Rzasa), and further notes that Funnie was also working on the case. The agency argues that, even if the appellant's statements were technically true, in light of the fact that at least five attorneys were available and working on CMP cases she deceptively misled the DAB by implying that only two attorneys were available in order to improve the chances of securing the requested extension. *Id.*

The appellant points out that she had notified the DAB only weeks before the motion-on June 10, 2019-of the reorganization that created OCIE, including the fact that only two attorneys had been assigned to work 1129 cases, and the motion simply repeated her previous explanation. IAF, Tab 76. She argues that the motion did not state, or even imply, that only two attorneys were available to work on 1129 cases, but rather provided a true statement regarding the number of attorneys who had been transferred and assigned to handle 1129 cases. *Id.*

The Board's reviewing court, the U.S. Court of Appeals for the Federal Circuit, has stated that, compared with a charge of falsification, lack of candor is a "broader and more flexible concept whose contours and elements depend upon the particular context and conduct involved." *See Ludlum v. Department of Justice*, 278 F.3d 1280, 1284 (Fed. Cir. 2002). "It may involve a failure to disclose something that, in the circumstances, should have been disclosed in order to make the given statement accurate and complete." *Id.* "Although lack of candor necessarily involves an element of deception, 'intent to deceive' is not a separate element of that offense - as it is for 'falsification.'" *Id.* at 1284-85.

I find the agency's evidence in support of this specification to be extremely weak, and its argument that the appellant's statements in the motion were deceptive to be unsupported by the evidence or logic.

First, as the appellant argues, the record shows that she had previously notified a DAB administrator by email on June 10, 2019 that OIG had reorganized, OCIE had been created to handle CMP actions, and she and Rodriguez had been appointed Deputy Counsel for 1129 and 1140 cases, respectively. IAF, Tab 63 at 16-17. The email exchange between the appellant and the administrator indicates that appellant left him a voicemail, and they planned to talk later that day. The appellant testified credibly, and without contradiction from any other record evidence, that she spoke with the administrator on June 10 and she explained that he would be receiving a "flurry of notices to change appearance, withdraw appearance, new counsel, some extensions possibly … so the judges wouldn't be wondering that the heck was going on." Tr. I at 66. She then admitted she was uncertain whether she explicitly stated that extensions might be sought during the call, but made it clear that the Board could expect a lot of filings. *Id.* at 66-67. On the same date, June 10, 2019, the appellant filed a "Revised Notice of Entry of Appearance" designating herself, Rodriguez, Johnson, and Rzasa as co-counsel in the *Weans* case. IAF, Tab 11 at 35-36.

The agency admits that at the time the appellant and Funnie drafted and filed the motion for an extension of time in *Weans* only two attorneys had been transferred to the 1129 CMP program as part of the reorganization that created OCIE, as the appellant stated in the motion. I find the agency's assertion that the appellant's truthful statement was misleading because other attorneys were "available" to help with the DAB cases to be unconvincing. Contrary to the agency's argument, I find it highly unlikely that the appellant noticed the appearance of four attorneys in the *Weans* case, indicating that any of the four could be called on to perform work in the case, but only a matter of weeks later attempted to deceive the same Judge into believing that only two attorneys were "available" to work on 1129 CMP cases.

Likewise, to the extent the agency contends that the appellant lacked candor when she stated in the motion that "unusual circumstances have created a temporary shortage of staff necessary to manage the current CMP workload," I find that the agency's position is contradicted by the weight of the evidence. Record evidence that is largely undisputed shows that the transfer of the CMP program to the newly-created OCIE had occurred only seven weeks before the appellant and Funnie filed the motion, that there were 23 active DAB cases at the time,[22] which is many more than were usually pending, and that the

office was not yet at its full staffing level. Moreover, it is clear that Funnie and her deputies were in the process of changing some of Gangloff's CMP practices, while attempting to continue processing the active cases and meeting litigation deadlines. Although there is evidence that they were making progress dividing and performing various required duties, it is also evident that they were still scrambling to stay on top of things. Finally, the fact that Funnie, the SES-level manager of the newly-created office, was handling the *Weans* litigation is further proof that unusual circumstances existed, and were having an effect on the office's ability to efficiently handle all of the litigation before the DAB.

After careful review of the evidence that existed at the time of the actions the appellant alleges were retaliatory, I find the evidence that the appellant's statements cited in specification one in charge one lacked candor to be very weak. [23]

Under specification two in the Lack of Candor charge, the agency stated that the appellant's statements to investigators that attorney Michelle Bloom would start working on 1129 CMPs as soon as human resources cleared her to start, she had not yet officially started, and she would be given new cases lacked candor.

The investigators asked the appellant two questions that elicited the allegedly deceitful responses. The first, on July 25, 2019, was, "Who is Michelle Bloom?" IAF, Tab 11 at 19. In the ROI, the investigators asserted that the appellant responded as follows:

Michelle was on detail from SSA's Office of Hearings Operations. Shaw is unsure when Bloom started-Shaw was on sabbatical when she started her detail. Shaw understands that she has been hired and will start working on 1129 CMPs as soon as human resources clears her to start.

*Id.* During the follow-up telephonic interview, on July 26, 2019, the investigator asked, "Since the reorg, what has the staffing arrangement been for CMP cases? Who is handling them? What is the distribution of the workload? *Id.* at 25. The appellant's response was reported as:

Debbie and Pete are doing 1129 CMPs and have the most 1129 cases assigned. Alex and David are pitching-in and handling their legacy 1129 cases. Joscelyn is helping when she can to alleviate the workload. Michele will be given new cases. The workload is not split evenly because Pete will be retiring soon und Michele has not yet officially started.

The appellant testified that she did not recall if the ROI accurately captured the substance of her response to the first question, and as to the second question, she testified that she did not recall telling the investigators that Bloom will be given new cases, and had not yet officially started. Tr. I at 105, 109. She denied any intent to deceive the investigators. *Id.* at 109.

The record shows that Bloom had been working as an attorney in the SSA-Office of Hearings Operations when she was selected by OCIG for a part-time virtual detail in October 2017, and then, in October 2018, she was detailed full-time to OCIG to work on CMP cases. IAF, Tab 13 at 111-12 (Funnie memorandum). Bloom worked on initial letters for CMPs in June 2019, under the appellant's supervision, and was officially appointed to a position in OCIE on or about July 7, 2019. Tr. I at 78-80; IAF, Tab 11 at 43 (Funnie interview); *id.*, Tab 13 at 111; *id.*, Tab 63 at 182-84. [24] That appointment, however, was "pending the successful completion of her LBI and full background investigation." *Id.*

In analyzing whether the appellant made the statements attributed to her, whether they were inaccurate, and if so, whether her responses to the investigators' questions contained an element of deception, I must make appropriate credibility determinations. *Hillen v. Department of the Army*, 35 M.S.P.R. 453, 458 (1987). In this regard, I found the appellant to be a highly credible witness, based on her straightforward and forthright manner, and the fact that her testimony was both internally consistent and largely consistent with other evidence that I found persuasive.

Although the appellant seemed uncertain when she attempted to recall what she told the investigators about Bloom, I note that the investigators did not document the appellant's responses to questions verbatim. Based on this record, I question whether the appellant actually told them that Bloom had not yet started working in OCIE. Moreover, even assuming the appellant

made the statements attributed to her by investigators, indicating Bloom had not yet started working for OCIE, one response explicitly stated that Bloom had not yet "officially" started, and the other referenced the need for Human Resources to clear her. Considering the fact that, as of July 19, 2019, Bloom's appointment was apparently still pending a background investigation, it is not at all clear that the appellant was trying to deceive the investigators.[25] Finally, Bloom had been on a lengthy detail to the Inspector General's Office, and I cannot definitively determine from this record whether the appellant was aware, as of July 25-26, 2019, that Bloom was no longer on the detail and had been officially appointed on July 7, 2019.

I am further unconvinced that the appellant told the investigators that Bloom "will" be given new cases. The appellant is a seasoned attorney who had been working in an Inspector General's Office for 13 years at the time she was interviewed, with experience conducting investigations. As such, she would very likely have known that an inaccurate response regarding an employee's current workload, not to mention whether the attorney had been appointed yet, could be easily disproven.

Even assuming the appellant did make a statement to the investigators about Bloom being given new cases, the record shows that Bloom had already been working on new cases by the time the appellant was interviewed; thus, the inaccuracy in the appellant's response would only have been the use of the future tense "will." Where, as here, the investigators did not make a verbatim record of the appellant's responses and the appellant denied making the statement at issue I find it difficult to conclude that the appellant's response contained an element of deception when its accuracy depends on the tense of only one word.

Finally, the only logical motive for the appellant to make inaccurate or deceptive statements about Bloom's employment status and/or work assignments would have been to attempt a cover up of an inaccuracy in the motion for an extension of time. However, it is undisputed that Bloom was not working on CMP litigation cases either at the time the appellant and Funnie filed the motion for an extension or when the appellant answered the investigators' questions. Thus, Bloom's status had little or no impact on the office's ability to meet litigation deadlines. In addition, Bloom had not transferred over from OCIG, so whether she had been appointed would not have affected the statement in the motion that only two attorneys had been transferred. Accordingly, I find that the appellant's motive to bend the truth when responding to questions about Bloom would have been very minimal.

Based on all of the above, I find that the agency's evidence that the appellant lacked candor with respect to the responses to investigators in specification two of the first charge is relatively weak. To the extent the appellant's responses contained any inaccuracies, based on this record I find that it is more likely that she was merely negligent, or mistaken, in providing the information at issue, and did not lack candor.

The second charge, Neglect of Duties, was based entirely on the appellant's alleged failure to maintain custody of the OI investigative case file for the *Weans* case.[26] The investigative file in a CMP case consists of the evidence compiled by agents who performed the criminal investigation, and includes handwritten notes, photographs, and bank records. Tr. I at 110-111. The attorneys will sometimes request the file if the case is going to hearing so they can look at the evidence. *Id.* at 111.

The agency argues, and appellant does not dispute, that the file at issue contained personally identifiable information (PII),[27] and the agency's Annual Personnel Reminders and OIG's Administrative Policies and Procedures Manual (Manual) include instructions for protecting and securing such information. IAF Tab 13 at 164-171, 187-89; *id.*, Tab 14, at 11, 13. The Manual requires all OIG employees to secure and safeguard all electronic and paper records that contain PII.

During the investigation into the motion for extension of time, attorney Amanda Stodgsdill, of OCIG, told investigators she had been working on the *Weans* case in OCIG when the case was reassigned to OCIE. IAF, Tab 11 at 48. She only maintained an electronic case file except for documents related to discovery. According to the ROI, Stodgsdill "assumed Attorney Collender had the paper file [after the case was reassigned] because she was the lead." In response to additional questioning, Stodgsdill explained that, after she reviewed the file, she provided the OI case file to the appellant. *Id.* at 49.

SHAW, DEBORAH V. SOCIAL SECURITY ADMINISTRATION, 2022 WL 1448513 (2022)

Robinson explained that, upon learning that the OI investigative file in *Weans* was missing, he was concerned that the file might contain PII, and he tasked the investigators with looking into the matter. Tr. III at 92-93.

The investigators met with OCIE Staff Assistant Jackie White on September 26, 2019 about the missing OI case file and White searched for the file in the file room and desk areas within OCIE, to no avail. IAF, Tab 11 at 83. They then searched the office suite the following day and were unable to find the file. In response to questioning by the investigators, Funnie stated that the OI investigative file would stay with either the original OCIG attorney-Collender, or the appellant. Collender told investigators that the appellant had requested the OI file and had it in headquarters. *Id.*

Investigators then spoke with the appellant, who confirmed that she had received the file, but could not recall the last time she had seen it. IAF, Tab 11 at 83. The appellant stated that she could not recall whether she had brought the file from OCIG to her new office in OCIE, and while she left three files on Funnie's desk for Funnie to work on, she was not certain if the OI investigative file was one of them. She could not recall if the file was one of several Stodgsdill had left her, and stated that it was possible she had left the file for another employee (Kirsten Lucas) to return to the case agent. *Id.*

The appellant further asserted that she did not ever recall seeing the file in the OCIE office space, and she reported that OCIG was continuously delivering files to OCIE that OCIG claimed not to have. IAF, Tab 11 at 84. She noted that there was a lot of confusion during the transfer to OCIE. The appellant was unable to specify a process for retaining investigative files that included grand jury information, though she said that she did not typically receive OI investigative files in CMP cases. The appellant stated that she does not remove paper files from the office,[28] and opined that the file could be with OCIG.

The investigators searched the appellant's office for the file, but did not find it there. They met with Gangloff about the file, since he occupied the appellant's old office, but he asserted that the file was not in the office when he moved in, and Lucas told the investigators that she did not recall receiving the OI investigative file in *Weans*, or sending it to back OI. At the time the ROI was completed the file had not been located. *Id.*

The appellant testified, largely consistently with her statement to investigators, that she did not take OI files home with her, though she did take CMP files home. Tr. I at 111. As to the *Weans* OI file, she left it in her office in OCIG in the second week in June when she was away at a training course, and Funnie had agreed to work on the three cases, so she took them. *Id.* at 111-12. That is the last time the appellant recalls seeing the file. *Id.* at 112, 161.

There is certainly some evidence that the appellant may have been the last employee who had the *Weans* OI investigative file in her possession, in light of the statements of Collender, Stodgsdill, and Funnie. Moreover, the appellant admitted having the OI file at some point. However, it is undisputed that the appellant was teleworking from California as of July 22, 2019, the date the appellant and Funnie drafted and filed the motion for an extension of time, and the agency has produced no evidence to rebut the appellant's assertion that she never removed OI files from the workplace. Thus, based on the record evidence, I find that more likely than not, the file remained in the workplace as of July 22, 2019.

By July 25, 2019, while the appellant was still teleworking, the allegations of false statements in the motion for an extension had been forwarded for investigation and the appellant was being interviewed in California. Since Funnie was performing much of the substantive work in the *Weans* litigation, it is unclear why the appellant would have had the OI file at that time, instead of Funnie. In fact, according to this record, Funnie moved for dismissal of the *Weans* case on July 25, 2019, again, while the appellant was still teleworking. Funnie told the investigators that she gave the file to either the appellant or White when the case was dismissed, but again, the appellant was teleworking from another location at that time, so there is no evidence to corroborate the possibility that she physically received the paper OI file.

The agency has not presented any evidence showing the existence of a case tracking system for paper OI investigative files, so it is difficult from this record to ascertain when various individuals were in possession of the *Weans* OI file. While the evidence pertaining to this charge is stronger than that bearing on the previous allegations, I find that the agency has failed to present

evidence sufficient to show that it is more likely than not that it was the appellant who failed to secure the *Weans* OI file. In this regard, I note that even if Funnie or another employee placed the file in the appellant's workspace while the appellant was teleworking, in light of the upheaval caused by the creation of OCIE and the movement to new office space, it is certainly possible that the file was removed or misplaced through no fault of the appellant. [29]

In sum, I found the agency's evidence in support of the first charge underlying the proposed suspension to be weak, and the while the evidence bearing on the second charge was stronger, it still fell short of the preponderant threshold. Further, because the only explicit basis Robinson cited for reassigning the appellant to a non-supervisory position was her alleged failure to maintain the *Weans* OI investigative file, which was the conduct at issue in charge two of the proposed suspension, I found the agency's reasons for the reassignment to be lacking, as well.

<u>The existence and strength of any motive to retaliate on the part of the agency officials involved in the decision</u>

The appellant argues that IG Ennis and Alpert had motive to retaliate against her because they were the focus of her second set of disclosures. IAF, Tab 76. She contends that they were trying to "muzzle" her disclosures-failure to provide proper service and imposition of excessive penalties without consideration of all required factors-related to the bucket three cases to prevent SSA from finding out about the improprieties and removing the CMP program from OIG. *Id.* The appellant further asserts that the Immediate Office immediately attempted to "close the book" on the bucket three issue the same day the appellant was placed on administrative leave, evidencing its retaliatory animus against her. *Id.*

The agency focuses its argument that it had no motive to retaliate against the appellant on the fact that Robinson was not in the appellant's chain-of-command and was on a detail at the time he was called on to become involved in this matter that left him uninvolved in any of the day-to-day operations of the OIG. IAF, Tab 77. According to the agency, Robinson was not affected in any way by the appellant's views regarding the CMP program, and was not subjected to any pressure as to what action to take against the appellant. *Id.* The agency further avers that the appellant's promotion in early June was after her first set of disclosures, undercutting any claim that agency management had a motive to retaliate against her for expressing her concerns.

First, the agency argues that there is no merit to the contention that the retaliation was for the second set of disclosures for two reasons. IAF, Tab 76. The agency contends that IG Ennis did authorize OCIE to reopen cases after September 2019, and to approach SSA to do so, contrary to the appellant's claim that the IG and Alpert continually blocked the action. Second, the agency points out that SSA had already been aware of issues with the CMP program in 2018, and Alpert knew that SSA had such awareness. *Id.* Thus, there would have been no motive to retaliate against the appellant to prevent SSA proper from finding out about the concerns with the bucket three cases.

After considering the parties' argument, and the record evidence, as explained below, I find that there is significant evidence that agency management-Gangloff, Ennis, Alpert, and other Immediate Office managers, had motive to retaliate against the appellant for her protected disclosures. This is particularly true with respect to the second group of disclosures, in connection with which the appellant was a vocal advocate for reopening the bucket three cases.

First, I agree with the agency that Robinson had no apparent personal motive to retaliate against the appellant for her disclosures. The appellant does not dispute that Robinson was on a detail at the time of she made the disclosures, and was not a target of them in any way. He was not in her chain-of-command, and there is no evidence that he had any personal animus against the appellant.

Nonetheless, I find that the question of whether Robinson had motive to retaliate against the appellant is only one part of the inquiry I must undertake. As discussed *supra*, Gangloff, Alpert and IG Ennis all had a role in the decision to refer the allegations against the appellant for investigation, and this decision led to all of the personnel actions at issue herein. In addition, Robinson sought, and received, Alpert's concurrence in the decision to reassign the appellant to a non-supervisory position, and IG Ennis delegated explicit authority to Robinson to place the appellant on administrative and investigative leave. The agency has presented no evidence that Robinson was authorized to take these actions without formal approval from Alpert or IG Ennis,

and as a result, I must conclude that, at minimum, they ratified the actions taken. Thus, when analyzing this *Carr* factor, I must consider whether they had motive to retaliate against the appellant.

Michele Williamson testified that Gangloff initially told her he was not a fan of the CMP program and intended to deconstruct it, and later he and acting IG Stone were "at loggerheads" over the program. Tr. I at 174-75. There was a lot of pressure on Gangloff, Stover-Springer, and Fredericks to "get the penalties up." *Id.* at 175. According to Williamson, Stone and her Chief of Staff, Steve Schaeffer, were displeased with Gangloff. *Id.* at 176.

In April-May 2019, after Funnie had reported the appellant's concerns with the CMP program to upper management, she was called into acting IG Stone's office where she witnessed a discussion between Gangloff and Stone regarding the claim that penalties being assessed were excessive. Tr. II at 13- 14 (Funnie). Gangloff, who was on the telephone, said to Stone, "you told me to increase the penalties," to which Stone responded, "I did not tell you to impose egregious penalties." *Id.* at 14. According to Funnie, the conversation deteriorated into a shouting match. Funnie answered in the affirmative when asked whether Gangloff was aware his conduct of the CMP penalty program was under scrutiny. *Id.* at 15.

Alpert further confirmed that acting IG Stone directed Gangloff to increase the CMP penalties. Tr. II at 178-79. Attorney Johnson testified that he, too, had heard that management wanted to increase penalties, and penalties did, in fact, increase. *Id.* at 66. And, Rodriguez testified that Gangloff told him penalties should be increased because of the new legislation increasing the penalty cap. Tr. II at 60.

Gangloff testified that he received no personal benefit from an increase in penalties assessed in the CMP program, implying that he did not set out to escalate penalties. Tr. III at 216-17. Nonetheless, while it may have been true that none of his performance metrics directly measured either average or total CMP penalties, based on the aforementioned testimony that upper management expected Gangloff to increase CMP penalties, and Gangloff's own admission that Congress passed legislation that increased the maximum penalty allowed, I find that he made changes to the program intended to increase penalties assessed.

In addition, there is credible evidence that Gangloff was irritated that the issue of excessive penalty amounts was continually being questioned, and not only by the appellant. Tr. II at 65 (Rodriguez). In fact, Rodriguez testified that he had numerous discussions in which he related to management that he disagreed with the new policies for proposing penalties, and "it was irritating to them…it was irritating to management." *Id.* Funnie stated that, when the appellant suggested at a June 2019 meeting that her concerns with the bucket three cases could be addressed by returning them to SSA, IG Ennis said she was worried about the "optics" of taking that action. *Id.* at 28. The appellant corroborated Funnie's recollection of management's reaction to the proposal to return the cases to SSA, testifying that the concern expressed was that returning a large number of cases to SSA at once would "raise a flag." Tr. I at 73.

Alpert denied that either he or IG Ennis was opposed to reopening the bucket three cases, but, he contended, they wanted more information before any action was taken. Tr. II at 191-95; IAF, Tab 63 at 19-20. According to Alpert, the requested information was never provided. Tr. II at 195. However, the appellant identified spreadsheets that, she asserts, were created to show the problems with some of the cases. Tr. I at 82-87; IAF, Tab 63 at 227-28. Funnie testified that there were numerous meetings with IG Ennis, Alpert, and Schaeffer between June and August 2019, and although they provided spreadsheets with the information about the bucket three cases that had been requested, management never approved any action to correct the "inequity" in the bucket three cases. Tr. II at 29-34.

Based on the aforementioned evidence, I conclude that Gangloff's management of the CMP program around the time the appellant made her first set of disclosures was under scrutiny, and he was well aware that criticism of the program was widespread. Gangloff certainly had a vested interest in defending the changes that he had made to the program, and there is some evidence that he did not take criticism lightly. Moreover, in early June 2019, the program was moved away from his purview when OCIE was created, and the appellant was placed in charge of 1129 CMP cases. From these findings, I conclude that Gangloff had at least some motive to retaliate against the appellant at the time he took the allegations against the appellant

to Alpert in July 2019. *See Fellhoelter v. Department of Agriculture*, 568 F.3d 965, 971 (Fed. Cir. 2009) (because direct evidence of retaliatory motive is rare, petitioners may rely on circumstantial evidence giving rise to inference of impermissible intent).

I agree with the agency that there is little evidence that upper management, meaning those in the Immediate Office, had motive to retaliate against the appellant as a result of her first set of disclosures. As the agency points out, the appellant had been making these disclosures for a number of months when she was promoted in June 2019, and Funnie, who was a conduit for the disclosures, was also promoted. These actions were taken or approved by Alpert and IG Ennis. Similarly, Alpert testified credibly, and without rebuttal, that other employees who were raising similar issues about the CMP program in the first half of 2019 were also either promoted or otherwise rewarded after they made their complaints. Tr. II at 230-31 (Shrestha recounted concerns regarding excessive penalties and was later promoted); *id.* at 231-32 (Rodriguez raised several issues with program, was promoted); *id.* at 232-35 (Rzasa asserted that penalties were high and workload inefficient, was approved for a pilot program and received an age waiver to work as a Special Agent).

In contrast, however, I find strong support in the record for a finding that the appellant's second set of disclosures were likely to have been significantly more threatening to upper management in the OIG, and I find it highly likely that Alpert, IG Ennis, and others in the Immediate Office had a motive to retaliate against her when they referred the allegations against her for investigation and concurred in or delegated authority for the actions at issue in this case.

The record shows that, between early June and August 2019, the appellant and Funnie strongly advocated for the reopening and rescinding of penalties in approximately 80 1129 CMP cases (the bucket three cases). Funnie testified credibly that IG Ennis expressed concern that taking this action would reflect badly on the OIG in the eyes of SSA proper, and it is clear from this record that Alpert and IG Ennis were resistant to take the drastic steps proposed by the appellant. I find that appellant's persistent recommendation that a large group of closed cases be reopened and penalties rescinded to remedy either failures to provide proper notice to subjects or the assessment of excessive penalties is much more likely to have caused animus against her than the concerns about the program the appellant and other employees had previously expressed.

I further found the agency's arguments that OIG management did not have motive to retaliate against the appellant as a result of the second set of disclosures to be either unconvincing or unsupported by the record. The agency's assertion that there was no need to "mastermind" a 6-month scheme to retaliate against the appellant in order to avoid reopening the bucket three cases because the agency could simply have declined to do so misses the mark. It is axiomatic that agency management often, if not always, has the authority to resist changing operations in order to remedy allegations made by whistleblowers. It would be counter-intuitive, however, to find that managers who are responsible for, or may be implicated by, alleged wrongdoing would never have animus against a whistleblower simply because they could avoid taking action to correct the allegations in the disclosures. Here, the fact that IG Ennis and Alpert clearly had authority, which they exercised, to decline to reopen the bucket three cases does not mean that the persistent attempts by the appellant and Funnie to convince them that the cases were compromised by errors and/or poor judgment did not prove an irritant, and a motive to retaliate when the situation presented itself.

As to the agency's assertion that IG Ennis actually did authorize OCIE to reopen CMP cases after September 2019, the agency's argument appears entirely reliant on Alpert's testimony to this effect. IAF, Tab 77 at 17; Tr. II at 193. Upon close review of Alpert's testimony, however, he admitted that the number of cases reopened was not "on the order of 80 cases: at a time. Tr. II at 193. I find the fact that Ennis agreed to reopen some unspecified number of case does not significantly undercut the appellant's claim that it was the push to have the large group of bucket three cases reopened that gave management animus to retaliate. Further, the fact that SSA proper was aware that employees had been expressing concerns with CMP program policies since 2018 is also inapposite where, again, general expressions of concerns do not compare with specific allegations that violations of regulation and abuses of authority required reopening and rescinding penalties in a large number of cases.

Finally, I find that, on the issue of motive, the testimony of Michele Williamson, the agency attorney whose duties included investigating whistleblower complaints, merits some weight, in light of her knowledge of and experience with the agency's treatment of whistleblowers. Williamson stated:

Sadly, and--and I don't say this lightly, and I feel like I'm putting myself at risk by saying this, I think that we work in a very retaliatory environment. I think that this inspector general values loyalty above all else, and that dissent for disclosures about possible violations of law or ethical rules are not tolerated. And that if you dissent, at the--at the--the best case scenario is that you're marginalized, worst case scenario is that adverse action is taken against you. But you lose your right to speak at that point, and you definitely lose your place at the table.

Tr. I at 187.[30] While this testimony on its own would not be particularly probative, since it is not specific to the facts of this case, in light of my finding that agency management officials, including the Inspector General, had motive to retaliate against the appellant, I find it to be generally consistent with other evidence.

<u>Evidence that the agency takes similar actions against employees who did not make disclosures but who are otherwise similarly situated</u>

The agency argues that comparator evidence reinforces its argument that the agency had no reason to take action against the appellant other than her conduct in handling the *Weans* case. IAF, Tab 77. The comparators the agency points to, however, are other employees who expressed concern with the CMP program, as discussed above under *Carr* factor 2, and not employees who engaged in conduct similar to that alleged against the appellant. *Id.*

In *Siler v. Environmental Protection Agency*, 908 F.3d 1291, 1299 (Fed. Cir. 2018), the court noted that, although "the agency's treatment of other whistleblowers may illuminate any motive to retaliate under *Carr* factor 2, it does not show the agency's treatment of non-whistleblower employees accused of similar misconduct, the precise inquiry considered under *Carr* factor 3." Instead, the third *Carr* factor looks at "any evidence that the agency takes similar actions against employees who are not whistleblowers but who are otherwise similarly situated." *Id.* (citing *Miller v. Department of Justice*, 842 F.3d 1252, 1262 (Fed. Cir. 2016)).

Here, the agency did not present any evidence showing its treatment of non-whistleblowers who were alleged to have committed misconduct similar to that at issue in the proposed suspension, or who were accused of conduct similar to the allegation against the appellant in her reassignment to a non-supervisory position during her probationary period. Likewise, the agency has not supplied evidence addressing whether allegations against non-whistleblowers similar to those made against the appellant are typically referred for investigation.

The court has stated that *Carr* "imposes no affirmative burden on the agency to produce evidence for each of the three factors." *Rickel v. Department of the Navy*, No. 20-2147, (Fed. Cir. Apr. 18, 2022); *see also Staley v. Dep't of Veterans Affairs*, No. 2020-2127, 2021 WL 2965007, at *2 (Fed. Cir. July 15, 2021). It has further held that "the absence of any evidence relating to *Carr* factor three can effectively remove that factor from the analysis," but that the failure to produce such evidence if it exists "may be at the agency's peril," and "may well cause the agency to fail to prove its case overall." *Whitmore v. Department of Labor*, 680 F.3d 1353, 1374-75 (Fed. Cir. 2012).

In the instant case, I find that there is no indication in the record that similarly situated non-whistleblowers existed. As such, I find that *Carr* factor 3 is largely neutral.

<u>Conclusion</u>

After considering all of the evidence and the parties' argument, I find that the agency's evidence in support of the reasons for the actions at issue was not strong, and almost all of the officials involved in referring the allegations against the appellant for

SHAW, DEBORAH V. SOCIAL SECURITY ADMINISTRATION, 2022 WL 1448513 (2022)

investigation and taking actions against her had motive to retaliate against her. Upon weighing the applicable *Carr* factors, I am not left with the "firm belief" that the agency would have taken any of the personnel actions at issue in the absence of her protected disclosures. Thus, the agency has failed to meet its burden on the merits by clear and convincing evidence, and I GRANT appellant's request for corrective action as to all four personnel actions.

## DECISION

The appellant's request for corrective action is GRANTED as to all four personnel actions at issue in this appeal.

## ORDER

I **ORDER** the agency to pay appellant by check or through electronic funds transfer for the appropriate amount of back pay, with interest and to adjust benefits with appropriate credits and deductions in accordance with the Office of Personnel Management's regulations no later than 60 calendar days after the date this initial decision becomes final. I **ORDER** the appellant to cooperate in good faith with the agency's efforts to compute the amount of back pay and benefits due and to provide all necessary information requested by the agency to help it comply.

If there is a dispute about the amount of back pay due, I **ORDER** the agency to pay appellant by check or through electronic funds transfer for the undisputed amount no later than 60 calendar days after the date this initial decision becomes final. Appellant may then file a petition for enforcement with this office to resolve the disputed amount.

I **ORDER** the agency to inform appellant in writing of all actions taken to comply with the Board's Order and the date on which it believes it has fully complied. If not notified, appellant must ask the agency about its efforts to comply before filing a petition for enforcement with this office.

For agencies whose payroll is administered by either the National Finance Center of the Department of Agriculture (NFC) or the Defense Finance and Accounting Service (DFAS), two lists of the information and documentation necessary to process payments and adjustments resulting from a Board decision are attached. I **ORDER** the agency to timely provide DFAS or NFC with all documentation necessary to process payments and adjustments resulting from the Board's decision in accordance with the attached lists so that payment can be made within the 60-day period set forth above.

## INTERIM RELIEF

If a petition for review is filed by either party, I **ORDER** the agency to provide interim relief to the appellant in accordance with 5 U.S.C. § 7701(b)(2)(A). The relief shall be effective as of the date of this decision and will remain in effect until the decision of the Board becomes final.

Any petition for review or cross petition for review filed by the agency must be accompanied by a certification that the agency has complied with the interim relief order, either by providing the required interim relief or by satisfying the requirements of 5 U.S.C. § 7701(b)(2)(A)(ii) and (B). If the appellant challenges this certification, the Board will issue an order affording the agency the opportunity to submit evidence of its compliance. If an agency petition or cross petition for review does not include this certification, or if the agency does not provide evidence of compliance in response to the Board's order, the Board may dismiss the agency's petition or cross petition for review on that basis.

FOR THE BOARD: /S/

Craig A. Berg Administrative Judge

## ENFORCEMENT

If, after the agency has informed you that it has fully complied with this decision, you believe that there has not been full compliance, you may ask the Board to enforce its decision by filing a petition for enforcement with this office, describing specifically the reasons why you believe there is noncompliance. Your petition must include the date and results of any communications regarding compliance, and a statement showing that a copy of the petition was either mailed or hand-delivered to the agency.

Any petition for enforcement must be filed no more than 30 days after the date of service of the agency's notice that it has complied with the decision. If you believe that your petition is filed late, you should include a statement and evidence showing good cause for the delay and a request for an extension of time for filing.

## NOTICE TO PARTIES CONCERNING SETTLEMENT

The date that this initial decision becomes final, which is set forth below, is the last day that the parties may file a settlement agreement, but the administrative judge may vacate the initial decision in order to accept such an agreement into the record after that date. *See* 5 C.F.R. § 1201.112(a)(4).

## NOTICE TO APPELLANT

This initial decision will become final on **June 10, 2022**, unless a petition for review is filed by that date. This is an important date because it is usually the last day on which you can file a petition for review with the Board. However, if you prove that you received this initial decision more than 5 days after the date of issuance, you may file a petition for review within 30 days after the date you actually receive the initial decision. If you are represented, the 30-day period begins to run upon either your receipt of the initial decision or its receipt by your representative, whichever comes first. You must establish the date on which you or your representative received it. The date on which the initial decision becomes final also controls when you can file a petition for review with one of the authorities discussed in the "Notice of Appeal Rights" section, below. The paragraphs that follow tell you how and when to file with the Board or one of those authorities. These instructions are important because if you wish to file a petition, you must file it within the proper time period.

## BOARD REVIEW

You may request Board review of this initial decision by filing a petition for review.

If the other party has already filed a timely petition for review, you may file a cross petition for review. Your petition or cross petition for review must state your objections to the initial decision, supported by references to applicable laws, regulations, and the record. You must file it with:

The Clerk of the Board Merit Systems Protection Board1615 M Street, NW.Washington, DC 20419

A petition or cross petition for review may be filed by mail, facsimile (fax), personal or commercial delivery, or electronic filing. A petition submitted by electronic filing must comply with the requirements of 5 C.F.R. § 1201.14, and may only be accomplished at the Board's e-Appeal website (https://e-appeal.mspb.gov).

### Criteria for Granting a Petition or Cross Petition for Review

Pursuant to 5 C.F.R. § 1201.115, the Board normally will consider only issues raised in a timely filed petition or cross petition for review. Situations in which the Board may grant a petition or cross petition for review include, but are not limited to, a showing that:

(a) The initial decision contains erroneous findings of material fact. (1) Any alleged factual error must be material, meaning of sufficient weight to warrant an outcome different from that of the initial decision. (2) A petitioner who alleges that the judge made erroneous findings of material fact must explain why the challenged factual determination is incorrect and identify specific evidence in the record that demonstrates the error. In reviewing a claim of an erroneous finding of fact, the Board will give deference to an administrative judge's credibility determinations when they are based, explicitly or implicitly, on the observation of the demeanor of witnesses testifying at a hearing.

(b) The initial decision is based on an erroneous interpretation of statute or regulation or the erroneous application of the law to the facts of the case. The petitioner must explain how the error affected the outcome of the case.

(c) The judge's rulings during either the course of the appeal or the initial decision were not consistent with required procedures or involved an abuse of discretion, and the resulting error affected the outcome of the case.

(d) New and material evidence or legal argument is available that, despite the petitioner's due diligence, was not available when the record closed. To constitute new evidence, the information contained in the documents, not just the documents themselves, must have been unavailable despite due diligence when the record closed.

As stated in 5 C.F.R. § 1201.114(h), a petition for review, a cross petition for review, or a response to a petition for review, whether computer generated, typed, or handwritten, is limited to 30 pages or 7500 words, whichever is less. A reply to a response to a petition for review is limited to 15 pages or 3750 words, whichever is less. Computer generated and typed pleadings must use no less than 12 point typeface and 1-inch margins and must be double spaced and only use one side of a page. The length limitation is exclusive of any table of contents, table of authorities, attachments, and certificate of service. A request for leave to file a pleading that exceeds the limitations prescribed in this paragraph must be received by the Clerk of the Board at least 3 days before the filing deadline. Such requests must give the reasons for a waiver as well as the desired length of the pleading and are granted only in exceptional circumstances. The page and word limits set forth above are maximum limits. Parties are not expected or required to submit pleadings of the maximum length. Typically, a well-written petition for review is between 5 and 10 pages long.

If you file a petition or cross petition for review, the Board will obtain the record in your case from the administrative judge and you should not submit anything to the Board that is already part of the record. A petition for review must be filed with the Clerk of the Board no later than the date this initial decision becomes final, or if this initial decision is received by you or your representative more than 5 days after the date of issuance, 30 days after the date you or your representative actually received the initial decision, whichever is first. If you claim that you and your representative both received this decision more than 5 days after its issuance, you have the burden to prove to the Board the earlier date of receipt. You must also show that any delay in receiving the initial decision was not due to the deliberate evasion of receipt. You may meet your burden by filing evidence and argument, sworn or under penalty of perjury (see 5 C.F.R. Part 1201, Appendix 4) to support your claim. The date of filing by mail is determined by the postmark date. The date of filing by fax or by electronic filing is the date of submission. The date of filing by personal delivery is the date on which the Board receives the document. The date of filing by commercial delivery is the date the document was delivered to the commercial delivery service. Your petition may be rejected and returned to you if you fail to provide a statement of how you served your petition on the other party. See 5 C.F.R. § 1201.4(j). If the petition is filed electronically, the online process itself will serve the petition on other e-filers. See 5 C.F.R. § 1201.14(j)(1).

A cross petition for review must be filed within 25 days after the date of service of the petition for review.

## ATTORNEY FEES

If no petition for review is filed, you may ask for the payment of attorney fees (plus costs, expert witness fees, and litigation expenses, where applicable) by filing a motion with this office as soon as possible, but no later than 60 calendar days after the

date this initial decision becomes final. Any such motion must be prepared in accordance with the provisions of 5 C.F.R. Part 1201, Subpart H, and applicable case law.

## NOTICE TO AGENCY/INTERVENOR

The agency or intervenor may file a petition for review of this initial decision in accordance with the Board's regulations.

## NOTICE OF APPEAL RIGHTS

You may obtain review of this initial decision only after it becomes final, as explained in the "Notice to Appellant" section above. 5 U.S.C. § 7703(a)(1). By statute, the nature of your claims determines the time limit for seeking such review and the appropriate forum with which to file. 5 U.S.C. § 7703(b). Although we offer the following summary of available appeal rights, the Merit Systems Protection Board does not provide legal advice on which option is most appropriate for your situation and the rights described below do not represent a statement of how courts will rule regarding which cases fall within their jurisdiction. If you wish to seek review of this decision when it becomes final, you should immediately review the law applicable to your claims and carefully follow all filing time limits and requirements. Failure to file within the applicable time limit may result in the dismissal of your case by your chosen forum.

Please read carefully each of the three main possible choices of review below to decide which one applies to your particular case. If you have questions about whether a particular forum is the appropriate one to review your case, you should contact that forum for more information.

**(1) Judicial review in general.** As a general rule, an appellant seeking judicial review of a final Board order must file a petition for review with the U.S. Court of Appeals for the Federal Circuit, which must be <u>received</u> by the court within **60 calendar days** of <u>the date this decision becomes final</u>. 5 U.S.C. § 7703(b)(1)(A).

If you submit a petition for review to the U.S. Court of Appeals for the Federal Circuit, you must submit your petition to the court at the following address:

```
U.S. Court of Appeals
for the Federal Circuit
717 Madison Place, N.W.
Washington, D.C. 20439
```

Additional information about the U.S. Court of Appeals for the Federal Circuit is available at the court's website, www.cafc.uscourts.gov. Of particular relevance is the court's "Guide for Pro Se Petitioners and Appellants," which is contained within the court's Rules of Practice, and Forms 5, 6, 10, and 11.

If you are interested in securing pro bono representation for an appeal to the U.S. Court of Appeals for the Federal Circuit, you may visit our website at http://www.mspb.gov/probono for information regarding pro bono representation for Merit Systems Protection Board appellants before the Federal Circuit. The Board neither endorses the services provided by any attorney nor warrants that any attorney will accept representation in a given case.

**(2) Judicial or EEOC review of cases involving a claim of discrimination.** This option applies to you <u>only</u> if you have claimed that you were affected by an action that is appealable to the Board and that such action was based, in whole or in part, on unlawful discrimination. If so, you may obtain judicial review of this decision—<u>including a disposition of your discrimination claims</u>—by filing a civil action with an appropriate U.S. district court (*not* the U.S. Court of Appeals for the Federal Circuit), within **30 calendar days** <u>after this decision becomes final</u> under the rules set out in the Notice to Appellant section, above. 5 U.S.C. § 7703(b)(2); *see Perry v. Merit Systems Protection Board*, 582 U.S. ____ , 137 S. Ct. 1975 (2017). If the action involves a claim of discrimination based on race, color, religion, sex, national origin, or a disabling condition, you may be entitled to

representation by a court-appointed lawyer and to waiver of any requirement of prepayment of fees, costs, or other security. *See* 42 U.S.C. § 2000e-5(f) and 29 U.S.C. § 794a.

Contact information for U.S. district courts can be found at their respective websites, which can be accessed through the link below:

http://www.uscourts.gov/Court_Locator/CourtWebsites.aspx.

Alternatively, you may request review by the Equal Employment Opportunity Commission (EEOC) of your discrimination claims only, excluding all other issues. 5 U.S.C. § 7702(b)(1). You must file any such request with the EEOC's Office of Federal Operations within **30 calendar days** after this decision becomes final as explained above. 5 U.S.C. § 7702(b)(1).

If you submit a request for review to the EEOC by regular U.S. mail, the address of the EEOC is:

```
Office of Federal Operations
Equal Employment Opportunity Commission
P.O. Box 77960
Washington, D.C. 20013
```
If you submit a request for review to the EEOC via commercial delivery or by a method requiring a signature, it must be addressed to:

```
Office of Federal Operations
Equal Employment Opportunity Commission
131 M Street, N.E.
Suite 5SW12G
Washington, D.C. 20507
```
(3) **Judicial review pursuant to the Whistleblower Protection Enhancement Act of 2012**. This option applies to you only if you have raised claims of reprisal for whistleblowing disclosures under 5 U.S.C. § 2302(b)(8) or other protected activities listed in 5 U.S.C. § 2302(b)(9)(A)(i), (B), (C), or (D). If so, and your judicial petition for review "raises no challenge to the Board's disposition of allegations of a prohibited personnel practice described in section 2302(b) other than practices described in section 2302(b)(8) or 2302(b)(9)(A)(i), (B), (C), or (D)," then you may file a petition for judicial review with the U.S. Court of Appeals for the Federal Circuit or any court of appeals of competent jurisdiction. The court of appeals must receive your petition for review within **60 days** of the date this decision becomes final under the rules set out in the Notice to Appellant section, above. 5 U.S.C. § 7703(b)(1)(B).

If you submit a petition for judicial review to the U.S. Court of Appeals for the Federal Circuit, you must submit your petition to the court at the following address:

```
U.S. Court of Appeals
for the Federal Circuit
717 Madison Place, N.W.
Washington, D.C. 20439
```
Additional information about the U.S. Court of Appeals for the Federal Circuit is available at the court's website, www.cafc.uscourts.gov. Of particular relevance is the court's "Guide for Pro Se Petitioners and Appellants," which is contained within the court's Rules of Practice, and Forms 5, 6, 10, and 11.

If you are interested in securing pro bono representation for an appeal to the U.S. Court of Appeals for the Federal Circuit, you may visit our website at http://www.mspb.gov/probono for information regarding pro bono representation for Merit Systems Protection Board appellants before the Federal Circuit. The Board neither endorses the services provided by any attorney nor warrants that any attorney will accept representation in a given case.

SHAW, DEBORAH V. SOCIAL SECURITY ADMINISTRATION, 2022 WL 1448513 (2022)

Contact information for the courts of appeals can be found at their respective websites, which can be accessed through the link below:

http://www.uscourts.gov/Court_Locator/CourtWebsites.aspx

## NOTICE TO THE APPELLANT REGARDING YOUR RIGHT TO REQUEST CONSEQUENTIAL AND/OR COMPENSATORY DAMAGES

You may be entitled to be paid by the agency for your consequential damages, including medical costs incurred, travel expenses, and any other reasonable and foreseeable consequential damages. To be paid, you must meet the requirements set out at 5 U.S.C. §§ 1214(g) or 1221(g). The regulations may be found at 5 C.F.R. §§ 1201.201, 1201.202 and 1201.204.

In addition, the Whistleblower Protection Enhancement Act of 2012 authorized the award of compensatory damages including interest, reasonable expert witness fees, and costs, 5 U.S.C. §§ 1214(g)(2), 1221(g)(1)(A)(ii), which you may be entitled to receive.

If you believe you are entitled to these damages, you must file a motion for consequential damages and/or compensatory damages with this office WITHIN 60 CALENDAR DAYS OF THE DATE THIS INITIAL DECISION BECOMES FINAL.

## NOTICE TO THE PARTIES

If this decision becomes final and the Board "determines that there is reason to believe that a current employee may have committed a prohibited personnel practice, the Board shall refer the matter to the Special Counsel to investigate and take appropriate action" under 5 U.S.C. § 1215. 5 U.S.C. § 1221(f)(3). Please note that while any Special Counsel investigation related to this decision is pending, "no disciplinary action shall be taken against any employee for any alleged prohibited activity under investigation or for any related activity without the approval of the Special Counsel." 5 U.S.C. § 1214(f).

## DEFENSE FINANCE AND ACCOUNTING SERVICE

### Civilian Pay Operations

### DFAS BACK PAY CHECKLIST

The following documentation is required by DFAS Civilian Pay to compute and pay back pay pursuant to 5 CFR § 550.805. Human resources/local payroll offices should use the following checklist to ensure a request for payment of back pay is complete. Missing documentation may substantially delay the processing of a back pay award. **More information may be found at: https://wss.apan.org/public/DFASPayroll/Back%20Pay%20Process/Forms/AllItems.aspx.**

**NOTE: Attorneys' fees or other non-wage payments (such as damages) are paid by vendor pay, not DFAS Civilian Pay.**

☐ 1) Submit a **"SETTLEMENT INQUIRY - Submission"** Remedy Ticket. Please identify the specific dates of the back pay period within the ticket comments.

Attach the following documentation to the Remedy Ticket, or provide a statement in the ticket comments as to why the documentation is not applicable:

☐ 2) Settlement agreement, administrative determination, arbitrator award, or order.

SHAW, DEBORAH V. SOCIAL SECURITY ADMINISTRATION, 2022 WL 1448513 (2022)

☐ 3) Signed and completed "Employee Statement Relative to Back Pay".

☐ 4) All required SF50s (new, corrected, or canceled). ***Do not process online SF50s until notified to do so by DFAS Civilian Pay.***

☐ 5) Certified timecards/corrected timecards. ***Do not process online timecards until notified to do so by DFAS Civilian Pay.***

☐ 6) All relevant benefit election forms (e.g. TSP, FEHB, etc.).

☐ 7) Outside earnings documentation. Include record of all amounts earned by the employee in a job undertaken during the back pay period to replace federal employment. Documentation includes W-2 or 1099 statements, payroll documents/records, etc. Also, include record of any unemployment earning statements, workers' compensation, CSRS/FERS retirement annuity payments, refunds of CSRS/FERS employee premiums, or severance pay received by the employee upon separation.

**Lump Sum Leave Payment Debts:** When a separation is later reversed, there is no authority under 5 U.S.C. § 5551 for the reinstated employee to keep the lump sum annual leave payment they may have received. The payroll office must collect the debt from the back pay award. The annual leave will be restored to the employee. Annual leave that exceeds the annual leave ceiling will be restored to a separate leave account pursuant to 5 CFR § 550.805(g).

National Finance Center Checklist for Back Pay Cases

Below is the information/documentation required by National Finance Center to process payments/adjustments agreed on in Back Pay Cases (settlements, restorations) or as ordered by the Merit Systems Protection Board, EEOC, and courts.

1. Initiate and submit AD-343 (Payroll/Action Request) with clear and concise information describing what to do in accordance with decision.

2. The following information must be included on AD-343 for Restoration:

a. Employee name and social security number.

b. Detailed explanation of request.

c. Valid agency accounting.

d. Authorized signature (Table 63).

e. If interest is to be included.

f. Check mailing address.

g. Indicate if case is prior to conversion. Computations must be attached.

h. Indicate the amount of Severance and Lump Sum Annual Leave Payment to be collected (if applicable).

Attachments to AD-343

SHAW, DEBORAH V. SOCIAL SECURITY ADMINISTRATION, 2022 WL 1448513 (2022)

1. Provide pay entitlement to include Overtime, Night Differential, Shift Premium, Sunday Premium, etc. with number of hours and dates for each entitlement (if applicable).

2. Copies of SF-50s (Personnel Actions) or list of salary adjustments/changes and amounts.

3. Outside earnings documentation statement from agency.

4. If employee received retirement annuity or unemployment, provide amount and address to return monies.

5. Provide forms for FEGLI, FEHBA, or TSP deductions. (if applicable)

6. If employee was unable to work during any or part of the period involved, certification of the type of leave to be charged and number of hours.

7. If employee retires at end of Restoration Period, provide hours of Lump Sum Annual Leave to be paid.

NOTE: If prior to conversion, agency must attach Computation Worksheet by Pay Period and required data in 1-7 above.

The following information must be included on AD-343 for Settlement Cases: (Lump Sum Payment, Correction to Promotion, Wage Grade Increase, FLSA, etc.)

a. Must provide same data as in 2, a-g above.

b. Prior to conversion computation must be provided.

c. Lump Sum amount of Settlement, and if taxable or non-taxable.

If you have any questions or require clarification on the above, please contact NFC's Payroll/Personnel Operations at 504-255-4630.

## Footnotes

| 1 | Authority for the program comes from 42 U.S.C. §§ 1320a-8, 1320b-10. |
|---|---|
| 2 | The CMP program had been delegated to OIG from SSA, and then OIG delegated the program to the Counsel's Office. |
| 3 | The DAB is an administrative entity that is part of the Civil Remedies Division at the Department of Health & Human Services. Tr. I at 13. |
| 4 | Preponderant evidence is the degree of relevant evidence a reasonable person, considering the record as a whole, would accept as sufficient to find that a contested fact is more likely to be true than untrue. 5 C.F.R. § 1201.4(q). |
| 5 | Only prehearing exhibits admitted at hearing are considered in this decision. IAF, Tab 64 (Summary of Telephonic Prehearing Conference explaining procedure for admission of exhibits). |
| 6 | The appellant explained that Inspector General Ennis, Deputy IG Alpert, and Schaeffer are in the Immediate Office, which from context, appears to include the IG's highest level management staff. Tr. I at 52-53. |

7    The appellant initially referred to the provision at issue as part of the statute, but subsequently cited the Code of Federal Regulations, and acknowledged that she meant regulation. Tr. I at 26-27.

8    The appellant testified that the CMP attorneys were no longer allowed to seek financial information from the investigative agents, contradicting Alpert's testimony that Gangloff informed him that the attorneys did solicit financial documentation from the agents. Gangloff did not testify that he instructed the attorneys to go to the agents for such information, and Alpert did not testify from personal knowledge of the procedures being followed. Thus, I lean toward finding the appellant's testimony on this issue more credible. In any case, even if I found that the attorneys were allowed to obtain financial information from the agents, the appellant testified that the agents "don't often get financial information," Tr. I at 19, so this would not have been an effective method to acquire the information.

9    In some of the communications the appellant has identified as disclosures she also complained about service of the penalty letter by U.S. Mail and UPS, rather than certified mail. However, she admitted on cross examination that the regulations do not require service of penalty letters by certified mail. Tr. I at 132. In a June 25, 2019 email to Funnie, the appellant noted that the regulation applicable to penalty letters (20 C.F.R. § 498.109) did not specify a particular method of service, though the agency had decided years before to use the same method to serve penalty letters it employed to serve default letters. IAF, Tab 63 at 187 (Ex. Z). Clearly, the appellant did not have a reasonable belief that service of the penalty letters by other than certified mail violated the regulation, and I find that she has not shown that she had a reasonable belief that the change in methods rose to the level of an abuse of authority. Thus, to the extent she is arguing that she made a protected disclosure regarding improper service of penalty letters, I find that she has failed to meet her burden of proof.

10   Rule 4 does allow service by "delivering a copy of the summons and of the complaint to the individual personally," and I assume UPS offers an option under which the customer may specify that delivery may only be made to one particular individual, rather than any individual at the residence. Thus, although not addressed in any detail by the agency, the agency may have been correct that the new service methods satisfied Rule 4.

11   Other decisions to which the agency cited in support of the proposition that a disclosure of a violation of law, rule or regulation must exceed a *de minimis* threshold either pre-dated *Ganski* II or did not concern disclosures alleging violations of law, rule, or regulation. IAF, Tab 77 at 10-11 (*citing McCorcle v. Department of Agriculture*, 98 M.S.P.R. 363, 376 (2005); *Special Counsel v. Spears*, 75 M.S.P.R. 639, 656 (1997); *Martin v. Department of Air Force*, 73 M.S.P.R. 574, 579 (1997)).

12   A majority of the Board initially issued an opinion finding that Ms. Ganski's disclosures were not "the type of fraud, waste, or abuse" that was covered by the Whistleblower Protection Act. *Ganski v. Department of the Interior*, 83 M.S.P.R. 301 (1999) (*Ganski* I). Ms. Ganski appealed the opinion to the Federal Circuit, at which time the Board intervened and filed a motion for the case to be remanded for further analysis. The court granted the motion, *Ganski v. Department of Interior*, 232 F.3d 910, at *1 (Fed. Cir. 2000) (unpublished disposition), and *Ganski* II is the Board's opinion after that remand.

13   When describing one particularly egregious case, the appellant testified that, as an attorney who was a member of the bar, she felt that the penalty assessment was a violation of the law. Tr. I at 40. In her post-hearing brief, however, she argued that she believed the "grossly excessive" penalties compared to the culpability of subjects were an abuse of authority. IAF, Tab 76 at 13. As discussed below, I do not interpret her argument to be that she believed the agency violated any law, rule, or regulation.

14   "SSA proper" is used to distinguish between SSA and SSA-OIG by witnesses and in this decision.

15   In early 2019, Gail Ennis was appointed as Inspector General and Stone apparently returned to her Deputy Inspector General position.

16   In finding that the appellant had a reasonable belief that she was disclosing an abuse of authority when she raised issues with the steep increase in penalties levied by the CMP program, I note that the appellant has not claimed that the decision to raise penalties was entirely arbitrary. Clearly, as Gangloff explained, there was a reason behind the decision to increase penalties. Nonetheless, I find that the Board's use of "arbitrary or capricious" in the definition of "abuse of authority" does not require a reasonable belief that the actions disclosed were random. Rather, as applied in Board precedent, "arbitrary" refers to a determination made based on "individual preference or convenience rather than by necessity or the intrinsic nature of something." https://www.merriam-webster.com/dictionary/arbitrary.

17   I note that the investigators asked attorney Amanda Stogsdill about the service regulations, and her response is in the ROI. *Id.*, Tab 11 at 49. It appears that the investigators took it upon themselves to gather information regarding this disclosure, though it is unclear from this record why this became part of their inquiry.

18   The Act states as follows: "The Inspector General shall not, after receipt of a complaint or information from an employee, disclose the identity of the employee without the consent of the employee, unless the Inspector General determines such disclosure is unavoidable during the course of the investigation."

19   Where an individual involved in a personnel action has general knowledge of allegations of wrongdoing by an appellant, the knowledge portion of the knowledge/timing test is satisfied even if that individual is unaware of the exact content of protected disclosure. *See Scoggins v. Department of the Army*, 123 M.S.P.R. 592, ; 24 (2016).

20   Robinson testified that the reassignment was based on the appellant's conduct in the position, not her performance. Tr. II at 99-100.

21   Alpert testified to an additional reason he concurred with Robinson's decision-the appellant's failure to timely respond to discovery in the *Weans* case. Tr. II at 256. The agency has presented no other evidence corroborating Alpert's testimony that he relied on the missed discovery deadline at the time he concurred with Robinson's recommendation to reassign the appellant and it is telling that the proposed suspension did not include a charge based on the allegation. Furthermore, Robinson admitted that the only reason he cited for reassigning the appellant was failing to maintain the *Weans* file. Tr. III at 133-34. Based on this record, I cannot conclude that the failure to timely respond to discovery in *Weans* was one of the bases for the decision to reassign the appellant.

22   By the time the motion was filed, there were 12 active cases, but that is still significantly more than the normal number of DAB cases active at a given time. IAF, Tab 11 at 31.

23   The fact that Funnie admitted to the investigators that more than two investigators were working on 1129 CMP cases and she would not have included the statement that only two attorneys were assigned to the program does not provide significant support for a finding that the language in the motion was deceptive. Funnie testified that the statement was true, but she would have taken it out because that level of detail was unnecessary. Tr. II at 42-43, 51.

24   In her interview with the investigators, Funnie stated that Bloom had been appointed on July 1, 2019, but in a July 19, 2019 Memorandum to the Inspector General, Funnie pinpointed July 7, 2019 as the date Bloom "officially became a member of OCIE. *Compare* IAF, Tab 11 at 43 *with id.*, Tab 13 at 111.

25   It is unlikely that the Human Resources office performs background investigations, but that office would likely be tasked with confirming that Bloom had passed her investigation, recording the results of the investigation and/or conveying the results of the investigation to Bloom.

26   After the record closed in this appeal, the appellant filed a motion for leave to reopen it to enter evidence that would purportedly show that the *Weans* OI file had been found in October 2021 in OCIG, and returned to OI. IAF, Tab 78. The agency does not dispute the appellant's contention that the *Weans* OI file was found in OCIG in October 2019, but opposed the motion on the ground that the discovery of the location of the file in 2021 is not relevant to the issue of whether the personnel actions taken in this case in 2019 were retaliatory. *Id.*, Tab 80. I agree with the agency that, when

considering the strength of the evidence in an IRA appeal, the Board will look only at the evidence the agency had before it when it took the allegedly retaliatory action. *Geyer*, 70 M.S.P.R. at 694. Nonetheless, it is arguable that the discovery of the *Weans* OI file in OCIG in October 2019, and the circumstances surrounding the discovery, would be relevant to other issues, such as the credibility of the agency investigators and the thoroughness of their investigation. Because I have found that the agency's evidence in support of charge two was not strong, and the appellant's request for corrective action is being granted, I find the appellant's motion would not yield material evidence, and it is therefore DENIED.

27   According to the Manual, PII "refers to any information about an individual maintained by an agency, including (1) any information that can be used to distinguish or trace an individual's identity, such as name, social security number, date and place of birth, mother's maiden name, or biometric records; and (2) any other information that is linked or linkable to an individual, such as medical, educational, financial, and employment information." IAF, Tab 13 at 164.

28   In an earlier interview with investigators, the appellant was asked a series of questions regarding the use of case files, including whether files are paper or electronic, and whether employees are able to access them remotely. IAF, Tab 11 at 25. The appellant responded that some employees keep paper files and some maintain them electronically. She stated that she keeps paper files and takes them home with her when she teleworks. *Id.* There is no indication that the appellant was referring to OI investigative files when she provided this response, as it had not yet been determined that the *Weans* OI investigative file was missing and the question did not reference investigative files. In the September 26, 2019 interview, where the subject was explicitly the missing investigative file, the appellant stated that she does not remove files from the office. *Id.* at 85. I credit this response, and find that it was not inconsistent with the appellant's earlier answer to questions regarding case files.

29   Even if I had found the agency's evidence in support of the second charge to be strong, I would question the decision to reassign her to a non-supervisory position during her probationary period based on this one transgression. I recognize the that the agency has a strong interest in protecting PII, but looking at the evidence in the worst light to the appellant, the *Weans* OI investigative file was lost from her custody during a period of significant transition, while she was spread thin attempting to adjust to her new position and to the transfer of the CMP program to OCIE. The loss of her supervisory position based on the misplacement of a file under those circumstances would be a severe sanction that, in my view, exceeds the bounds of reasonableness.

30   The agency moved to strike Williamson's testimony, quoted above, but I denied the motion. Tr. I at 187-190; Tr. II at 3-4.

2022 WL 1448513 (PERSONNET)

---

**End of Document**                                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.