**DOW JONES**

# The Washington Post

National-Politics
**How a Social Security program piled huge fines on the poor and disabled**

By Lisa Rein
2,840 words
20 May 2022
Washington Post.com
WPCOM
English
Copyright 2022, The Washington Post Co. All Rights Reserved.

Four years after her longtime partner died of kidney cancer, federal agents knocked on Gail Deckman's door outside Chicago and told her she was in trouble: She had kept thousands of dollars in Social Security disability benefits that should have stopped when he died.

Deckman told the agents she thought the $1,400 check deposited each month into an account to which she had access was a payment for land her partner had sold in Michigan. She spent the money on rent and clothes and gifts for her grandchildren, she said.

The inspector general's office, which investigates disability fraud and tries to recoup money for the government, ultimately charged her $119,392 — nearly three times what she received in error.

Deckman didn't have the money. So the Social Security Administration garnished the entire $704 check she was going to receive every month when she retired from her minimum wage job flipping burgers at the convenience store in her local Rebel gas station. She can apply for retirement in 2032 — when she's 83.

"I'm going to be dead by then," Deckman said. "They're taking away my Social Security. They're charging me so much. Do they think I can afford a lawyer to fight this?" At 73, she continues to work, because she says she has to.

The inflated fees were set in motion during the Trump administration when attorneys in charge of a little-known anti-fraud program run by the inspector general's office levied unprecedented fines against Deckman and more than 100 other beneficiaries without due process, according to interviews, documents and sworn testimony before an administrative law judge. In doing so, they disregarded regulations and deviated from how the program had recovered money since its inception in 1995, failing to take into account someone's financial state, their age, their intentions and level of remorse, among other factors.

The sums demanded by the government stunned those accused of fraud. The unusual penalties were not the only break with how the Civil Monetary Penalty program had previously been conducted: Unlike in the past, the chief counsel also directed staff attorneys to charge those affected as much as twice the money they had received in error, on top of the fines, interviews and court testimony show.

The escalating penalties created a giant jump — at least on paper — in the amount of money the inspector general could show lawmakers it was bringing in, according to interviews and sworn testimony obtained by The Washington Post. Fines as high as hundreds of thousands of dollars were imposed on poor, **disabled** and elderly people, many of whom had no hope of ever being able to pay.

A Chicago woman was fined $132,000 after wrongly receiving up to $10,618 in benefits, according to internal data of penalties and assessments obtained by The Post. A Denver woman was sanctioned $168,000 after cashing up to $14,960 in wrongly received checks. A New Jersey woman is on the hook for nearly $435,000 after she accepted about $47,000 in benefits but failed to report a $120,000 house she inherited from her father and car loans she co-signed for her children, on what she said was a lawyer's advice.

Rep. Gerald E. Connolly (D-Va.), who leads the government operations panel on the House Oversight and Reform Committee, called the penalties "a cheap, easy way of getting enforcement up."

"These cases are not willful crimes," he said. "Shouldn't the punishment fit the crime?"

Over a seven-month period ending in mid-2019, 83 people were charged a total of $11.5 million, the documents obtained by The Post show — a jump from less than $700,000 for all of 2017. It is not clear if that is a full accounting of those affected by the practice of imposing stepped-up fines, which was halted by the inspector general's office last year amid ongoing whistleblower complaints.

This account is based on interviews with 18 current and former Social Security employees, congressional officials, advocates for the **disabled** and beneficiaries, some of whom spoke on the condition of anonymity because they were not authorized to speak publicly.

The remarkable penalties led to tumult inside the office of Inspector General Gail Ennis, where a whistleblower was targeted for retaliation, according to a ruling this month by the administrative judge at the Merit Systems Protection Board.

Ennis, who was sworn in as a Trump appointee in January 2019, declined an interview request, but said in a written statement that her office is "unaware of any basis that supports the statement that unprecedented fines have been imposed."

Ennis wrote that the civil monetary program is administered by "the Counsel to the Inspector General, not the Inspector General." She said no penalty in recent years has been reduced or overturned by an internal appeals board for being excessive. However, cases rarely make it to the board, the last resort when an appeal to an administrative law judge fails.

Inside Ennis's office, two officials raised concerns about the fees to her and her top staff, according to interviews and court testimony: Deborah Shaw, considered the program's most knowledgeable, experienced attorney, who testified in September that she was directed by her bosses to issue penalties she found unconscionable, and veteran senior executive Joscelyn Funnié.

Ennis told them that she would not renegotiate any cases because she did not want to draw attention to the program and worried that Social Security would take it away from her office, according to testimony and four people familiar with her comments during a staff meeting.

After they repeatedly pressed to have cases reexamined and the penalties lowered, Shaw and Funnié were escorted out of the agency's headquarters in Woodlawn, Md., in September 2019 and placed on paid leave. Ennis then fired Funnié, who had also raised separate concerns to her about what she believed were improper hiring actions she took and directed that Shaw, who was also threatened with suspension, be demoted, according to hearing transcripts and people familiar with their cases.

In a May 6 ruling, Judge Craig A. Berg found that Shaw was the victim of a "prima facie case of whistleblower reprisal" by Ennis's office and ordered the agency to restore back pay and benefits and reinstate her as a supervisor.

Shaw "has shown that she had a reasonable belief she was disclosing an abuse of authority when she raised issues with the drastic increase in penalties the [Civil Monetary Penalty] program was assessing ..." Berg wrote in a 68-page decision. He found "significant evidence" that Ennis and her top staff "had motive to retaliate" against Shaw as she became a "vocal advocate" to reopen 83 cases whose penalties she believed were excessive.

In a statement before the ruling, Ennis said she had never retaliated "against any employee." After the judge's decision, her spokeswoman, Rebecca Rose, said in an email, "We disagree with the decision and we are evaluating options for next steps in this case."

In a email to The Post, Shaw said, "As a 27-year public servant who cares deeply about the Inspector General's oversight mission, I had no choice but to speak up when I witnessed the corruption of an anti-fraud program I helped build."

"While I strongly believe that those who commit fraud against public entitlement programs deserve to be held accountable, I also believe that each person accused of misconduct deserves due process," she added.

Shaw testified that she was shocked when she was directed in early 2019 to issue a penalty of $176,000 to a woman who had already written a check for $26,000 to repay the government the entire amount she had wrongly

received in disability benefits. Before she was placed on leave, Shaw was able to dismiss or settle about 23 cases with high proposed fines that were already in the appeals process. But that left at least 83 cases that she thought merited review, interviews and testimony show.

The week after her hearing before the merit board, Shaw learned that a file she was ostensibly put on leave for losing was never misplaced at all, but had reappeared in the mailbox of the inspector general's Office of Investigations, according to two people familiar with the incident.

Funnié was out of work for close to two years before she settled a similar claim of retaliation late last year with Ennis's office, which had originally told her she was being fired for asking for a postponement in a court case. She is now back as a special adviser, but her duties have been restricted to tasks below her experience level, according to two people familiar with her situation. Funnié declined to comment.

Ennis's staff issued new guidelines for the fraud program beginning late last year after the whistleblowers lodged their concerns, recommending a single fine of $2,300 to $7,000 in cases where the accused settle. But scores of those who came under scrutiny in 2018 continue to owe disproportionately high fines.

Advocates for those fined said they could not fathom how the government expected to recoup such large sums of money from people who generally live below the poverty line.

"Any penalties that impact poor people that don't take into account their circumstances are unfair, particularly when there are policies in place that require this," said Jonathan Stein, a longtime disability advocate who is of counsel to Philadelphia-based Community Legal Services.

The troubled anti-fraud program is one in a multitude of controversies roiling Social Security's 500-person internal watchdog division, charged with oversight of the agency that distributes retirement benefits to 69 million Americans and monthly disability checks to about 15 million others.

Ennis's office, with a $112 million budget, published 46 staff audits and reports of Social Security operations and performance in 2021, interviews and records show — less than two-thirds of its output in 2017 and 2018. Some early pandemic oversight work took a year to get underway.

Dozens of senior auditors, investigators and other staff have quit or retired, many in frustration with what they describe as Ennis's mercurial leadership and lack of focus on the office's mission, according to current and former staff members. The Office of Audit has lost 35 auditors since March 2019, almost double the number who resigned in the prior three years. In recent months, multiple supervisory law enforcement agents and the heads of investigations and digital evidence units quit, following an exodus in which some took demotions to accelerate their departures.

Ennis, in her statement, said she is committed to addressing issues affecting employee morale, which dipped to its lowest point since 2014 in a new survey of the federal workforce. She cited expanded recruitment efforts, particularly to find diverse job candidates, regular meetings to foster informal engagement and other efforts. Her spokeswoman, in an email, blamed the departures on a "normal and expected increase in attrition" due to leadership changes and the shift to remote work during the pandemic.

Ennis, a former WilmerHale attorney, also wrote that the number of audits "does not sufficiently capture the value the OIG provides to taxpayers" and said her office's productivity has remained consistently above the average for the federal watchdog community.

Congress created the civil penalty program with bipartisan support to help Social Security recover benefits paid in error in its two antipoverty programs for low-income elderly Americans and those with disabilities. These have long been considered vulnerable to fraud since they rely on beneficiaries to report any changes that would disqualify them.

Civil fines provide an alternative when fraud is considered too insignificant to warrant criminal prosecution by the Justice Department. The fines act, in theory, as a deterrent to misconduct. Starting in 2015, Congress allowed the office to update the maximum penalties by a small amount each year in line with inflation. By 2018, the cap was $8,250, meaning that someone could be charged that amount for each wrongly received benefit check. But until the Trump administration, the full amount was rarely — if ever — imposed, according to people familiar with the program. Doing so was viewed as excessive punishment for a low-income and **disabled** population, according to current and former employees.

Twice a year, the inspector general reports to Congress how much money it has assessed to those it has accused of wrongdoing. By 2017, the amount had plummeted to less than $1 million from a peak of $20 million years earlier, according to the reports.

At the time, the program was run by Ennis's predecessor, acting Inspector General Gale Stone, a career auditor. Stone asked her chief counsel, Joseph Gangloff, how he planned to reinvigorate the program, according to Gangloff and another person familiar with the conversation.

Gangloff directed his staff to increase penalties, attributing the demand to pressure from Stone and from lawmakers on Capitol Hill, according to current and former employees, who said they did not have any indications that lawmakers were concerned about how much the program was recovering. Stone declined to comment.

The counsel also did away with the financial disclosure forms the office had sent for two decades to those it accused of fraud in order to determine how much they would be charged. Deckman, for example, said she did not receive a form asking her to list the details of her finances, even though the final letter she received in July 2018 laying out what she owed said it was taken into account.

Gangloff also stopped issuing notices of any payments due by certified mail, a practice designed to ensure that people were properly notified of what the government claimed they owed and could appeal, according to interviews and testimony.

In an interview, Gangloff said the program suffered from a "lack of consistency" when he arrived as chief counsel in 2015 and that by raising penalties, "we tried to create a very transparent, consistent process."

"I think there was a significant pressure both from Congress and the inspector general to increase the fines. ... I thought congressional oversight would focus on this issues," he said.

The higher fines were still "well below" the maximum set by Congress, Gangloff said. He did not think that notifying beneficiaries by certified mail was mandated by regulation, he said. In fact, the regulation does call for such notification. Gangloff said he stopped sending financial disclosure forms because someone filling them out could easily omit something and "be criminally liable." He retired at the end of 2019.

Those accused of fraud have 60 days to file an appeal. Most of the 83 did not, or contacted the office past the deadline, records show. Six people reached by The Post had missed the deadline and said they didn't know they could appeal or were told they had forfeited that right.

One was Lydia DePiero, the New Jersey woman who was told in December 2018 she owed $434,935 — nearly 80 percent of it in fines to compensate the government for several years of benefits to which the agency said she was not entitled.

"I feel like I got thrown in a pot of boiling water," DePiero said of her reaction to the demand she received, signed by Gangloff. "I'm twisted in something I can't get out of."

DePiero, 55, said she has learning disabilities and back pain stemming from a leg damaged from birth. A single mother of five children, she had fought through eight years of appeals to win a $1,600 monthly benefit. Soon before her final appeal was heard, her parents died, DePiero said, and she asked the lawyer she had hired on contingency if inheriting their homes would put her benefits in jeopardy. He told her not to worry about it, she said. But while inheriting one house did not count against her benefits, the second did, along with several vehicles for which DePiero said she was signatory for car loans for her children.

"I know it all falls on me, even though he told me not to worry about it," she said.

DePiero made several calls to the inspector general's office before her appeal window closed, phone records show. But by the time she connected with an attorney there, it was two days after the deadline. She said she was told it was not possible to appeal the charges.

Her disability checks were diverted to pay her debt. DePiero found work during the pandemic in warehouses loading boxes, but back pain caused her to quit. She now lives on a monthly $1,502.70 disability check from UPS, she said. It will take her more than 22 years to pay back what the inspector general's office told her she owes the government.

Alice Crites and Jennifer Jenkins contributed to this report.

Document WPCOM00020220520ei5k002bf

Page 4 of 5 © 2022 Factiva, Inc. All rights reserved.

**Search Summary**

| | |
|---|---|
| Text | How a Social Security program piled huge fines on the poor and disabled |
| Date | In the last day |
| Source | All Sources |
| Author | All Authors |
| Company | All Companies |
| Subject | All Subjects |
| Industry | All Industries |
| Region | All Regions |
| Language | English |
| Results Found | 1 |
| Timestamp | 20 May 2022 9:40 |

# The Washington Post

National-Politics
**'Full Investigation' pledged of vast fines imposed by Social Security**

By **Lisa Rein**
909 words
21 May 2022
Washington Post.com
WPCOM
English
Copyright 2022, The Washington Post Co. All Rights Reserved.

The acting Social Security commissioner will launch a "full investigation" on Monday of Inspector General Gail Ennis's oversight of an anti-fraud program that imposed extensive penalties on disabled and elderly people, a senior agency official said Saturday.

The action follows a Washington Post report that revealed how attorneys in charge of a little-known program run by Social Security's watchdog division issued unprecedented fines beginning in the Trump administration.

More than 100 people who received disability benefits to which they were not entitled were hit with penalties as high as hundreds of thousands of dollars. Those fines were imposed on poor, disabled and elderly people, many of whom had no hope of ever being able to pay.

The acting commissioner "has very serious concerns about the issues raised by The Washington Post about the inspector general's oversight of this program," Scott Frey, chief of staff to Kilolo Kijakazi, said in an interview. Kijakazi has scheduled a meeting with her senior staff on Monday "to discuss how to proceed," Frey said.

Top House Democrats with oversight of the Social Security Administration and its watchdog also called on President Biden to investigate, calling the penalties an "apparent abuse of authority."

"We are outraged by this stunning report," Ways and Means Committee Chairman Richard E. Neal (Mass.), Social Security subcommittee Chairman John B. Larson (Conn.) and worker and family support subcommittee Chairman Danny K. Davis (Ill.) wrote in a statement late Friday.

The lawmakers called on the president and Kijakazi to "swiftly investigate this apparent abuse of authority, to put in place safeguards to prevent future abuse, and to provide relief to any individuals wrongfully victimized."

A White House official said in an email, "We are aware of the reporting but have no further comment at this time."

A spokesman for the Senate Finance Committee, which also has jurisdiction over Social Security, said the committee is "evaluating a number of steps" in response to the article.

The remarkable penalties issued by the Civil Monetary Penalty Program started in 2018 as the program was floundering. Attorneys went against federal regulations and deviated from how the program had recovered money from those accused of fraud for more than two decades.

The inspector general's office failed to take into account recipients' financial state, their age, their intentions and level of remorse, among other factors, according to interviews, documents and sworn testimony before an administrative law judge. Staff attorneys were directed to charge those affected as much as twice the money they had received in error, on top of the fines.

Over a seven-month period that ended in mid-2019, 83 people were charged a total of $11.5 million, the documents obtained by The Post show — a jump from less than $700,000 for all of 2017.

It is not clear whether that is a full accounting of those affected by the practice of imposing stepped-up fines, which was halted by Ennis's office last year amid ongoing whistleblower complaints.

Two senior officials who raised repeated concerns about the fees to Ennis and her top staff after Ennis took office as a Trump appointee in 2019 were abruptly placed on administrative leave. Ennis then fired one official and directed that her staff demote the other, Deborah Shaw, an attorney who was found by an administrative law judge at the Merit Systems Protection Board in May to have been the victim of a "prima facie case of whistleblower reprisal" by Ennis's office. The office was ordered to restore Shaw's back pay and benefits and reinstate her as a supervisor.

Ennis had told Shaw and the other official, senior executive Joscelyn Funnié, that she would not renegotiate the penalties because she did not want to draw attention to the program and worried that Social Security would take it away from her office, according to testimony and four people familiar with her comments during a staff meeting.

Ennis spokeswoman Rebecca Rose said in an email Saturday that the civil monetary program imposes penalties on those who commit fraud against the Social Security Administration and its trust fund. "The ultimate victims are taxpayers and future, rightful beneficiaries," she said.

Rose wrote that the inspector general "is committed to ensuring that penalties and assessments are imposed fairly, consistently and in accordance with the law." She said Ennis will be responsive to "any Congressional inquiries" and will keep the acting commissioner "informed" about the program's operations.

Inspectors general at large agencies have broad autonomy over their operations once the Senate confirms them. Ennis reports both to Congress and the Social Security commissioner, but neither engages directly in hiring or policy decisions.

Federal watchdogs also are monitored by the Council of the Inspectors General on Integrity and Efficiency (CIGIE), which sets government-wide policies and investigates complaints of misconduct against them.

The group's chairwoman, Allison Lerner, also the watchdog for the National Science Foundation, said in an interview that "while I cannot comment on any specific inspector general, we have a time-tested process for handling allegations of misconduct against inspectors general or their direct reports."

Ennis was named earlier this year to the council's Integrity Committee, which is in charge of any investigations. Any member who is the subject of an inquiry must recuse themselves, Lerner said.

Magda Jean-Louis contributed to this report.

Document WPCOM00020220521ei5l003h1

**DOW JONES**

# The Washington Post

A-Section
**Watchdog probes Social Security fines to disabled, elderly**
Lisa Rein
1,078 words
2 June 2022
The Washington Post
WP
FINAL
A09
English
Copyright 2022, The Washington Post Co. All Rights Reserved

An independent watchdog this week opened a broad investigation into Social Security Inspector General Gail Ennis and her office following a Washington Post report that revealed how an anti-fraud program has imposed massive penalties on disabled and elderly people.

The inquiry by the Council of the Inspectors General on Integrity and Efficiency (CIGIE), a group that investigates misconduct allegations against inspectors general, comes as Ennis has been directed by the acting Social Security commissioner to suspend the program amid mounting political pressure.

In a letter, a senior White House official urged a quick response from the chairwoman of the inspectors general council, Allison Lerner, who took the unusual step of notifying Congress and the White House that she had opened the probe. On Thursday, congressional staffers will question Ennis's deputies about the program.

"Given the gravity of the allegations, I strongly encourage the Integrity Committee to work expeditiously," Jason Miller, deputy director for management for the White House Office of Management and Budget, wrote in a letter sent late Monday that also noted concerns about reports of retaliation against whistleblowers who questioned the penalties. "It is critical that the American public have full confidence in the important work of the Inspector General community, and that is why it is imperative these allegations be resolved in an appropriate and expeditious manner."

Rebecca Rose, a spokeswoman for Ennis, wrote in an email, "We will continue to be responsive and cooperate fully" with the investigation and a parallel probe of the penalties by acting Social Security commissioner Kilolo Kijakazi, who has announced a "full investigation" of Ennis's oversight of the anti-fraud program. Ennis, as a member of the inspectors general council's Integrity Committee, must recuse herself from all committee matters while the investigation is ongoing.

Lerner declined to comment on the investigation.

At the heart of the investigation is the Civil Monetary Penalty Program, a little-known anti-fraud program run by the inspector general's office. During the Trump administration, under Ennis's watch, the program began levying unprecedented fines, which reached hundreds of thousands of dollars, on more than 100 people accused of improperly receiving disability benefits. The fines were imposed without considering the age, financial condition or other mitigating factors of the recipients - a departure from how the program had previously operated.

Many of those fined had no hope of ever being able to pay. Over a seven-month period that ended in mid-2019, 83 people were charged a total of $11.5 million, documents obtained by The Post showed - a jump from less than $700,000 for all of 2017.

Civil fines are supposed to provide an alternative when fraud is considered too insignificant to warrant criminal prosecution by the Justice Department. In years past, cases had often settled, with agreements for drastically lower fines as claimants gradually paid back what they owed taxpayers.

On Thursday, the staff of the House Oversight and Government Reform and Ways and Means committees will summon two of Ennis's deputies to brief them on how the fines escalated, and about the treatment of two senior officials on Ennis's staff who raised repeated concerns about the penalties.

Those senior officials were then abruptly placed on administrative leave, with one fired and the other demoted. Both are back at work, one after settling a whistleblower case with the agency. The other, attorney Deborah Shaw, in May was found by an administrative law judge at the Merit Systems Protection Board to have been the victim of "whistleblower reprisal" by Ennis's office.

The Office of Special Counsel, a small independent agency that investigates complaints of retaliation against whistleblowers who report waste, fraud and abuse in the federal government, also has opened a case after receiving multiple complaints that employees who work for Ennis have suffered reprisals, according to two people with knowledge of the matter. A spokesman for Special Counsel Henry Kerner declined to comment.

Ennis's chief counsel on Wednesday told the attorneys who work in the civil penalty program to stop issuing fines until further notice while Kijakazi's staff conducts a thorough review of the program, which was delegated to the inspector general's office when it started in 1995.

Top House Democrats welcomed the new investigation by CIGIE.

"It's a welcome first step in understanding who has been harmed by the apparent abuses by Social Security's Office of the Inspector General, and to what extent," Ways and Means Committee Chairman Richard E. Neal (D-Mass.) said in a statement.

Rep. Gerald E. Connolly (D-Va.), who leads the government operations panel on the House Oversight and Reform Committee, said in a statement that "inspectors general must be pure as driven snow" and said other watchdogs have lingered in their positions for years while the council investigated.

"Congress is watching, and our oversight Subcommittee is prepared to take appropriate, swift action," Connolly wrote.

The investigation is likely to be far-reaching. The troubled anti-fraud program is one of several controversies roiling Social Security's 500-person internal watchdog division, charged with oversight of the agency that distributes retirement benefits to 69 million Americans and monthly disability checks to about 15 million others.

Dozens of senior auditors, law enforcement agents and other staff have quit or retired, many in frustration with what they describe as Ennis's mercurial leadership and lack of focus on the office's mission, according to current and former staff members. Ennis has defended her leadership and said some employees bristle at changes when a new leader comes in.

Audits have also plummeted. So has morale, which has taken a nosedive in successive surveys of the federal workforce since Ennis took over. New data for 2021 collected by the Office of Personnel Management for the annual Federal Employee Viewpoint Survey (FEVS) and released internally Tuesday shows 28 percent of those who responded consider the inspector general's office a good place to work, with 13 percent agreeing that their senior leaders generate high levels of motivation and commitment. And 22 percent said senior leaders maintained high standards of honesty and integrity.

Rose, a spokeswoman for Ennis, called the inspector general's staff "our most valuable resource in accomplishing our mission" and said the office has made efforts to "improve workplace engagement" for several years. "We are analyzing the 2021 FEVS survey results," she wrote.

WP20220602IGPROBE

Document WP00000020220602ei620002b