**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

———————————————————— )
                                                              )
**MICHELLE M. MURRAY,**                    )
                                                              )
          **Plaintiff,**                               )
                                                              )
                    **v.**                                 )          **Case No. 24-cv-00640 (APM)**
                                                              )
**DEBBIE SHAW, et al.**                       )
                                                              )
          **Defendants.**                         )
                                                              )
———————————————————— )

<u>**MEMORANDUM OPINION**</u>

This suit arises from a claim of whistleblower reprisal made by two attorneys employed with the Social Security Administration's Office of the Inspector General ("the Agency"). The charges made by the two attorneys, Defendants Debbie Shaw and Jocelyn Funnié, led to an administrative proceeding before the Merits System Protection Board ("MSPB") and a decision against the Agency by an administrative judge. Plaintiff Michelle Murray, an Agency lawyer with management authority, was involved in the proceeding and mentioned in the decision. Various media outlets reported on these happenings. Murray believes these stories contain false information about her. Proceeding *pro se*, she has sued ten defendants, including Shaw, Funnié, other Agency and government employees, and various media outlets for defamation, related torts, and conspiracy under 42 U.S.C. § 1985.

Before the court are no less than ten ripe motions.[1] As explained below, the motions to dismiss are granted on various grounds. Murray's Objection to the Government's Westfall

---

[1] Defs. WP Company LLC & Lisa Rein's Mot. to Dismiss, ECF No. 53; Defs. Proj. on Gov't Oversight & Faith Williams' Mot. to Dismiss, ECF No. 54; Defs. Gov't Exec. & Erich Wagner's Mot. to Dismiss, ECF No. 82; Def. Michelle Williamson's Mot. to Dismiss, ECF No. 85; United States of America's Mot. to Dismiss, ECF No. 88; Def.

Certification, ECF No. 96, and Motion for Rule 11 Sanctions, ECF No. 115, are denied. This matter is hereby dismissed.

## I.    BACKGROUND

### A.    Plaintiff Michelle Murray

Since June 2021, Murray has served as Chief Counsel for the Office of the Counsel to the Inspector General at the Agency.  Am. Compl., ECF No. 49, [hereinafter Compl.], ¶ 40.  In this role, Murray, "is directly responsible to the Inspector General for providing authoritative legal advice concerning legal and Regulatory strategy."  *See* Soc. Sec. Admin., SSA Organizational Manual: Chapter S8—The Office of the Inspector General, https://www.ssa.gov/org/orgOIG.htm (last visited Mar. 25, 2025) [hereinafter Agency Organizational Manual].[2]  Murray alleges that she is not a political appointee, does not regularly engage in social media, has not testified before Congress or been identified in media coverage before this episode, and did not begin reporting directly to Inspector General Gail Ennis until the summer of 2023.  Compl. ¶¶ 24–26, 28.

Among Murray's duties is to manage an office of roughly 20 employees that oversees the Agency's Civil Monetary Penalty ("CMP") Program, through which the Agency imposes penalties against individuals unlawfully or fraudulently retaining social security benefits.  Agency Organizational Manual; *see also* Compl. ¶ 27.  Additionally, from 2020 to roughly November 2023, Murray served as the Social Security Administration's Whistleblower Protection Coordinator.  Compl. ¶¶ 41, 82.  In that role, Murray educated Agency employees about anti-retaliation safeguards for protected disclosures, including rights, remedies, and processes for

---

Dennis McGunagle's Mot. to Dismiss, ECF No. 94; Pl.'s Objection to the Gov't's Westfall Cert., ECF No. 96; Def. Deborah Shaw's Mot. to Dismiss, ECF No. 102; Def. Jocelyn Funnié's Mot. to Dismiss, ECF No. 103; Pl.'s Mot. for Rule 11 Sanctions, ECF No. 115.

[2] The court may take judicial notice of information appearing on a government website without converting the present motions into summary judgment motions.  *See, e.g., Dastagir v. Blinken*, 557 F. Supp. 3d 160, 163 n. 3 (D.D.C. 2021).

seeking review through relevant entities like the Agency and the MSPB.  *Id.* ¶ 41 (citing 5 U.S.C. § 403(d)(1)(C)).

### B.    The Underlying Administrative Proceedings

The dispute underlying this action centers on whistleblowing activity relating to the Agency's management of the CMP Program.  Beginning in 2019, Defendants Shaw and Funnié, also lawyers at the Agency, *see* Compl. ¶ 32, raised concerns about higher penalties and improper changes to the CMP Program, *see id.*, Ex. 2, ECF No. 1-2 [hereinafter MSPB Decision], at 2.[3] They believed that the Agency was failing to take recipients' financial conditions or remorse into account when assessing penalties, and had changed the method of serving default letters in CMP cases.  *Id.* at 2, 4.  Between January and August 2019, Shaw and Funnié reported their concerns to the Agency's upper management several times.  *Id.* at 2–11.

"In September 2019, Defendants Shaw and Funnié were placed in paid, non-duty status because they were under investigation for demonstrating a lack of candor when filing a motion to extend a deadline," Compl. ¶ 34, in the "*Weans* case" before an administrative tribunal, MSPB Decision at 3.  The investigation into Shaw and Funnié was itself the result of an anonymous whistleblower complaint.  *See id.*  Inspector General Ennis delegated this investigation to Michael Robinson, another employee of the Agency.  *Id.*  After placing Shaw and Funnié on leave in September 2019, Robinson issued a proposal to suspend Shaw for 45 days and to remove Funnié from federal service because of their lack of candor and neglect of duties.  *Id.*  Funnié ultimately was fired, Compl. ¶ 34, and Shaw's suspension remained pending, MSPB Decision at 3.

---

[3] Murray filed an initial complaint in this action with 13 exhibits.  *See* First Compl., ECF No. 1, Exs. 1–13, ECF Nos. 1-1–1-13.  When Murray filed her Amended Complaint, she failed to reattach these exhibits.  *See generally* Compl., ECF No. 49, & attachments.  However, Murray continues to rely on and incorporate by reference the initial exhibits in the Amended Complaint, and thus the court considers them when ruling on the various defendants' motions to dismiss.  *See Farah v. Esquire Mag.*, 736 F.3d 528, 534 (D.C. Cir. 2013) ("I[]n determining whether a complaint states a claim, the court may consider the facts alleged in the complaint, documents attached thereto or incorporated therein, and matters of which it may take judicial notice.") (internal quotation marks and citation omitted).

Shaw filed a complaint with the Office of Special Counsel in November 2019, "alleging that the agency had retaliated against her for her protected whistleblowing disclosures regarding the CMP program[.]" *Id.* In November 2020, the Office of Special Counsel closed its investigation and informed her of her right to file an Individual Right of Action with the MSPB. *Id.* Shaw did so. *Id.*

Understanding the procedural and evidentiary nuances of an Individual Right of Action is critical to understanding Murray's claims. When, as here, an Individual Right of Action involves allegations of "reprisal for whistleblowing," an administrative judge determines whether the employee is "entitled to corrective action" for the personnel actions taken against her. *Id.* at 3. An employee may be so entitled "if she shows by preponderant evidence that she made a protected disclosure . . . and that disclosure or activity was a *contributing factor* in the personnel action." *Id.* (emphasis added); *see also* Compl. ¶ 38. Whether a disclosure was a contributing factor can be demonstrated through "circumstantial evidence." Compl. ¶ 38. If the employee satisfies her burden of proving a *prima facie* case of whistleblower reprisal, MSPB Decision at 13, "the burden of persuasion shifts to the agency [to] prove by clear and convincing evidence that it would have taken the same actions in the absence of the [whistleblower's] disclosures,'" *id.*; *see also* Compl. ¶ 39.

In Shaw's Individual Right of Action, decided in May 2022, Administrative Judge Craig A. Berg held that she was entitled to corrective action because she had proved her *prima facie* case of whistleblower reprisal and the Agency had failed to rebut it by clear and convincing evidence. MSPB Decision at 1–2, 23–24. Judge Berg found that Shaw reasonably believed her disclosures regarding the changes in the CMP Program were protected, *see id.* at 10–11, and that these disclosures were a "contributing factor" to negative personnel actions against her because the

evidence showed that "individuals with knowledge of her [protected] disclosures influenced" those decisions, *id.* at 13.

Judge Berg made certain findings as to Murray's role in the reprisal. Those findings are the basis for the media defendants' defenses, so the court quotes the relevant passages of the opinion in full.

> In addition to the aforementioned basis for a finding that the disclosures were a contributing factor in the personnel actions, Murray, who was a Senior Attorney in 2019 and became Deputy Counsel in early 2020, testified that [Joseph Gangloff, Chief Counsel to the Inspector General at that time,] brought her the *Weans* request for extension in July 2019, and she was assigned to provide legal support during the investigation into the allegations that the appellant[, Shaw,] and Funnié had made false statements. Murray memorialized the delegations of authority from IG Ennis to Robinson to put the appellant on administrative and investigative leave, and to take corrective action against her. Murray further admitted that she had made handwritten notes regarding some of the appellant's disclosures, on September 23, 2019, after Schaeffer[, another Agency employee,] informed her at a meeting that appellant claimed she was being placed on administrative leave in retaliation for her whistleblowing disclosures.
>
> She believed that [Deputy Inspector General Ben] Alpert was at that meeting, and they discussed the issue of whether there had been proper service in some of the closed cases. Gangloff was not at the meeting, but Murray testified that she followed up with him "a lot" regarding the service issues raised. Thus, Murray was involved in both looking into the service issue and evaluating emails collected by the OI investigators in the investigation into the appellant.

MSPB Decision at 12–13 (evidentiary citations omitted).

Based on the above factual determinations, Judge Berg drew the following conclusions about Murray's role in the Agency's reprisal against Shaw.

> I find that Murray was aware of at least some of the appellant's disclosures, and was in fact tasked with performing some review of

the bucket three cases[4] to aid in determining whether there had been any due process violations. At the same time, she was a conduit between IG Ennis and Robinson with respect to the delegation of authority to place the appellant on administrative and investigatory leave, and she aided in the investigation into the appellant's conduct at issue in the decisions to take or threaten the additional personnel actions.

Based on the foregoing, I conclude that the appellant has established by preponderant evidence that individuals with knowledge of her disclosures influenced Robinson's decision to take or threaten to take the personnel actions at issue.

*Id.* at 13 (evidentiary citations and footnotes omitted).

One paragraph later, Judge Berg concluded that Shaw "has established that her disclosures were a contributing factor" in the personnel actions she alleged were taken in retaliation for her whistleblower disclosure, and just below that, found that Shaw "proved her *prima facie* case of whistleblower reprisal." *Id.* at 13. He also found that "there is significant evidence that agency management—Gangloff, Ennis, Alpert, and other Immediate Office managers, had motive to retaliate against the appellant for her protected disclosures." *Id.* at 20. Because the Agency failed to rebut Shaw's *prima facie* case, Judge Berg ordered her reinstated. *Id.* at 26; *see also* 5 U.S.C. § 1221(g)(1)(A)(i) ("If the Board orders corrective action under this section, such corrective action may include . . . that the individual be placed, as nearly as possible, in the position that the individual would have been in had the prohibited personnel practice not occurred[.]"). Funnié separately settled her whistleblower reprisal claims with the Agency and returned to employment. *See* Compl. ¶ 45.

The Agency appealed the MSPB's decision, for which Murray is responsible. *See* Compl. ¶ 73.

---

[4] The "bucket three cases" were CMP Program cases which "had been processed and closed by settlement or default" and in which Shaw and others "expressed concern . . . because of service issues, exorbitant penalties, and failure to consider . . . the individuals' financial condition." MSPB Decision at 10.

### C.      Reporting by The Washington Post

The Washington Post and journalist Lisa Rein (collectively "WaPo")—both named as Defendants—began reporting on these events on May 20, 2022, with an article entitled "How a Social Security program piled huge fines on the poor and disabled."  *See* Compl., Ex. 3, ECF No. 1-3 at 1 (CM/ECF pagination).  This first article mentioned that Shaw had proven her *prima facie* case of whistleblower reprisal.  *Id.* at 2.  Murray alleges that this article was republished on "the Charles Hall Blog, 'Social Security News,'" which is a blog "of all matters related to" the Social Security Administration.  Compl. ¶ 51.  She further claims that anonymous individuals posted "repeated vicious and unfounded comments about" her on this blog, which she pleads on information and belief were authored by Shaw, Funnié, and Defendant Michelle Williamson.  *Id.*; *see also id.*, Ex. 4, ECF No. 1-4.

On May 21, 2022, WaPo published a second article.  *See* Compl. ¶ 49.  It reported that the acting Social Security commissioner had pledged to investigate the issues raised about the CMP Program.  *See id.*, Ex. 3 at 6.  In June 2022, WaPo ran a third story, recounting that the Council of the Inspectors General on Integrity and Efficiency also had announced an investigation of the CMP Program.  *Id.* at 8.  Each of these subsequent articles reported that Shaw had been the victim of whistleblower reprisal by "Ennis's office."  *Id.* at 7, 9.  None of these first three articles made any mention of Murray.  Compl. ¶ 49.

Months later, on October 25, 2022, WaPo later published a fourth article entitled "Social Security whistleblowers say they've been sidelined," which is the basis for Murray's claims against WaPo and Shaw in part.  *Id.* ¶ 54; *see also id.*, Ex. 6, ECF No. 1-6 [hereinafter WaPo Article]. Prior to the article being released, WaPo contacted the Agency seeking comment, advising that the story "has a line near the bottom that mentions chief counsel Michelle Murray is Deborah Shaw's

second line supervisor even as she was a fact witness in her case and wrote/signed the appeal of the MSPB ruling in her favor." Compl. ¶ 60 (quoting *id.*, Ex. 9, ECF No. 1-9). The Agency advised Murray not to comment. *Id.*, Ex. 9, ECF No. 1-9 at 1 (CM/ECF pagination).

The article reported that Shaw and Funnié "faced ongoing backlash from their supervisors for speaking out." Compl. ¶ 54 (quoting WaPo Article at 1 (CM/ECF pagination)). The article detailed that Shaw was "limited to administrative nonlegal busywork," such as "writ[ing] a legal opinion on the soundness of starting a book club to improve morale," had been "reprimanded for helping colleagues," and that "[h]er colleagues were directed to document anything she said about her case or other concerns and report it back to management." *Id.* ¶ 55 & n. 9 (quoting WaPo Article at 2–3). The portion of the article that Murray alleges defamed her, with the key passage italicized, is quoted below:

> Ennis's staff has appealed the ruling to the three-member board of the merit systems office, effectively putting the judge's order on hold, with the exception that Shaw was returned to her GS-15 rank. Ennis's chief counsel, Michelle Murray—*one of the management officials the judge found had retaliated against Shaw*—wrote and signed the appeal and is now her second-line supervisor, controlling her work assignments, requests for training and other aspects of her job, according to Shaw.
>
> Murray also serves as coordinator of Social Security's whistleblower protection program, according to the inspector general's website. She declined to comment for this story.

Compl. ¶ 55 (quoting WaPo Article at 2).

According to Murray, the statement that she was "one of the management officials who the judge found had retaliated against Shaw" is defamatory and defamatory *per se*, because it brands her as a "nefarious 'retaliator.'" *Id.* ¶ 61. In truth, she alleges, a *prima facie* showing of whistleblower reprisal is not the legal equivalent of retaliation under federal personnel law. *Id.* ¶¶ 38–39, 46. WaPo therefore falsely accused her of having "retaliated" against Shaw, when in

fact Judge Berg did not so find.  *See id.* ¶ 62.  Further, Murray states that the article "publicized [her] in a false light by knowing or recklessly publishing selective pieces of true information to imply that [she], as the second line supervisor, engaged in continual 'retaliation' by 'sidelining' Defendant Shaw."  *Id.* ¶ 63.  Last, with respect to her interference with contractual and business relations claims, Murray alleges that an organization declined to participate in a whistleblower educational program that she put on because of this article, *id.* ¶ 61, and the reference to her as Whistleblower Protection Coordinator "was intended to have [her] stripped of this designation and the accompanying job duties," *id.* ¶ 64.

Murray maintains that she contacted WaPo on five occasions seeking a correction of the article, but they did not respond to her requests.  *Id.* ¶ 59.

### D.    Reporting by the Project on Governmental Oversight

WaPo was not the only outlet that covered these events.  In July of 2023, Defendant Project on Governmental Oversight and its Director of the Effective and Accountable Government Program, Defendant Faith Williams (collectively, "POGO"), published an article entitled "Trouble at the Social Security Administration Watchdog."  *Id.* ¶¶ 11–12, 68; *id.*, Ex. 12, ECF No. 1-12 [hereinafter POGO Article].  The article was highly critical of Ennis's operation of the Office of Inspector General and noted that "reports of whistleblower retaliation continue against a backdrop of disfunction."  Compl. ¶ 68 (quoting POGO Article at 1 (CM/ECF pagination)).  The POGO Article linked to WaPo's October 2022 article and stated that Shaw and Funnié "faced ongoing retaliation" and "paid a high price" for their whistleblowing.  Compl. ¶ 72 (quoting POGO Article at 3–4).

Murray takes exception to the following passages from POGO's reporting, which the court quotes in full:

In May 2022, an administrative law judge with the Merit Systems Protection Board (MSPB) ruled that Shaw had been the victim of prima facie whistleblower retaliation by the OIG. The judge ordered the agency to reinstate her to her previous position and restore her back pay and benefits. However, the inspector general's office has appealed the ruling. (The office's Chief Counsel, Michelle Murray, is responsible for the appeal, and she is also Shaw's second-line supervisor and coordinator of the agency's whistleblower protection program.) The appeal means that much of this remedy has been put on hold until Shaw's case is heard, which could take years, as the MSPB is facing a huge appeals backlog.

Shaw reported that since returning to work, she has been denied projects in her area of expertise and forced to do nonlegal busywork, and that her colleagues were instructed to document anything she said related to her case and report it to management. Further, in a twist out of a spy thriller, Shaw learned that a file she was accused of losing was anonymously left in the mailbox of another office within the OIG. She was never officially told of its return, despite it being at the heart of one of the charges leveled against her.

Compl. ¶ 72 (quoting POGO Article at 4). According to Murray, this excerpt leaves the reader "with the understanding that [she] engaged in constant and consistent retaliatory actions against Defendant Shaw, to include doing her job by representing the organization in a due process right to appeal an initial decision," which is "the essence of publicizing someone in a false light." *Id.* ¶ 72. POGO did not ask Murray for comment. *Id.* ¶ 73.

On August 15, 2023, Defendant Williams sat for an interview with Tom Temin of Federal News Network about the Agency's "internal management problem." *Id.* ¶ 70. When asked whether the Agency retaliated against whistleblowers, Williams said "[y]es, they have." *Id.* Murray alleges that the following from Williams' interview with Temin portrayed her in a false light:

The OIG counsel is also the whistleblower coordinator. So that person is responsible for training their agency on whistleblower protocols, procedures, things like that. And so, yes, when these two Office of Inspector General whistleblowers raised the alarm, they did so to folks in their own office. And they were not just shut down, but they were then retaliated against. They were escorted out of the

10

building a few months after initially raising the alarm.  They were placed on a combination of sort of paid leave, and then one was terminated and then brought back etc.  But yes, it's sort of like the foxes guarding the henhouse in this instance.

*Id.* ¶ 70 (quoting *id.*, Ex. 19, ECF No. 49-6).

### E.    Claims Against Individual Defendants

Murray generally alleges that Shaw and Funnié were the driving force behind the WaPo and POGO articles, and thus asserts the same claims against them as against WaPo and POGO. *See, e.g.*, Compl. ¶¶ 48, 61, 67, 68.  Without identifying any statements, she further alleges that Shaw "defamed Plaintiff at various public events, including a National Whistleblower Appreciation Day at the National Whistleblower Center . . . as well as at least one other public event." *Id.* ¶ 65.

Murray claims the individual defendants went beyond just making defamatory statements to press outlets.  She alleges that, after she filed this case, "Shaw, Funnié, Williamson, and [Defendant Dennis] McGunagle conspired to prevent Plaintiff from performing her job duties as Whistleblower Protection Coordinator and to deter, intimidate and threaten Plaintiff from continuing with this suit[.]" *Id.* ¶ 74 (footnote omitted).  Murray alleges that Williamson shared a copy of the initial complaint with McGunagle, *id.* ¶ 75, with whom Williamson has a personal relationship, *see id.* ¶ 5.  McGunagle then sent a copy of the complaint to Hall, who posted it on his Social Security News blog.  *See id.* ¶ 76.  At some point, Hall allegedly identified McGunagle as the source of the complaint.  *Id.* ¶ 77.  Thereafter, Murray alleges that all the individual defendants "blogg[ed]" anonymous "comments or encourage[ed] the blogging of comments," which caused her to feel "intimidated" and "threatened" from continuing with this action. *Id.* ¶ 79; *see also id.*, Ex. 20, ECF No. 49-7, at 3 (CM/ECF pagination) (anonymous comment stating

"Michelle Murray is supposed to be the attorney in charge of the whistleblower program. What a freaking JOKE! How is this not blatant whistleblower retaliation?!").

The alleged conspiratorial conduct even extended to the halls of Congress. Murray asserts that the individual defendants approached Senator Ron Wyden to force Ennis to remove Murray from her Whistleblower Protection role and to prevent her from continuing with this lawsuit. Compl. ¶ 80. That contention is based on a November 2023 letter that Senator Wyden sent to Ennis, charging that the Agency's "combative posture toward whistleblowers" was "exacerbated" by Murray's lawsuit. *Id.* ¶ 81 (quoting *id.*, Ex. 21, ECF No. 49-8, at 1 (CM/ECF pagination)). Senator Wyden maintained that Murray's continued role as Whistleblower Protection Coordinator while proceeding with this lawsuit "presents a hostile environment for current and future whistleblowers," and requested that Ennis respond with "remedial steps," including reporting back whether Murray would remain in her role. *Id.* ¶ 81 (quoting *id.*, Ex. 21, ECF No. 49-8, at 2). Ennis removed Murray as Whistleblower Protection Coordinator after receiving the letter. *Id.* ¶ 82.

### F.    Reporting by Government Executive

Senator Wyden's interest in these matters did not end with the letter to Ennis. In early February 2024, he wrote President Biden, urging him to remove Ennis from her position. *See* Compl., Ex. 24, ECF No. 49-11. This second letter did not explicitly mention Murray but did refer to "retaliatory civil lawsuits filed against fellow employees." Compl. ¶ 85 (quoting *id.*, Ex. 24, ECF No, 49-11, at 1 (CM/ECF pagination)).

Defendant Government Executive, a media outlet covering the "government's business news daily," Compl. ¶ 18, covered the Senator's call for Ennis's dismissal. It published an article written by Defendant Erich Wagner (collectively, with Government Executive, "GovExec") entitled "Senate finance chair calls for inspector general's ouster." *Id.* ¶ 83; *see also* Ex. 23,

ECF No. 49-10.  Murray alleges that GovExec's article casts her in a false light as it "causes the reader to believe that this lawsuit continued illegal retaliation, once again branding Plaintiff as a sustained 'retaliator.'"  *Id.* ¶ 85.  Murray points to the following excerpt from the piece:

> In 2022, an administrative law judge found that Ennis' office retaliated against employee Debbie Shaw for making "protected disclosures," qualifying her as a whistleblower.  Last October, SSA OIG chief counsel and federal whistleblower coordinator Michelle Murray sued Shaw and another whistleblower for defamation, as well as The Washington Post for its reporting on their disclosures, seeking more than $1 billion in damages.
>
> Wyden pointed to the ordeal, which culminated in a default finding against the agency last month, as to why Ennis should be removed from her post.

*Id.* ¶ 84 (quoting *id.*, Ex. 23, at 1 (CM/ECF pagination)).

### G.     Procedural History

This case was transferred to this court in early March 2024 from the Middle District of Pennsylvania.  *See* Order, ECF No. 50.  Murray's Amended Complaint alleges a host of claims against a host of parties: (1) defamation and defamation *per se* against Shaw, Funnié, Rein, The Washington Post, Williams, and the Project on Governmental Oversight; (2) false light against Shaw, Funnié, Rein, The Washington Post, Williams, the Project on Governmental Oversight, Wagner, and Government Executive; (3) negligent tortious interference and tortious interference against Shaw, Funnié, Rein, The Washington Post, Williams, the Project on Governmental Oversight, Williamson, and McGunagle; and (4) violations of 42 U.S.C. § 1985(1) and (2) against Shaw, Funnié, Williamson, and McGunagle.  *See* Compl. at 33–35.

All Defendants moved to dismiss the claims against them.  Additionally, the United States filed a Westfall Certification, *see* ECF No. 84, certifying that certain actions taken by Shaw, Funnié, and Williamson were within the scope of their employment, and sought to substitute itself

as the defendant for claims arising from those actions. *See* 28 U.S.C. § 2679(d)(1). Murray objected to the government's Westfall Certification and seeks discovery on the scope of employment issue. *See* Pl.'s Objection to the Gov't Westfall Certification, ECF No. 96.

Additionally, Murray filed a Motion for Sanctions, ECF No. 115, against Shaw, Funnié, and their attorney, Alexis Pozonsky, for certain statements made in their motions to dismiss. All pending motions are now ripe for resolution.

## II.    LEGAL STANDARD

The parties move to dismiss under several different sections of Rule 12, so the court addresses the relevant legal standards for each. The court also addresses Murray's status as a *pro se* litigant.

### A.    Rule 12(b)(1)

A court must dismiss a case when it lacks subject matter jurisdiction pursuant to Rule 12(b)(1). The plaintiff bears the burden of establishing jurisdiction when a defendant files a motion to dismiss under Rule 12(b)(1). *Knapp Med. Ctr. v. Hargan*, 875 F.3d 1125, 1128 (D.C. Cir. 2017) (citation omitted). Because the court "bear[s] an independent obligation to assure [itself] that jurisdiction is proper before proceeding to the merits," *Plains Com. Bank v. Long Fam. Land & Cattle Co.*, 554 U.S. 316, 324 (2008) (citation omitted), the factual allegations in the complaint "will bear closer scrutiny" on a Rule 12(b)(1) motion for lack of subject matter jurisdiction than on a Rule 12(b)(6) motion for failure to state a claim, *Nat'l Ass'n for Latino Cmty. Asset Builders v. CFPB*, 581 F. Supp. 3d 101, 104 (D.D.C. 2022) (internal quotation marks omitted). To that end, "where necessary, the court may consider the complaint supplemented by undisputed facts evidenced in the record, or the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." *Coal. for Underground Expansion v. Mineta,* 333 F.3d 193, 198

(D.C. Cir. 2003) (internal quotation marks and citations omitted).  *See also Jerome Stevens Pharm.,*
*Inc. v. Food & Drug Admin.,* 402 F.3d 1249, 1253 (D.C. Cir. 2005) (noting that "the district court
may consider materials outside the pleadings in deciding whether to grant a motion to dismiss for
lack of jurisdiction" while still taking factual allegations in the complaint as true).

### B.    Rule 12(b)(5)

Federal Rule of Civil Procedure 12(b)(5) governs motions to dismiss for insufficient
service of process.  The plaintiff bears the burden of proving that she has effected proper service.
*See Hilska v. Jones*, 217 F.R.D. 16, 20 (D.D.C. 2003) (citing *Light v. Wolf*, 816 F.2d 746, 751
(D.C. Cir. 1987)).  "To do so, [s]he must demonstrate that the procedure employed satisfied the
requirements of the relevant portions of Rule 4 [which governs summonses] and any other
applicable provision of law."  *Light*, 816 F.2d at 751 (internal quotation marks and citation
omitted).  "[U]nless the procedural requirements for effective service of process are satisfied, a
court lacks authority to exercise personal jurisdiction over the defendant."  *Candido v. District of*
*Columbia*, 242 F.R.D. 151, 160 (D.D.C. 2007).  Failure to effect proper service is thus a "fatal"
jurisdictional defect and may be grounds for dismissal.  *See Tom Sawyer Prods., Inc. v. Progressive*
*Partners Achieving Sols., Inc.*, 550 F. Supp. 2d 23, 26 (D.D.C. 2008).

### C.    Rule 12(b)(6)

A motion to dismiss under Rule 12(b)(6) tests the legal sufficiency of a complaint.  *Sickle v.*
*Torres Advanced Enter. Sols., LLC*, 884 F.3d 338, 344 (D.C. Cir. 2018).  "To survive a motion to
dismiss, a complaint must contain sufficient factual matter . . . to state a claim to relief that is
plausible on its face."  *Id.* at 344–45 (alteration in original) (quoting *Ashcroft v. Iqbal*, 556 U.S.
662, 678 (2009)).  A claim is plausible on its face "when the plaintiff pleads factual content that
allows the court to draw the reasonable inference that the defendant is liable for the misconduct

alleged." *Iqbal*, 556 U.S. at 678. When evaluating a motion under Rule 12(b)(6), the court must "accept the plaintiff's factual allegations as true," *Sickle*, 884 F.3d at 345 (internal quotation marks omitted), and "construe the complaint in favor of the plaintiff, who must be granted the benefit of all inferences that can be derived from the facts alleged," *Hettinga v. United States*, 677 F.3d 471, 476 (D.C. Cir. 2012) (internal quotation marks omitted). The court need not accept as true, however, "a legal conclusion couched as a factual allegation." *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555 (2007)). Accordingly, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*

"To preserve First Amendment freedoms and give [the press] the breathing room they need to pursue the truth, the Supreme Court has directed courts to expeditiously weed out unmeritorious defamation suits." *Kahl v. Bureau of Nat'l Affairs, Inc.*, 856 F.3d 106, 109 (D.C. Cir. 2017) (citations omitted). Thus, Rule 12 plays a crucial screening role in a case like this one—"[e]arly resolution of defamation cases under Federal Rule of Civil Procedure 12(b)(6) not only protects against the costs of meritless litigation, but provides assurance to those exercising their First Amendment rights that doing so will not needlessly become prohibitively expensive." *BYD Co. Ltd. v. All. For Am. Mfg.*, 554 F. Supp. 3d 1, 6 (D.D.C. 2021) (quoting *Fairbanks v. Roller*, 314 F. Supp. 3d 85, 89 (D.D.C. 2018)).

### D.    Pleading by a *Pro Se* Plaintiff

Although Murray proceeds *pro se*, the typical "less stringent standards" applied to evaluate *pro se* complaints do not apply in this case. *Haines v. Kerner*, 404 U.S. 519, 520 (1972). As the D.C. Circuit recently held, "the liberal pleading standard for *pro se* litigants does not invariably apply when the litigant is a licensed attorney." *Spence v. U.S. Dep't of Veterans Affs.*, 109 F.4th 531, 538 (D.C. Cir. 2024). This is especially the case where the pleading is written by someone

like Murray, who "has formal legal training" and "years of legal work experience," including litigation responsibilities. *Id.* at 539; *see also* Compl. ¶¶ 22–24, 27; Agency Organizational Manual.

## III.    MEDIA DEFENDANTS' MOTIONS TO DISMISS

The court beings with the media defendants' motions to dismiss. WaPo, POGO, and GovExec each move under Rule 12(b)(6) for failure to state claims upon which relief can be granted. *See* WaPo Mot. to Dismiss, ECF No. 53 [hereinafter WaPo Mot.]; POGO Mot. to Dismiss, ECF No. 54 [hereinafter POGO Mot.]; GovExec Mot. to Dismiss, ECF No. 82 [hereinafter GovExec Mot.].

### A.    Defamation and Defamation Per Se Against WaPo and POGO

Under Pennsylvania law,[5] to state a claim for defamation, the plaintiff must plead the following elements:

> (1) The defamatory character of the communication.
> (2) Its publication by the defendant.
> (3) Its application to the plaintiff.
> (4) The understanding by the recipient of its defamatory meaning.
> (5) The understanding by the recipient of it as intended to be applied to the plaintiff.
> (6) Special harm resulting to the plaintiff from its publication.
> (7) Abuse of a conditionally privileged occasion.

---

[5] Murray alleges that "Pennsylvania state law governs" her action. Compl. ¶ 21. Murray and all Defendants proceed under that assumption as to the state law tort claims. The court notes some confusion, however, over whether this case was transferred under 28 U.S.C. § 1404 or § 1406, which impacts the choice of law. *See* Consent Mot. to Transfer, ECF No. 46, at 1–2 (requesting transfer under either section, but stating that certain defendants argued that Pennsylvania does not have personal jurisdiction over them); Order, ECF No. 50 (granting transfer without specifying either section). If an action is transferred pursuant to § 1404, the transferee court "must apply the choice-of-law rules of the State from which the case was transferred." *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 244 n. 8 (1981) (citation omitted). However, where an action is transferred for lack of personal jurisdiction under § 1406, the transferee forum's choice-of-law rules apply. *See Mar-Jac Poultry, Inc. v. Katz*, 773 F. Supp. 2d 103, 112 n.4 (D.D.C. 2011); *Liu v. Mayorkas*, 737 F. Supp. 3d 1, 5 n.1 (D.D.C. 2024). Both Pennsylvania and District of Columbia choice-of-law analysis, however, first asks whether there exists a conflict between the laws of the various jurisdictions. *See Auto-Owners Ins. Co. v. Stevens & Ricci Inc.*, 835 F.3d 388, 404 (3d Cir. 2016); *Barry v. Islamic Republic of Iran*, 437 F. Supp. 3d 15, 47 (D.D.C. 2020) (citation omitted). The court does not discern a true conflict and the parties have identified none, so the court proceeds under Pennsylvania law. *See, e.g., Zimmerman v. Al Jazeera Am., LLC*, 246 F. Supp. 3d 257, 273 n. 10 (D.D.C. 2017). D.C. Circuit law to applies any constitutional or federal issue. *See Nunes v. WP Co., LLC*, 513 F. Supp. 3d 1, 6 n. 2 (D.D.C. 2020).

42 Pa. Cons. Stat. §8343(a); *see also McCafferty v. Newsweek Media Grp., Ltd*., 955 F.3d 352, 357 (3d Cir. 2020). After the plaintiff meets her burden of proof, the burden generally shifts to the defendant to prove: (1) the truth of the defamatory statement; (2) the privileged nature of the communication; or (3) that the subject matter of the defamatory statement is a matter of public concern. 42 Pa. Cons. Stat. § 8343(b). Further, under Pennsylvania law, "[d]efamation *per se* can be either words imputing (1) criminal offense, (2) loathsome disease, (3) business misconduct, or (4) serious sexual misconduct." *Mallory v. S & S Publishers*, 260 F. Supp. 3d 453, 465 (E.D. Pa. 2017) (internal quotation marks and citation omitted), *aff'd sub nom. Mallory v. Simon & Schuster, Inc.*, 728 F. App'x 132 (3d Cir. 2018).

WaPo and POGO argue that Murray's defamation claims must fail on several grounds. The court addresses them in turn.

### 1.    *Fair Report Privilege*

The court agrees with WaPo and POGO that certain statements in their publications are covered by Pennsylvania's fair report privilege. This includes WaPo's statement that Murray was "one of the management officials the judge found had retaliated against Shaw," Compl. ¶ 55 (quoting WaPo Article at 2), and POGO's statements that Shaw "has been the victim of prima facie whistleblower retaliation by the OIG" and that "[t]he judge ordered the agency to reinstate [Shaw] to her previous position and restore her back pay and benefits," *id.* ¶ 72 (quoting POGO Article at 4).[6]

"[A] newspaper has the privilege to report the acts of the executive or administrative officials of the government." *Sciandra v. Lynett*, 187 A.2d 586, 588 (Pa. 1963). This privilege is

---

[6] Statements by Williams in her interview with Temin exceed the information presented in the MSPB decision and include information about Funnié's alleged whistleblower retaliation. *Compare* Compl. ¶ 70, *with* MSPB Decision. Thus, the court does not find that those statements are subject to the fair report privilege.

"qualified"—the newspaper's account must be "fair, accurate, and complete, and not published solely for the purpose of causing harm to the person defamed." *Id.* at 588–89. It is the defendant's burden to first demonstrate that the statements pertain to a "privileged occasion," *i.e.*, that they describe "official governmental reports or proceedings." *Hudak v. Times Pub. Co.*, 534 F. Supp. 2d 546, 559–60 (W.D. Pa. 2008); *see also First Lehigh Bank v. Cowen*, 700 A.2d 498, 503 (Pa. Super. Ct. 1997). This is a question of law. *First Lehigh Bank*, 700 A.2d at 503.

The burden then shifts to the plaintiff to establish an abuse of the privilege, *see id.*—that the account was not "fair, accurate, and complete" or it was "published solely for the purpose of causing harm to the person defamed," *Sciandra*, 187 A.2d at 589. A "verbatim" report is not required for an account to be "fair, accurate, and complete," as "[a] summary of substantial accuracy" will suffice. *Id.* "A statement is substantially accurate if its 'gist' or 'sting' is true, that is, if it produces the same effect on the mind of the recipient which the precise truth would have produced." *First Lehigh Bank*, 700 A.2d at 503 (internal quotation marks and citations omitted). These issues may also be decided as a matter of law. *Id.*; *see also Monge v. Univ. of Pa.*, No. 22-cv-2942, 2023 WL 3571935, at *5–6 (E.D. Pa. May 19, 2023) (dismissing defamation claims under the fair report privilege); *Abraham v. Greater New Castle Cmty. Fed. Credit Union*, No. 15-cv-632, 2016 WL 1161217, at *4 (W.D. Pa. Mar. 23, 2016) (similar).[7]

### a.    Privileged Occasion

The court is satisfied that the alleged defamatory statements published by WaPo and POGO concern a "privileged occasion." Pennsylvania courts have a "somewhat broad interpretation to the concept of 'reports of an official action or proceeding.'" *Hudak*, 534 F. Supp. 2d at 572.

---

[7] Courts in this Circuit have dismissed defamation claims for failure to state a claim pursuant to another jurisdiction's fair report privilege. *See, e.g., Boley v. Atlantic Monthly Grp.*, 950 F. Supp. 2d 249, 257–59 (D.D.C. 2013); *Hargrave v. Wash. Post*, No. 09-cv-0357 (HHK), 2009 WL 1312513 (D.D.C. May 12, 2009), *aff'd per curiam*, 365 F. App'x 224 (D.C. Cir. 2010).

"[A] newspaper has the privilege to report the acts of the executive or *administrative* officials of government." *Sciandra*, 187 A.2d at 588 (emphasis added). An MSPB proceeding easily qualifies under that standard.

The publication must also attribute the statement in question to the official proceeding or document on which it is reporting or from which it is quoting. *See Medico v. Time, Inc.*, 509 F. Supp. 268, 280 (E.D. Pa. 1980), *aff'd*, 643 F.2d 134 (3d Cir. 1981). Contrary to Murray's argument, the WaPo article directly attributes the allegedly defamatory statement to the MSPB decision. *See* Pl.'s Opp'n to WaPo Mot., ECF No. 65 [hereinafter WaPo Opp'n], at 4. It states that "Ennis's chief counsel, Michelle Murray—one of the management officials *the judge found* had retaliated against Shaw—wrote and signed the appeal and is now her second-line supervisor, controlling her work assignments, requests for training and other aspects of her job, according to Shaw." *See* Compl. ¶ 55 (emphasis added) (quoting WaPo Article at 2). Further, context matters— as Murray concedes, the Article earlier on discusses the administrative law judge's ruling. *See* WaPo Opp'n at 4–5 (citing WaPo Article); WaPo Article at 2; *see also Dameron v. Washington Mag., Inc.*, 779 F.2d 736, 739 (D.C. Cir. 1985) ("It must be apparent either from specific attribution *or from the overall context* that the article is quoting, paraphrasing, or otherwise drawing upon official documents or proceedings.") (emphasis added).

The court also finds that the statements by POGO are fairly attributed to the MSPB decision. The statements in their July 2023 article that "Shaw had been the victim of prima facie whistleblower retaliation by the OIG" and that "[t]he judge ordered the agency to reinstate her to her previous position and restore her back pay and benefits," Compl. ¶ 72 (quoting POGO Article at 4), are both tied to a preceding clause stating "[i]n May 2022, an administrative law judge with the [MSPB] ruled . . . . " POGO Article at 4.

b.    <u>Abuse of the Privilege</u>

Plaintiff has failed to plausibly allege that either WaPo or POGO abused the fair report privilege in this case.  The WaPo statement at issue is that Murray was "one of the management officials the judge found had retaliated against Shaw."  *See* Compl. ¶ 55 (quoting WaPo Article at 2).  Murray claims that she was neither identified as a "management official" in the MSPB decision nor did the MSPB judge find that she retaliated against Shaw.  *See* WaPo Opp'n at 5–13.  These arguments, steeped in the minutia of federal personnel law and MSPB proceedings, do not undermine the "substantial accuracy" of WaPo's reporting.  *Sciandra*, 187 A.2d at 589.

First, Murray maintains that WaPo falsely characterized her as a "management official" because, under federal law, she lacked "supervisory authority" over Shaw.  WaPo Opp'n at 6–7.  Specifically, she cites to 5 U.S.C. § 2302(b), which provides that only an "employee who has authority to take, direct others to take, recommend, or approve any personnel action" is subject to its listed prohibited personnel actions.  5 U.S.C. § 2302(b).  But this hyper-technical argument misses the point.  The MSPB decision states that Murray was a "Senior Attorney in the Office of Strategy and Performance" and "Deputy Counsel"; she "memorialized the delegations of authority from IG Ennis to Robinson to put [Shaw] on administrative and investigative leave, and to take corrective action against her"; and she served "as a conduit between IG Ennis and Robinson with respect to the delegation of authority to place [Shaw] on administrative and investigatory leave."  MSPB Decision at 12–13.  These statements from the MSPB decision make clear that WaPo's description of Murray as a "management official," at least in the ordinary sense, was substantially accurate.

Second, Murray claims that it was not substantially accurate to have reported that Judge Berg found her to have "retaliated" against Shaw because, in an Individual Right of Action before

21

the MSPB, "[t]he 'administrative judge' does not—*as a matter of law*[]—make a finding that an official committed a 'prohibited personnel practice,'" such as "retaliation for a protected disclosure." Compl. ¶¶ 38–39, 44. Instead, Murray insists, Judge Berg found only that Shaw had made out a made prima facie case of reprisal, which the Agency failed to rebut. *Id.*; *see also* WaPo Opp'n at 8–10. It takes Murray *over five pages* of her brief to explain this distinction. *See* WaPo Opp'n at 7–13.

WaPo was not required to wade into such legal technicalities to enjoy the protections of the fair report privilege. *See Nanji v. Nat'l Geographic Soc.*, 403 F. Supp. 2d 425, 433 (D. Md. 2005) (no liability for defamation where publication "simply convert[s] exact legalism into common parlance that could be understood by its national and worldwide readership base"). Judge Berg found that Murray knew of Shaw's protected disclosures, and yet participated in personnel activities that resulted in her suspension. MSPB Decision at 12–13. Partially on that basis, he concluded that Shaw "proved her *prima facie* case of whistleblower reprisal." *Id.* at 13. Reprisal means "[a]ny act or instance of *retaliation*, as by an employer against a complaining employee." *Reprisal*, Black's Law Dictionary (12th ed. 2024) (emphasis added). So, for WaPo to report that Judge Berg found that Murray had "retaliated" against Shaw was substantially accurate and does not take this case outside the fair report privilege. *See Hudak*, 534 F. Supp. 2d at 561–62 (use of the word "stealing" for "theft" was protected by the privilege); *Reilly v. N. Hills News Record*, No. 98-cv-1058, 1998 WL 1113472, at *3 (use of the word "embezzling" was substantially accurate even though defendant was not indicted for embezzlement), *report and recommendation adopted*, 1998 WL 1113472 (W.D. Pa. Oct. 26, 1998).

POGO's reporting was substantially accurate, too. That POGO called Shaw a "victim of prima facie whistleblower retaliation" is substantially accurate because it is almost verbatim what

Judge Berg found.  *See* MSPB Decision at 13.  He also awarded pay back pay and benefits and granted Shaw "corrective action," which included reinstatement.  *See* MSPB Decision at 3, 24 (citing 5 U.S.C. § 1221); *see also* 5 U.S.C. § 1221(g)(1)(A) ("If the Board orders corrective action under this section, such corrective action may include . . . that the individual be placed, as nearly as possible, in the position that the individual would have been in had the prohibited personnel practice not occurred[.]").  Thus, the challenged portions of POGO's July 2023 article concerning the MSPB proceedings are subject to the fair report privilege as a matter of law.[8]

### 2.    *Statements Outside the Fair Report Privilege*

Not all statements contained in the WaPo and POGO articles that Murray alleges are actionable are subject to the fair report privilege because some do not relate to the MSPB's proceedings.  Specifically, she contends that reporting about ongoing retaliation against Shaw, after the MSPB decision, was defamatory and cast her in a false light because, by implication, the reasonable reader would believe—wrongly—that she was the Agency official continuing to retaliate against Shaw.  *See* WaPo Opp'n at 3–4; Pl.'s Opp'n to POGO Mot., ECF No. 64 [hereinafter POGO Opp'n], at 2–4.  The court now considers whether Plaintiff has plausibly alleged that those statements were both defamatory in nature and false.  *See Tucker v. Phila. Daily News*, 848 A.2d 113, 123–24 (Pa. 2004); *Lewis v. Phila. Newspapers, Inc.*, 833 A.2d 185, 191 (Pa. Super. Ct. 2003); *see also Monge v. Univ. of Pennsylvania*, 674 F. Supp. 3d 195, 205–06 (E.D. Pa. 2023).

---

[8] Murray asserts that the same facts that make out the element of actual malice also support the "solely to harm" prong of the fair report privilege.  *See* WaPo Opp'n at 13; POGO Opp'n at 14.  The court views these arguments as unmeritorious for the same reasons, discussed below, it finds Murray has not adequately pleaded actual malice.

a.    Defamation by Implication

"In determining whether a communication is defamatory, the court must view the statement 'in context' with an eye toward 'the effect the [statement] is fairly calculated to produce, the impression it would naturally engender, in the minds of the average persons among whom it is intended to circulate.'" *Remick v. Manfredy,* 238 F.3d 248, 261 (3d Cir. 2001) (quoting *Baker v. Lafayette College,* 532 A.2d 399, 402 (Pa. 1987)). "Pennsylvania courts recognize that a claim for defamation may exist where the words utilized themselves are not defamatory in nature, however, the context in which these statements are issued creates a defamatory implication, *i.e.,* defamation by innuendo." *Mzamane v. Winfrey*, 693 F. Supp. 2d 442, 477 (E.D. Pa. 2010) (citations omitted).

Murray argues that the statements by WaPo and POGO are defamatory in nature because they painted her as continuing to retaliate against Shaw by sidelining her, reprimanding her, and controlling her work assignments. *See* WaPo Opp'n at 3; POGO Opp'n at 3–4. Construing the allegations in the light most favorable to her,[9] the court agrees that some of the statements made by WaPo and POGO can be considered capable of a defamatory implication. The WaPo and POGO articles both talk about Murray being Shaw's second-line supervisor, and then proceed to discuss the retaliation Shaw faces by Agency management. *See* Compl. ¶¶ 55, 72. No other direct supervisor of Shaw's is mentioned in those pieces other than Murray. *See generally* WaPo Article. This language in context "could fairly and reasonably be construed to have the meaning imputed in the innuendo," *Sarkees v. Warner-West Corp.*, 37 A.2d 544, 546 (Pa. 1944) (internal quotation marks omitted), that Murray continued retaliating against Shaw after the MSPB decision.

Further, the interview between Williams and Temin does not mention Murray, but that fact is not dispositive as to defamatory meaning. *See* Compl. ¶ 70; *Weinstein v. Bullick*, 827 F. Supp.

---

[9] In Pennsylvania courts, defamation and defamation by implication are often pled as different claims rather than different theories. *See, e.g., Monge*, 674 F. Supp. 3d at 204–05, 208.

1193, 1199 (E.D. Pa. 1993) (noting that a defamed party "need not be specifically named in a defamatory statement in order to recover, if she is pointed to by description or circumstances tending to identify her"). Because Williams refers to the Agency Whistleblower Coordinator, *see* Compl. ¶ 70, this description "tend[s] to identify" Murray. And further the statement is capable of the defamatory implication assigned to it, including the defamatory *per se* implication that Murray retaliates against other Agency employees. *See Monge*, 2023 WL 3571935, at *11 ("A statement is defamatory *per se* as an accusation of business misconduct if it ascribes to another conduct, characteristics, or a condition that would adversely affect his fitness of the proper conduct of his lawful business.") (internal quotation marks and citation omitted).

b.    <u>Falsity</u>

Of course, for liability to attach, it is not enough to establish the statement had a defamatory meaning; the statement also must be false. *See, e.g., Joseph v. Scranton Times L.P.,* A.2d 322, 334 (Pa. Super. Ct. 2008) ("In order to be actionable [as defamation], the words must be untrue, unjustifiable, and injurious to the reputation of another."). Under Pennsylvania law, truth is generally an affirmative defense to defamation. *See, e.g.*, *Monge*, 2023 WL 3571935, at *7 (citing *Tucker v. Fischbein*, 237 F.3d 275, 287 (3d Cir. 2001) and 42 Pa. Cons. Stat. § 8343(b)(1)). However, "[w]here a person claims to have been defamed by statements about matters of public concern, the First Amendment protects robust debate by preventing . . . truthful statements from serving as grounds for liability." *Montgomery v. Risen*, 875 F.3d 709, 713 (D.C. Cir. 2017). Thus, "a statement on matters of public concern must be provable as false before there can be liability under state defamation law, at least in situations, like the present, where a media defendant is involved." *Milkovich v. Lorain J. Co.*, 497 U.S. 1, 19–20 (1990); *see also Lewis*, 833 A.2d at 191 ("If the statement in question bears on a matter of public concern, or the defendant is a member of the media, First Amendment concerns compel the plaintiff to prove, as an element, that the alleged

defamatory statement is in fact false.").  In such a situation, a plaintiff must plead falsity as part of her affirmative case.  *Montgomery*, 875 F.3d at 713; *Monge*, 2023 WL 3571935, at *7–8; *see also Libre By Nexus v. Buzzfeed, Inc.*, 311 F. Supp. 3d 149, 155 (D.D.C. 2018).

There can be little doubt that the WaPo and POGO reporting at issue related to a matter of public concern.  "Speech deals with matters of public concern when it can be fairly considered as relating to any matter of political, social, or other concern to the community, . . . or when it is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public[.]"  *Snyder v. Phelps*, 562 U.S. 443, 453 (2011) (internal quotation marks and citation omitted).  Whistleblower retaliation at a federal agency is a matter of public concern because it is the "subject of legitimate news interest."  *Snyder*, 562 U.S. 443.  Accordingly, to survive a motion to dismiss, Murray must affirmatively plead falsehood.

Murray does not dispute that certain statements made by WaPo and POGO are true.  WaPo's reporting that "Murray also serve[d] as coordinator of Social Security's whistleblower protection program," she is Shaw's "second-line supervisor," and she "declined to comment for th[e] story" are true as shown by other allegations in her complaint.  *See, e.g.*, Compl. ¶¶ 41, 47, 55; *see also* Compl., Ex. 9, ECF No. 1-9.  As are POGO's statements that "[t]he OIG counsel is the whistleblower coordinator" and "[t]he office's Chief Counsel, Michelle Murray is responsible for the appeal, and she is also Shaw's second-line supervisor and coordinator of the agency's whistleblower protection program."  *See* Compl. ¶¶ 41, 47, 70, 72.

Importantly, Murray fails to allege facts that plausibly establish the falsity either of Shaw's claim of continued retaliation *or* the implication that Murray was responsible for that retaliation.  Murray, at most, offers an implicit denial of this accusation by claiming it cast her in a "false light" and was made "knowing[ly] and reckless[ly]."  Comp. ¶ 63.  But nowhere does she allege any

*facts* that would allow the court to plausibly infer the charge's falsity. Notably, the WaPo piece enumerates the types of ongoing retaliation Shaw faced, including (1) the assignment of "administrative, nonlegal busywork," (2) the denial of work in her area of expertise, (3) a direction to write a "legal opinion" about starting a book club to improve morale, (4) a reprimand for assisting colleagues who asked for advice, and (5) a scolding for sending emails in "response to her supervisors at 6:28 p.m. and 6:51 p.m." WaPo Article at 2–3; *see also* POGO Article at 4. Murray never denies her participation in any of these incidents; nor does she point to someone else who was responsible for it. Given her duties at the Agency and role as Shaw's second-line supervisor, she was well-positioned to possess *some* facts to rebut the implication that she was responsible for "sidelining" Shaw in the ways detailed by WaPo and POGO. Her failure to bring forward any at all is fatal to her claims.

### 3.    *Actual Malice*

The court's discussion in the section above leaves Murray with no viably pleaded defamation claim against any media defendant. Still, in the interest of completeness, the court considers the final ground on which the media defendants urge dismissal: Murray is a "public official" and fails to plead actual malice. WaPo Mot., Mem. of P&A in Supp., ECF No. 53-1, at 22–30; POGO Mot., Br. in Supp., ECF No. 54-1, at 21–28; *see also* GovExec Mot., Br. in Supp., ECF No. 82-1, at 16–23 (arguing failure to plead actual malice in the context of Murray's false light claim). The court agrees that dismissal on this ground is warranted as well.

### a.    Public Official

Determining whether Murray must plead actual malice requires the court to grapple with a threshold question: Was Murray a public official at the time of the publications? If she was, then she must plead actual malice. If not, then she does not need to carry that pleading burden.

*See New York Times Co. v. Sullivan*, 376 U.S. 254, 279–80 (1964) (finding that a public official cannot "recover[] damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with 'actual malice'").[10]

Whether a defamation plaintiff is a public official is a question of law for the court to decide. *See Rosenblatt v. Baer*, 383 U.S. 75, 88 (1966).[11]  In *Rosenblatt*, the Supreme Court held that the "public official" designation applies "at the very least to those among the hierarchy of government employees who have, or appear to have, substantial responsibility for or control over the conduct of governmental affairs." *Id.* at 85; *see also* 1 Robert D. Sack, *Sack on Defamation: Libel, Slander, and Related Problems* § 5.2.1 at 5-8 (5th ed. 2024) ("The public official category is by no means limited to upper echelons of government.  All important government employees are subject to discussion by the people who employ them and by others who would comment on their behavior."); *Garrison v. Louisiana*, 379 U.S. 64, 77 (1964) ("The public-official rule protects the paramount public interest in a free flow of information to the people concerning public officials, their servants.").  A person is a public official where her "position in government has such apparent importance that the public has an independent interest in the qualifications and performance of the person who holds it, beyond the general public interest in the qualifications and performance of all government employees." *Rosenblatt*, 383 U.S. at 86.  "The employee's position must be one which would invite public scrutiny and discussion of the person holding it, entirely apart from the scrutin[y] and discussion occasioned by the particular charges in controversy." *Id.* at 86 n.13.  If a plaintiff is a public official, the court must determine whether

---

[10] Defendants do not argue that Murray is a public figure or a limited purpose public figure at this juncture.  *See, e.g., Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 345 (1974).

[11] Unlike the public figure inquiry, "[t]hat a plaintiff is or is not a public official is often easily decided and therefore predictable."  1 Robert D. Sack, *Sack on Defamation: Libel, Slander, and Related Problems* § 5.5 at 5-86 (5th ed. 2024).  The court thus believes that Murray's role as a public official is ripe for determination on this motion to dismiss.

the allegedly defamatory statements relate to her official conduct such that the "actual malice" standard applies. *See New York Times*, 376 U.S. at 279–80; *Garrison*, 379 U.S. at 77; *see also White v. Fraternal Order of Police*. 909 F.2d 512, 517 (D.C. Cir. 1990) ("The public's interest 'extends to anything which might touch on an official's fitness for office.'") (quoting *Gertz*, 418 U.S. at 344–45).

As there is a dearth of D.C. Circuit case law on this issue, the court finds instructive the Fourth Circuit's decision in *Horne v. WTVR, LLC*, 893 F.3d 201 (4th Cir. 2018). In *Horne*, the court affirmed that a Director of Budget & Finance in a local school district was a public official. *Id.* at 207–09. It found determinative several factors inherent in the Director position as "creat[ing] the appearance that [the plaintiff's] governmental responsibilities were significant and necessarily involved discretion regarding several tasks as she managed the school system's financial affairs." *Id.* at 209. Those included: (1) the plaintiff's job title and description implied substantial control over the school system's budget and finances; (2) the plaintiff had to oversee several high-priority projects and programs; and (3) management of the budget appeared to be important both to the government and to the public. *Id.* at 209–10.

For similar reasons, the court concludes that Murray is a public official. By the time that the allegedly defamatory publications came out, Murray was a member of the Senior Executive Service ("SES") and Chief Counsel for the Office of Counsel to the Inspector General. Compl. ¶¶ 23, 40. The SES was established to "ensure that the executive management of the Government of the United States is responsive to the needs, policies, and goals of the nation and is otherwise of the highest quality." Civil Service Reform Act of 1978, Pub. L. No. 95-454 § 402(a), 92 Stat. 1111 (Oct. 13, 1978). To that end, "[m]embers of the SES serve in the key positions just below the top Presidential appointees" and "operate and oversee nearly every government activity in

approximately 75 Federal agencies."  U.S. Off. of Personnel Mgmt., Senior Executive Service, https://www.opm.gov/policy-data-oversight/senior-executive-service/ (last visited Mar. 25, 2025). Murray admits that she was one of 15 SES members at the Agency, which itself has roughly 500 employees.  Compl. ¶¶ 22–23.  With regard to the Social Security Administration in general, which has roughly 60,000 employees, Murray is one of 158 SES members.  *Id.*  Her membership in a cadre of elite federal employees counsels in favor of treating her as a public official.

So, too, do her job responsibilities.  As Chief Counsel, Murray was:

> directly responsible to the[] Inspector General for providing authoritative legal advice concerning legal and Regulatory strategy; legislative proposals; program authority and responsibilities; and the content of applicable statutes, regulations, rulings administrative decisions and judicial precedents in all matters relating to audits and investigations of Agency programs and the CMP program.

*See* Agency Organizational Manual.  Further, Murray was the head of an office within the Agency that was directly responsible for implementing the CMP Program, "including imposition of penalties and assessments and the settlement and litigation of CMP cases."  *Id.*

Not only does Murray exercise substantial responsibility over important agency functions and policy matters, she also served as the Social Security Administration's Whistleblower Protection Coordinator at the time of the defamatory publications.  Compl. ¶ 41.  In that role, Murray (1) "educate[d] agency employees" about prohibitions against and remedies for whistleblower retaliation"; and (2) "assist[ed] the Inspector General in promoting the timely and appropriate handling and consideration" of whistleblower claims and allegations of whistleblower reprisals.  5 U.S.C. § 403(d)(1)(C).

Murray's various roles and responsibilities "create[] the appearance" that her "governmental responsibilities were significant and necessarily involved discretion regarding several tasks."  *Horne*, 893 F.3d at 209.  These range from the Agency's regulatory and legislative

agenda to the implementation of a public-facing program (the Civil Monetary Penalty Program) to the protection of whistleblowers in a federal agency of 60,000 people. The court believes that such responsibilities would "invite public scrutiny and discussion of the person holding" any one of these roles, let alone all three, and an "independent interest in the qualifications and performance of [such] person." *Rosenblatt*, 383 U.S. at 86, 86 n. 13. She is therefore properly considered a public official for purposes of First Amendment scrutiny.

Murray's contentions do not warrant a different conclusion. She emphasizes that she is not a political appointee within the Agency, has never testified before Congress or been identified in media articles or blogs until the events at issue in this matter, leads a small legal office of approximately 20 employees, did not report directly to the Inspector General until the summer of 2023, and has been told that her work is not "[n]ewsworthy." *See* Compl. ¶¶ 24–28. These assertions confuse the public official inquiry with that of a public figure or limited-purpose public figure. *See Jankovic v. Int'l Crisis Grp.*, 822 F.3d 576, 584 (D.C. Cir. 2016) ("Some individuals are public figures because they 'occupy positions of such persuasive power and influence that they are deemed public figures for all purposes,' but more commonly, private individuals become more limited-purpose public figures because they 'have thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved.'") (quoting *Gertz*, 418 U.S. at 345). The question for a public official is whether there is an *appearance* of substantial control over policy or governmental affairs. *See Rosenblatt*, 383 U.S. at 85; *Horne*, 893 F.3d at 209. Murray's position within the Agency merits that status.

That conclusion is consistent with decisions from courts around the country that have found federal employees in roles similar to Murray's are public officials for First Amendment purposes. *See*, *e.g., Revell v. Hoffman*, 309 F.3d 1228, 1230, 1232–33 (10th Cir. 2002) (former Associate

Deputy Director of the FBI); *Piccone v. Bartels*, 40 F. Supp. 3d 198, 217–20 (D. Mass. 2014) (Associate Chief Counsel to Customs and Border Protection in New York); *Matta v. May*, 888 F. Supp. 808, 810, 812 (S.D. Tex. 1995) (attorney serving as the "assistant regional administrator" of the Houston Branch office of the Securities and Exchange Commission); *see also Crane v. Arizona Republic*, 972 F.2d 1511, 1525 (9th Cir. 1992) (finding former strike force lawyer was public official for portion of article referring to him as a federal prosecutor); *Sack on Defamation* § 5:2.1 at 5-9–5-18 (citing authorities).

Having determined that Murray is a "public official," the court quickly turns to whether the allegedly defamatory publications relate to her official conduct. *See New York Times*, 376 U.S. at 279–80. They clearly do. The allegedly defamatory statements bear directly on her "fitness" to serve as Chief Counsel and as Whistleblower Protection Coordinator for the Agency. *Garrison*, 379 U.S. at 77.

### b.    Actual Malice

Having concluded that Murray is a public official for purposes of defamation law and that the defamatory publications by the media defendants relate to her official conduct, she must plausibly allege that WaPo and POGO published their articles "with 'actual malice,' that is, with 'knowledge that it was false or with reckless disregard of whether it was false or not.'" *Liberty Lobby, Inc. v. Dow Jones & Co.*, 838 F.2d 1287, 1292 (D.C. Cir. 1988) (quoting *New York Times*, 376 U.S. at 280). Stated another way, Murray must plead facts that would render it plausible that the media defendants "in fact entertained serious doubts as to the truth of [their] publication." *Id.* (quoting *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968)). She comes nowhere close to doing so. *See Tah v. Glob. Witness Publ'g, Inc.*, 991 F.3d 231, 240 (D.C. Cir. 2021) (describing the "famously 'daunting'" actual malice standard) (citation omitted).

Murray puts stock in the fact that WaPo possessed the MSPB decision but mischaracterized her actions against Shaw. *See* Compl. ¶ 62. But the court already has determined that the WaPo article was "substantially accurate" insofar as it reported Murray as having "retaliated" against Shaw. *See supra*, Section III(A)(1)(b). Even if WaPo misread the MSPB decision, "an 'honest misinterpretation does not amount to actual malice even if the publisher was negligent in failing to read the document carefully.'" *Kahl*, 856 F.3d at 117 (quoting *Jankovic*, 822 F.3d at 594); *see also Jankovic*, 822 F.3d at 594 (no actual malice where the defendant misread an Executive Order and OFAC sanctions list as it was "not the same as showing that [the defendant] knowingly published a false statement or subjectively doubted" its conclusion). Murray fails to allege any facts that would support that WaPo's description of her conduct was anything more than an honest misinterpretation of the MSBP's decision.

Murray also points to the fact that WaPo sought comment from Murray only about that part of the story describing her as Shaw's "second line supervisor even as she was a fact witness in her case and wrote/signed the appeal of the MSPB ruling in her favor." *See* Compl. ¶ 60 (quoting *id.*, Ex. 9, ECF No. 1-9, at 1 (CM/ECF pagination)). Murray seeks to draw from this an inference of actual malice, because WaPo "intentionally did not inquire about the judge's finding of retaliation" or Shaw's other allegations. *Id.* This argument is problematic for multiple reasons. For one, "seeking comment in advance of publication is a standard journalistic practice . . . . Drawing a pernicious inference from adherence to such professional standards would turn First Amendment case law on its head." *Tah*, 991 F.3d at 241 (citation omitted). Further, Murray has not pleaded any facts plausibly establishing that WaPo should have asked for her take on the MSPB's findings. Again, the court already has found that WaPo's characterization of Murray's actions were substantially accurate. Nor has she established that WaPo should have sought her comment on the

other topics.  She has not pleaded any facts tending to show, for instance, that Shaw was an unreliable source and WaPo had a reason to doubt her.  *See, e.g., Jankovic*, 822 F.3d at 594 ("Only if 'a defendant has reason to doubt the veracity of its source' is its 'failure to examine evidence within easy reach or to make obvious contacts' evidence of its reckless disregard.") (quoting *McFarlane v. Sheridan Square Press, Inc.*, 91 F.3d 1501, 1510 (D.C. Cir. 1996)).

Murray also seeks an inference of actual malice from WaPo's non-responsiveness to her requests for correction.  Compl. ¶ 59.  But because "[t]he actual malice inquiry focuses on the defendant's state of mind at the time of publication," WaPo's refusal to retract has no bearing on this question.  *Kahl*, 856 F.3d at 118; *see also McFarlane*, 91 F.3d at 1515 (resisting the implication "that a publisher may be liable for defamation because it fails to retract a statement upon which grave doubt is cast after publication"); Compl., Ex. 8, ECF No. 1-8 (Murray requesting correction after publication).  In any event, there was nothing for WaPo to correct.

The court has carefully considered Murray's other arguments as to actual malice, *see* WaPo Opp'n at 13–17 & nn. 13, 23–24, but concludes that none have merit.  *Tah*, 991 F.3d at 240.  That Murray was mentioned for the first time in the fourth article written by WaPo and that she was the only supervisor mentioned does not merit a finding of actual malice.  Compl. ¶¶ 49, 56.  The reason for her inclusion in the article was clear and newsworthy—the MSPB had found that Murray had played a role in the Agency's reprisal against Shaw, and Murray's participation was particularly noteworthy in light of her role as the Social Security Administration's Whistleblower Protection Coordinator.  *See, e.g., Tah v. Glob. Witness Publ'g, Inc.*, 413 F. Supp. 3d 1, 14 (D.D.C. 2019) (allegations that the defendants "targeted [the plaintiffs]" and not others involved in the illicit scheme was not evidence of actual malice where the publication showed the rationale for the focus), *aff'd*, 991 F.3d 231.  Further, the "structure" and editorial choices of the WaPo article do

not support actual malice. *See McFarlane*, 74 F.3d at 1307 (choices in the presentation of an article that "generally hype[d] its broad theme of Republican skullduggery" did not show actual malice); *Coles v. Wash. Free Wkly. Inc.*, 881 F. Supp. 26, 33 (D.D.C. 1995) ("Courts must be slow to intrude into the area of editorial judgment not only with respect to choice of words, but also with respect to . . . omissions from news stories.") (citation omitted). The court therefore concludes that claims against WaPo based on any defamatory statements not already subject to the fair report privilege should be dismissed for Murray's failure to plead actual malice.

For many of the same reasons, the court concludes that Murray fails to allege actual malice as to POGO. Her complaint makes two factual allegations bearing on this inquiry: (1) POGO possessed the MSPB decision and allegedly mischaracterized it in its publication; and (2) POGO did not ask Murray for comment prior to publication. Compl. ¶¶ 73, 87. The court already disposed of these arguments with respect to WaPo and that reasoning applies with equal force to POGO. The only other argument Murray makes as to POGO is that POGO "published their article" and "interview over one year after the administrative decision was issued." POGO Opp'n at 17. But this timing is readily explained. According to the POGO article, which ran on July 31, 2023, the news outlet had called for Ennis's resignation in March 2023, based in part on issues with whistleblower retaliation. POGO Article at 1. Further, Senator Wyden sent an initial letter to Ennis in July 2023 expressing his concerns about her performance as Inspector General. *Id.* at 3. That POGO reraised issues of whistleblower retaliation in this context does not beget a plausible inference of actual malice. Further, Murray does not plead that any intervening events caused POGO to have "entertained serious doubts as to the truth of [their] publication." *St. Amant*,

390 U.S. at 731. Accordingly, the claims based on any allegedly defamatory statements by POGO will be dismissed as well.[12]

### B.    False Light against WaPo, POGO, and GovExec

Murray also brings claims against the media defendants for false light invasion of privacy. Pennsylvania adopts the Second Restatement's formulation of this tort, which requires that "(1) the false light in which the other was placed would be highly offensive to a reasonable person, and (2) the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed." *Krajewski v. Gusoff*, 53 A.3d 793, 805–06 (Pa. Super. Ct. 2012) (citing Restatement (Second) of Torts § 652E (1977)). "The required standard of fault in a false light claim is . . . actual malice." *Monge v. Univ. of Penn.*, 674 F. Supp. at 212 (quoting *Rubin v. CBS Broad., Inc.*, 170 A.3d 560, 568 n.9 (Pa. Super. Ct. 2017)); *see also Walter v. Herbert*, No. 3:23-cv-2166, 2024 WL 2159516, at *10 (M.D. Pa. May 14, 2024) (requiring the plaintiff to prove actual malice without regard to the plaintiff's status as a public or private figure) (citation omitted). Further, "in Pennsylvania, falsity means the same thing for false light as it does for defamation." *McCafferty v. Newsweek Media Grp., Ltd.*, 955 F.3d 352, 360 (3d Cir. 2020) (citation omitted). Falsity in the false light context can thus be that a statement is "not true" or if there is "discrete presentation of information in a fashion which renders the publication susceptible to inferences casting one in a false light." *Larsen v. Phila. Newspapers, Inc.*, 543 A.2d 1181, 1188–89 (Pa. Super. Ct. 1988) (citations omitted).

Because a claim for false light under Pennsylvania law requires Murray to plead actual malice and falsity, the court's previous rulings that she failed to do so as to her defamation claims against WaPo and POGO is dispositive. *McCafferty*, 955 F.3d at 360; *Tah*, 991 F.3d at 243;

---

[12] Because the court finds no liability in defamation for the original publications, the court also concludes there is no liability for any alleged republications. *See, e.g.*, Compl. ¶¶ 58, 66, 71.

*Farah v. Esquire Magazine*, 736 F.3d 528, 540 (D.C. Cir. 2013) ("[A] plaintiff may not use related causes of action to avoid the constitutional requisites of a defamation claim.") (internal quotation marks and citation omitted).

That leaves the false light claim against GovExec, which is the only one against it. *See* Compl. ¶¶ 84–85; *id.* at 34 (Count IV).  The article by GovExec in question states that: (1) "an administrative law judge found that Ennis' office retaliated against" Shaw; (2) "[l]ast October, SSA OIG chief counsel and federal whistleblower coordinator Michelle Murray sued Shaw and another whistleblower for defamation, as well as *The Washington Post* for its reporting on their disclosures, seeking more than $1 billion in damages"; and (3) in a February 2024 letter to President Biden, Senator Wyden called for Inspector General Ennis's removal.  Compl. ¶ 84–85.  In his letter, Wyden wrote that, under Ennis's leadership, the Agency "has been plagued by complaints of a hostile work environment, retaliatory civil lawsuits filed against fellow employees, abysmal staff morale ratings, and failing productivity," and "[m]ost concerningly, the [MSPB] has recently found that" Ennis "and her leadership team have retaliated against one of her employees for blowing the whistle."  *Id.*, Ex. 24, ECF No. 49-11 at 1–2.

"In order to prevail on this theory of false light invasion of privacy, [plaintiff] must show discriminate publication of true statements, that is, appellees must have *created* a false impression by knowingly or recklessly publicizing selective pieces of true information."  *Santillo v. Reedel*, 634 A.2d 264, 267 (Pa. Super. Ct. 1993) (emphasis in original); *see Nothstein v. USA Cycling*, 499 F. Supp. 3d 101, 127 (E.D. Pa. 2020) ("To prove invasion of privacy false light 'it is enough that the plaintiff is given unreasonable and highly objectionable publicity that attributes to him characteristics, conduct or beliefs that are false, and so is placed before the public in a false position.'") (quoting Restatement (Second) Torts § 652E cmt. B) (cleaned up).  Murray comes

nowhere close to making out such a claim against GovExec.  According to Murray, "the article—by virtue of its sentence structure—causes the reader to believe that this lawsuit continued illegal retaliation, once again branding Plaintiff as a sustained 'retaliator.'"  Compl. ¶ 85.  But even if that were the impression created by the article, it is not a false one.  Senator Wyden's letter refers to "*retaliatory* civil lawsuits," but does not mention Murray's name, and then GovExec simply conveyed that Murray had brought the case.  That does not make for an actionable false light claim.

Murray's false light claim against GovExec must be dismissed for an additional reason: the failure to plead actual malice.  The only new argument raised is that before publishing GovExec "sought an official statement from SSA OIG," which then "disputed Wyden's characterization of . . . [the] MSPB's ruling against the agency."  Pl.'s Opp'n to GovExec Mot., ECF No. 91, at 17 (internal quotation marks and citation omitted).  The Agency spokeswoman told GovExec that the MSPB "did not find that IG Ennis or anyone in her leadership team retaliated against a whistleblower."  Compl., Ex. 23, ECF No. 49-10, at 2.  But GovExec conveyed that very response, quoting at length the spokeswoman's rebuttal to Wyden's allegations.  That is the opposite of acting with actual malice.  The denial, further, did not put GovExec on notice of any falsity of their statement.  *See Lohrenz v. Donnelly*, 350 F.3d 1272, 1285 (D.C. Cr. 2003).  Accordingly, the false light claim against GovExec is dismissed.

### C.    Tortious Interference Against WaPo and POGO

Murray alleges both negligent tortious interference and tortious interference against WaPo and POGO.  In *Farah*, the D.C. Circuit found that "[t]he First Amendment considerations that apply to defamation" also apply to tortious interference claims and affirmed dismissal on the same grounds as the plaintiff's defamation claim.  736 F.3d at 540 (collecting cases).  Murray did not respond to any of WaPo or POGO's substantive arguments on these counts, and she conceded that

they are based on the same alleged facts as her defamation claims. *See* WaPo Opp'n at 18 n.25 (arguing that her additional claims for false light and tortious interference should survive with her defamation claims); *see also* POGO Opp'n at 18 n. 20 (same). Murray nowhere addresses additional substantive grounds for this claim to survive. The court therefore dismisses the tortious interference counts for the same reasons as the defamation and false light counts.

## IV.    INDIVIDUAL DEFENDANTS' MOTIONS TO DISMISS[13]

The court now turns to Defendants Shaw's, Funnié's, and Williamson's Motions to Dismiss under Rule 12(b)(6) (collectively "Individual Defendants").[14] *See* Williamson Mot. to Dismiss, ECF No. 85 [hereinafter Williamson Mot.]; Shaw Mot. to Dismiss, ECF No. 102 [hereinafter Shaw Mot.]; Funnié Mot. to Dismiss, ECF No. 103 [hereinafter Funnié Mot.]. Because the United States noticed its substitution for these Defendants for some but not all aspects of Murray's claims, the court also addresses here the government's motion to dismiss under Rule 12(b)(1) for lack of subject matter jurisdiction. *See* Gov't Mot. to Dismiss, ECF No. 88 [hereinafter Gov't Mot.]; Westfall Cert., ECF No. 84.

### A.    The Westfall Certification

The court, however, begins not with these motions, but with the propriety of the United States seeking to substitute itself as a defendant under the Westfall Act. The Act provides in relevant part:

> Upon certification by the Attorney General that the defendant was acting within the scope of his office or employment at the time of the incident out of which the claim arose, any civil action or proceeding commenced upon such a claim in a United States district court shall be deemed an action against the United States under the

---

[13] Because McGunagle filed only a Rule 12(b)(5) motion to dismiss for failure to effect proper service, the court does not rule on any substantive claims against him.

[14] Williamson also moves on subject matter jurisdiction grounds under Rule 12(b)(1) for lack of complete diversity. However, the court's jurisdiction over Murray's state law claims is based not on diversity, but supplemental jurisdiction under 28 U.S.C. § 1267, given her assertion of federal claims that arise out of the same nucleus of operative facts.

provisions of this title and all references thereto, and the United States shall be substituted as the party defendant.

28 U.S.C. § 2679(d)(1). A certification by the Attorney General that an official was acting within the scope of their employment is not "conclusive[]," but it does "constitute *prima facie* evidence that the employee[s] [were] acting within the scope of [their] employment." *Council on Am. Islamic Rels. v. Ballenger*, 444 F.3d 659, 662 (D.C. Cir. 2006) [hereinafter "*CAIR*"] (internal quotation marks and citations omitted).

In this case, the government certified that Individual Defendants acting within the scope of their employment with respect to five alleged acts: (1) "statements made by the Employees to Congress or interactions regarding the same," *see* Compl. ¶¶ 80–87; (2) "statements made by the Employees during [MSPB] proceedings or interactions regarding the same," *see id.* ¶¶ 42–47; (3) "the Employees sharing or distributing a copy of the initial complaint in this action to others within the government," *see id.* ¶ 75; (4) "statements made by the Employees to other employees of the Office of the Inspector General or interactions regarding the same," *see id.* ¶ 52; and (5) "the Employees urging others in the Office of Inspector General to hire an individual," *see id.* ¶ 57. Westfall Cert. at 1–2. The government thus substituted itself for Individual Defendants for claims arising from those actions. *See id.* at 2 (citing 28 U.S.C. § 2679(d)(1)). The United States did not, however, substitute itself for certain other conduct, determined to fall outside the scope of the Individual Defendants' employment: alleged statements made by them to the press or outside interest groups or within the comment sections of the Social Security News blog. *See id.* (citing Compl. ¶¶ 48, 51, 61–62, 65, 67–68, 79).

Murray concedes that if the government's Westfall Certification stands, then her claims against the Individual Defendants for acts within the Certification must be dismissed for lack of jurisdiction because the United States has not waived sovereign immunity as to them. *See* Pl.'s

40

Stmt. in Response to Gov't Mot., ECF No. 119, at 1.  Murray thus objects to the government's Westfall Certification.  *See* Pl.'s Objection to Gov't Westfall Cert, ECF No. 96 [hereinafter Westfall Objection].  Murray acknowledges that none of her claims arise from Shaw's or Funnié's pursuit of corrective action before the MSPB or Williamson's urging the Agency to hire any individual employee.  *See id.* at 9, 14–15; *see also* Compl. ¶ 36 n. 7 ("This Complaint does not concern Defendants Shaw's or Funnié's legal right to pursue corrective action before the Merit Systems Protection Board, including defamatory and false statements" made therein.).  The court therefore does not delve into the Certification as to that conduct.  As to the other three actions the government certifies were within the scope of employment, Murray argues that they "were not a part of or incidental to any authorized job duty or assignment," "did not occur while they were on duty time or at their official duty station," and their purpose "was entirely personal in nature." Westfall Objection at 2–3.

To challenge a Westfall Certification, a plaintiff must "com[e] forward with specific facts rebutting the certification" that the defendant's challenged conduct was within the scope of their employment.  *Stokes v. Cross*, 327 F.3d 1210, 1214 (D.C. Cir. 2003) (internal quotation marks and citations omitted).  However, "[n]ot every complaint will warrant further inquiry into the scope-of-employment issue."  *Id.* at 1216.  Thus, in many instances, it is appropriate for the court to decide the question on the papers—"there is no right to even limited discovery in a Westfall Act case unless and until a plaintiff alleges sufficient facts to rebut the Government's certification." *Wuterich v. Murtha*, 562 F.3d 375, 382 (D.C. Cir. 2009) (citations omitted).  And further, "[r]ather than rely on mere conclusory allegations and speculation, [the plaintiff] must submit persuasive evidence—specific evidence or a forecast of specific evidence—that contradicts the certification." *Steele v. Meyer*, 964 F. Supp. 2d 9, 17 (D.D.C. 2013) (internal quotation marks and citation

omitted); *see also Jacobs v. Vrobel*, 724 F.3d 217, 221 (D.C. Cir. 2013) (noting that "[m]ere conclusory statements" are not enough to rebut a Westfall Certification) (internal quotation marks and citation omitted).

The court concludes that Murray has not alleged sufficient material facts either to sustain her objection or warrant discovery as to scope of employment.

### 1.    *Governing Law*

Both Murray and the United States evaluate the Westfall Certification's merits under District of Columbia law.  Westfall Objection at 2; Gov't's Opp'n to Pl.'s Mot. for Discovery and Objection to Westfall Cert., ECF No. 111 [hereinafter Gov't Westfall Opp'n], at 6–7.  The court then does the same.

The District of Columbia "generally adheres to" the Second Restatement of Agency in delineating the scope of employment.  *Trump v. Carroll*, 292 A.3d 220, 228 (D.C. 2023).  This means, in relevant part, that conduct falls within the scope of employment if "(a) it is of the kind [the person] is employed to perform; (b) it occurs substantially within the authorized time and space limits;" and "(c) it is actuated, at least in part, by a purpose to serve the master[.]"  *Id.* (quoting Restatement (Second) of Agency § 228(1)).  "Conduct of a servant is not within the scope of employment if it is different in kind from that authorized, far beyond the authorized time or space limits, or too little actuated by a purpose to serve the master."  *Id.* (quoting Restatement (Second) of Agency § 228(2)).  The D.C. Court of Appeals construes this language broadly.  *Id.* at 229.  "Although scope of employment is generally a question for the jury, it 'becomes a question of law for the court . . . if there is not sufficient evidence from which a reasonable juror could conclude that the action was within the scope of the employment.'"  *CAIR*, 444 F.3d at 663 (quoting *Boykin v. District of Columbia*, 484 A.2d 560, 562 (D.C. 1984)).

The first factor of the inquiry "plainly encompasses an employee's performance of their stated job duties," but also "extends beyond that narrow category of conduct." *Trump*, 292 A.3d at 230. Thus, the action need not be "*expressly* authorized" and can include "informal responsibilities" integral to employment. *Id.* (internal citations omitted) (emphasis in original). Accordingly, conduct falls within the scope of the employment if it is "'the same general nature as' *or* 'incidental to' the conduct authorized." *Id.* (quoting Restatement (Second) of Agency § 299(1)) (emphasis in original). The D.C. Court of Appeals has focused on "whether the conduct was an 'outgrowth of a job-related controversy,' . . . the 'outgrowth of the employees' instructions or job assignments,' . . . or the 'outgrowth of a job-related dispute.'" *Id.* at 232 (citations omitted). The first prong requires "focus on the type of act [the defendant] took that gave rise to the tort, not the wrongful character of that act." *Jacobs*, 724 F.3d at 221 (citation omitted).

Whether an employee's conduct "occurs substantially within the authorized time and space limits"—the second factor—presents "three distinct considerations: (1) a "temporal element," *i.e.,* was the employee acting during an authorized time; (2) a "spatial element," *i.e.*, was the employee acting within authorized space limits; and (3) a quantitative element, *i.e.* "that the conduct need only be 'substantially' within the authorized time and space limits." *Trump*, 292 A.3d at 232 (citations omitted). The quantitative element "counsels against a strict understanding of where and when an employee was on duty." *Id.* at 233. It is "the specific circumstances of the employment" that matter. *Id.* at 232.

The third factor asks whether the employee was "actuated, at least in part, by a purpose to serve the master." *Id.* at 233 (cleaned up). This prong also presents three considerations: (1) a "purpose element," *i.e.*, whether the employee's action was motivated by a purpose to serve their employer; (2) a "quantum element," *i.e.*, whether the employee was motivated "at least in part" to

serve the employer; and (3) a "timing element," *i.e.* when the employee possesses the requisite purpose. *Id.* at 233–38. As to the purpose element, the "focus is on the subjective state of mind of the tortfeasor-employee," asking whether "the tortfeasor employee . . . used their employment as a mere opportunity to act on a personal grievance," or "whether the employee was in fact responding to an employment-related circumstance, despite the tortious conduct appearing as if it were personally motivated." *Id.* at 234–35. As to the quantum element, an employee may be dually motivated by a personal purpose and a desire to serve her employer—a personal purpose may in fact be the employee's predominant purpose, but a desire to serve her employer must be "more than an insignificant" purpose. *Id.* at 235–37. Lastly, the timing element, "construed quite broadly," requires only that the "requisite purpose" exist "in the moments preceding the commission of the tort when warranted by the factual context." *Id.* at 237.

### 2.    Statements to Congress

The court begins with the Individual Defendants' statements to Congress. Murray first argues that such communications were not conduct of the kind the Individual Defendants were employed to perform. Murray alleges that the three Individual Defendants and McGunagle "approach[ed]" Senator Ron Wyden to commit tortious and defamatory acts, *see* Compl. ¶ 80, which prompted him to send letters to the Agency and President Biden addressing his concerns with whistleblower retaliation and Murray's lawsuit, *see id.* ¶¶ 81–85. Murray points to a meeting occurring in December 2022 at Senator Wyden's office, and claims that the Individual Defendants' attendance at this meeting or other communications with Congress were "not foreseeable or incidental to their job duties or an assignment" since "none of these Defendants are assigned work duties or tasks that include Congressional outreach." Westfall Objection at 4–7.

44

Case law says otherwise.  Courts in this district "routinely find that a federal employee's statements made during the course of government investigations fall within the scope of that employee's duties, even when the statements are alleged to be false or defamatory." *Minnick v. Carlile*, 946 F. Supp. 2d 128, 132 (D.D.C. 2013), *aff'd sub nom. Minnick v. United States*, No. 13-5241, 2014 WL 590863 (D.C. Cir. Jan. 22, 2014) (citing *Upshaw v. United States*, 669 F. Supp 2d 32, 42 (D.D.C. 2009); *Klugel v. Small*, 519 F. Supp. 2d 66, 74 (D.D.C. 2007); *Hosey v. Jacobik*, 966 F. Supp. 12, 14–15 (D.D.C. 1997)).  As Murray admits, Congress was preparing to launch a broad, bipartisan inquiry into the Agency around the time that Defendants' communications took place.  *See* Pl.'s Reply to Gov't Westfall Opp'n, ECF No. 113, at 6 n. 6 (citing Lisa Rein, *Senate investigators to probe tumult in Social Security watchdog division*, The Washington Post (Dec. 29, 2022), https://www.washingtonpost.com/politics/2022/12/29/senate-probe-social-security/).

Further, District of Columbia law requires only a "nexus between the tortious conduct and the employee's responsibilities for it to be an outgrowth of a job-related controversy." *Trump*, 292 A.3d at 232.  The proper inquiry "focuses on the underlying dispute or controversy, not on the nature of the tort, and is broad enough to embrace *any intentional tort arising out of a dispute that was originally undertaken on the employer's behalf*." *CAIR*, 444 F.3d at 664 (internal quotation marks and citation omitted) (emphasis added).  Applying that principle here, federal employees have the right to seek corrective action from the MSPB based on whistleblower reprisal, *see* 5 U.S.C. § 1221(a), and MSPB proceedings may be used by federal employees to challenge prohibited personnel actions taken against them by their supervisors, *see generally* 5 U.S.C. § 2302.  It therefore fell within the scope of their employment for the Individual Defendants to take their concerns about whistleblower reprisal to the MSPB.  Cooperating with Congress was a direct "outgrowth of [this] job-related dispute." *Trump*, 292 A.3d at 232 (citation omitted).

Moreover, the government has presented specific evidence that at the time of the December 2022 meeting with Senator Wyden, contact with Congress was part of the scope of these defendants' duties at the Agency. *See* Gov't Westfall Opp'n, Decl. of Keith Ewancio, ECF No. 111-1 [hereinafter Ewancio Decl.], ¶¶ 3–5; *id.*, Exs. B, E, F; *see also Jerome Stevens Pharm., Inc. v. Food & Drug Admin.*, 402 F.3d 1249, 1253 (D.C. Cir. 2005) (allowing district courts to consider materials outside the pleadings in deciding whether to grant a motion to dismiss for lack of jurisdiction). Beginning December 2019, Shaw was an Attorney-Advisor at the Agency, Ewancio Decl., ¶ 3, and her job description stated that she "may have contact with Congressional committees," *id.*, Ex. B at 15 (CM/ECF pagination). Funnié, as Assistant Inspector General for Workforce Performance and Development at the time, Ewancio Decl. ¶ 4, would "represent[]" the Agency "at meetings and in work groups, with entities such as . . . Congress, as needed," and "[p]rovide[] summaries of findings and activities for the" Agency's "Semiannual Reports to Congress," *id.*, Ex. E at 3. Lastly, Williamson, as Attorney-Advisor for Special Reviews, Ewancio Decl. ¶ 5, was tasked with "[d]evelop[ing] and prepar[ing] reports of complex investigations, as well as briefing memoranda for . . . Congress," *id.*, Ex. F at 35 (CM/ECF pagination). These job descriptions refute Murray's assertion that *any* contact with Congress was outside the scope of the Individual Defendants' employment.

Next, Murray maintains that the Individual Defendants were "not performing job duties on official duty time or at an official agency station when they engaged with Senator Wyden and his staff." Westfall Objection at 3. According to Murray, a meeting between the Individual Defendants and Senator Wyden occurred on a Saturday,[15] outside of duty time, and not at an Agency duty

---

[15] In Defendant Williamson's Motion to Dismiss, ECF No. 85, she states that she, Shaw, and Funnié attended a meeting at Senator Wyden's office on December 17, 2022, which was a Saturday, *see id.* at 10. Williamson later filed an Errata to correct that date to December 14, 2022, a Wednesday, *see* ECF No. 107, which Murray consented to while contesting

station.    She thus seeks discovery to identify various attendance records and any travel authorizations for Defendants to go to Senator Wyden's office in Washington, D.C.  *Id.* at 3–4. The court is unpersuaded.  As discussed, the Individuals Defendants' job-related responsibilities included communicating with Congress—whether generally about Agency matters or specifically whistleblower retaliation.  Nothing in the case law suggests that such communications must be restricted to a particular time or place.  If a Senator calls a federal employee to Capitol Hill on a Saturday, surely that day and location does not take such contact outside the scope of employment. *See Trump*, 292 A.3d at 232–33 (stating that an "employee's conduct does not need to be absolutely within the authorized time and space of the employment, only 'substantially,' which counsels against a strict understanding of where and when an employee was on duty").

Last, Murray insists that the Individual Defendants' actions were actuated not by a purpose to serve the Agency but personal animosity.  According to Murray, this is evidenced by (1) statements by Shaw's attorney targeting Murray's reputation during the MSPB proceeding, *see* Compl. ¶¶ 42–43, (2) an alleged admission by Shaw that the judge did not find Murray liable for retaliation, *id.* ¶ 52, and (3) the fact that, at the time of their communications with Congress, Shaw had won her Individual Right of Action, Funnié had settled hers, and Williamson had no claim for whistleblower retaliation, *see* Westfall Objection at 8.  These allegations, however, focus too much on what Murray perceives to be tortious acts and too little on the context of the situation. The Individual Defendants were engaging in whistleblower disclosures to Congress. Whistleblower activities "serve the public interest by assisting in elimination of fraud, waste, abuse and unnecessary Government expenditures" and assist the Government by striving toward a "more effective civil service[.]"  *See* Whistleblower Protection Act of 1989, Pub. L. No. 101-12 § 2(a)(1),

---

the veracity of the claim that the meeting occurred on December 14, *see id.*, Ex. A, ECF No. 107-1, at 2 (CM/ECF pagination).  The court does not make any judgment about the date of the meeting.

(2), 103 Stat. 16 (Apr. 10, 1989). With this in mind, "[p]ersonal animosity, if any existed, was subsumed by the benefit that inured to employees generally at the [Agency.]" *Brumfield v. Sanders*, 232 F.3d 376, 380–81 (3d Cir. 2000) (applying Restatement (Second) of Agency § 228)). Accordingly, Murray's assertions of malintent are of little moment in the circumstances.

The court therefore concludes that, consistent with the Westfall Certification, the Individual Defendants were acting within the scope of their employment while communicating or interacting with Congress.

### 3.   *Other Westfall Certification Actions*

The court addresses the other two categories of the government's Westfall Certification together: "the Employees sharing or distributing a copy of the initial complaint in this action to others within the government" and "statements made by the Employees to other employees of the Office of Inspector General or interactions regarding the same." Westfall Cert. at 1. Murray alleges that she overheard Shaw in conversation with another Agency employee during duty time about the initial decision from the MSPB proceeding. Compl. ¶ 52. Shaw allegedly stated that, although the judge did not find Murray had retaliated against Shaw, everyone, including Murray, would have to be fired. *Id.* Murray also alleges that Williamson shared a copy of her complaint with Defendant McGunagle as part of a conspiracy to prevent her from continuing with this suit. *Id.* ¶¶ 74–75.

Murray fails to allege any facts or forecast discovery of any evidence that these actions fall outside the scope of Shaw's or Williamson's employment. Murray's rebuttal is simply to baldly assert that "the conversation" between Shaw and the other Agency employee "did not include a job duty or was not incident to a work assignment," because the topic was "the result of her Individual Right of Action." Westfall Objection at 14. She adds that "Williamson's job duties

48

and work assignments do not include sharing Plaintiff's lawsuit with her paramour" and "her purpose for doing so was not to serve the interests of [the Agency.]" *Id.* at 12. However, Murray provides no *factual* allegations for the court to conclude that Defendants Shaw and Williamson were acting outside of the scope of their employment. *See, e.g., Jacobs*, 724 F.3d at 221, 223; *see also Cobb v. United States*, No. 21-cv-2419 (CKK), 2022 WL 2046109, at *5 (D.D.C. June 7, 2022) (a "'bare assertion' that [a defendant] was not acting in the scope of her employment 'is not sufficient to defeat the Attorney General's certification' as a matter of law." (quoting *Steele*, 964 F. Supp. 2d at 15)). The court thus finds that Murray failed to rebut the government's Westfall Certification as to these acts.

### 4.    *The Government's Motion to Dismiss*

Having determined that the government properly certified certain of the Individual Defendants' actions as within the scope of their employment, the court turns to the United States' Motion to Dismiss, ECF No. 88. "Under the [Federal Tort Claims Act ("FTCA")], 'certification by the Attorney General that the defendant employee was acting within the scope of his office or employment at the time of the incident out of which the claim arose' transforms an action against an individual federal employee into one against the United States." *Hui v. Castaneda,* 559 U.S. 799, 810 (2010) (citing 28 U.S.C. § 2679(d)(1)). The FTCA waives sovereign immunity for claims for money damages for some, but not all, torts. *See* 28 U.S.C. §§ 1346(b)(1), 2680. Murray concedes that she has "no legal basis to argue against the Government request for dismissal based on the [FTCA,]" as she neither exhausted administrative remedies nor did the government waive sovereign immunity. Pl.'s Stmt. in Response to Gov't Mot., ECF No. 119, at 1.

Murray nevertheless argues that her claim pursuant to 42 U.S.C. § 1985(2) should be allowed to proceed despite the Westfall Certification. *See id.* at 2. The court does not need to

reach the question of how, if at all, the United States' Westfall Certification affects the validity of Murray's § 1985(1) and § 1985(2) claims. For the reasons the court will explain below, that claim will be dismissed for failing to plausibly allege a cause of action.

### B.    Non-Westfall Claims

That leaves for the court's consideration Murray's claims against the Individual Defendants for acts outside the scope of their employment. Those actions include any statement made to the press or outside interest groups or within the comment section of the Social Security News blog. *See* Westfall Cert. at 2; *see also* Compl. ¶¶ 48, 54–56, 61–64, 65, 67–68, 72, 74, 79, 87.

### 1.    Defamation and Defamation Per Se Against Shaw and Funnié

Murray asserts defamation and defamation *per se* claims against Shaw and Funnié.[16] Although there is no heightened pleading standard for defamation in this Circuit generally, *see Croixland Props. Ltd. P'ship v. Corcoran*, 174 F.3d 213, 215 n.2 (D.C. Cir. 1999), courts have routinely held that a plaintiff must allege "the time, place, content, speaker, and listener of the alleged defamatory matter," *see Mattiaccio v. DHA Grp., Inc.*, 908 F. Supp. 2d 136, 138 (D.D.C. 2012) (quoting *Stovell v. James*, 810 F.Supp.2d 237, 248 (D.D.C. 2011) (holding that the plaintiff failed to adequately plead his defamation claim where he "failed to identify any of the specific statements" he alleged were defamatory)). The court thus must consider whether Murray

---

[16] Given the court's conclusion that Murray is a public official, *see* Section III(A)(3)(a), *supra*, the actual malice standard likely applies equally to her defamation and false light claims against Shaw and Funnié. *See e.g., Davis v. Schuchat*, 510 F.2d 731, 734 n.3 (D.C. Cir. 1975) ("Our understanding of [*New York Times v. Sullivan*] and its offspring is that private persons and the press are equally protected by the requirement that false comment about public figures must be knowing or in reckless disregard of the truth to be actionable. It seems to us a necessary corollary that comment about public figures should be equally protected whether made in mass media or in private."); *see also Tavoulareas v. Piro*, 817 F.2d 762, 798 n. 53 (D.C. Cir. 1987) (assuming without deciding that a nonmedia defendant "is protected by the *Sullivan* standard of actual malice when sued by a public figure"); *Avins v. White*, 627 F.2d 637, 649 (3d Cir. 1980) (requiring application of actual malice to statement by private defendant as "non-extension of the [*New York Times*] privilege to private individuals like [the defendant] creates a dangerous disequilibrium between the [F]irst [A]mendment's guarantees of freedom of speech and the press") (citing *Davis*, 510 F.3d at 734 n.3). However, Shaw and Funnié did not move on this ground, so the court will not address actual malice here.

adequately pleaded defamation as to the statements that fall outside of the government's Westfall Certification.

a.    Funnié

Starting with Funnié, Murray has not pleaded a single defamatory statement made by her. She alleges that "Defendants Shaw and Funni[é] intentionally and willfully, with malice, used and conspired with Defendants Rein and WaPo to publish a knowingly defamatory statement and other statements for the purpose of . . . bringing publicity placing Plaintiff in a false light."  Compl. ¶ 48. Yet, she does not attribute any statement in the WaPo article to Funnié that is defamatory.  *Id.* ¶¶ 54–56, 61–63.  Murray further alleges that "[o]n July 31, 2023 . . . , Defendants Shaw, Funni[é], Williams and POGO knowingly and willfully, with malice, or with reckless disregard publicized Plaintiff in a false light."  *Id.* ¶ 68.  Yet again, she identifies no false statement by Funnié.  *Id.* ¶ 72. As for Williams's interview with Temin, Murray alleges only that the statements made by *Williams* are defamatory.  *Id.* ¶ 70.  Murray's attempt to recast that allegation as against Shaw and Funnié in her opposition comes too late.  *See* Pl.'s Opp'n to Shaw and Funnié's Mot. to Dismiss, ECF Nos. 114 & 116 [hereinafter Shaw and Funnié Opp'n], at 9 n.10, 12–13 (identical oppositions); *Spence*, 109 F.4th at 538–39 (a court need not consider new facts alleged in an opposition where pro se litigant has "formal legal training") (internal quotation marks omitted).

Murray also argues for the first time in her opposition that anonymous blog-post comments were made by Shaw and Funnié and are defamatory.  Shaw and Funnié Opp'n at 13.  The court again declines to allow Murray, a high-level government attorney, to amend her complaint via opposition to a motion to dismiss.  In her complaint, she does not premise her defamations claims on any such anonymous statements, Compl. ¶¶ 51, 58, 79, but relies on them only as to her *conspiracy* claims, *id.* ¶ 79.   In any event, even if such allegations were in the complaint, she

offers no facts from which the court can infer that these Defendants were behind the anonymous comments. *See Iqbal*, 556 U.S. at 678.

           b.   <u>Shaw</u>

The court now turns to statements made by Shaw to the media or to outside interest groups. As an initial matter, the court dismisses any defamation claim based on purported statements by Shaw at National Whistleblower Day or at other events, as Murray does not even say what these alleged statements were or the nature of them. *Id.* ¶ 65.

Of primary concern to Murray are the statements Shaw made to WaPo. *See* Compl. ¶¶ 48, 55; Shaw and Funnié Opp'n at 3–11. The first is easily disposed of. The statement that she was "one of the management officials the judge found had retaliated against Shaw" was, according to Murray, made by *Shaw*. *See id.* at 11. That is simply wrong. It is plain from the text of the article that WaPo sourced that statement to the MSPB decision. *See* Section III(A)(1)(a), *supra*. The same is true for the paragraph in the POGO article regarding the MSPB decision. *See id.*; *see also* 42 Pa. Cons. Stat. § 8343(a)(2) (requiring a plaintiff to allege a statement's "publication by the defendant").[17]

Then there are the statements in the WaPo and POGO articles about ongoing retaliation. They include: "Michelle Murray . . . wrote and signed the appeal and is now her second-line supervisor, controlling her work assignments, requests for training and other aspects of her job, *according to Shaw.*" Compl. ¶ 55 (emphasis added). Elsewhere the WaPo article attributes to Shaw the statements that she "faced backlash for speaking out," "was limited to administrative, nonlegal busywork," "[h]er colleagues were directed to document anything she said about her case

---

[17] That Shaw allegedly stated "something to the effect that the administrative judge DID NOT find that Plaintiff had retaliated against her but noted that Plaintiff was a part of the Immediate Office" does not cut in favor of finding that the WaPo statement is properly attributed to Shaw. *See* Compl. ¶ 52.

or other concerns and report it to management," and that she was "reprimanded for helping colleagues." *Id.* ¶ 54–55; *see also* WaPo Article at 1–3.  The POGO Article also states that "Shaw reported that since returning to work, she has been denied projects in her area of expertise and forced to do nonlegal busywork, and that her colleagues were instructed to document anything she said related to her case and report it to management." *Id.* ¶ 72.[18]

  As an initial matter, Murray nowhere alleges in her complaint that Shaw's statements about her experience are false.  The closest she comes to such an allegation is a footnote stating that Shaw was not "reprimanded" because she was not given "an official disciplinary action recorded on an employee's official personnel records."  Compl. ¶ 55 n. 10.  But that alone is not enough to make out falsity given that no statement is attributed to Shaw in which she says that she was given a "formal" reprimand.

  What is clear from Murray's complaint is that she bristles at the inference that *she* engaged in sustained retaliation against Shaw after the MSPB hearing.  *See id.* ¶¶ 63, 72; *see also Graboff*, 744 F.3d at 137 (finding that publication of correct statements that convey a false impression can be actionable as defamation).  But that innuendo comes from the structure of the articles and editorial choices made by WaPo and POGO, not Shaw.  The statements attributed to Shaw with which Murray takes issue are not quotes; indeed, other statements by Shaw in the articles are. *See* WaPo Article at 3; POGO Article at 5.  The court has no way of knowing how long Shaw spoke to WaPo or POGO, the order in which she made her statements, or whether in fact she attributed the ongoing retaliation to Murray or someone else and WaPo or POGO simply decided not to name

---

[18] It is entirely unclear from the context of the POGO Article whether POGO spoke to Shaw prior to its release or whether the reporting was based solely on WaPo's previous articles.  The POGO Article refers repeatedly to WaPo's reporting and mirrors it in relevant respects, and only includes one direct quote from Shaw that is explicitly denoted as being "told [to] POGO."  *See generally* POGO Article.  Notwithstanding this uncertainty, the court addresses the claim anyway.  *See Hettinga*, 677 F.3d at 476.

names.  *See Chicarella v. Passant*, 494 A.2d 1109, 1112 (Pa. Super. Ct. 1985) ("Publication of defamatory matter is the intentional or negligent communication of such matter to one other than the person defamed.") (citation omitted).  Given that Shaw is not responsible for the media's editorial choices, which Murray argues caused her harm, *see* WaPo Opp'n at 3–4, POGO Opp'n at 2–4, the court cannot conclude that Murray has plausibly alleged that Shaw defamed her by implication with these statements.  *See Sarkees*, 37 A.2d at 546 (language must be "fairly and reasonably be construed to have the meaning imputed in the innuendo"); *cf. Tavoulareas v. Piro*, 759 F.2d 90, 137–37 (D.C. Cir. 1985) (finding no liability for the  defendant where he did not take "any part in the *actual* writing or editing" of an article and exercised no "influence or control over" the media's handling of these materials, even though he furnished information, conferred over the course of the story, and gave a source) (emphasis in original), *vacated in part on reh'g on other grounds*, 763 F.2d 1472 (D.C. Cir. 1985), *and on reh'g on other grounds*, 817 F.2d 762 (D.C. Cir. 1987).

### 2.    *False Light Against Shaw and Funnié*[19]

To reiterate, to plead false light under Pennsylvania law, Murray must "allege[] that the defendant knowingly or recklessly" published statements "in a manner which created a false impression."  *Larsen*, 543 A.2d at 1189.  For the same reasons that her defamation claims fail, so too do her false light claims against Shaw and Funnié.

### 3.    *Tortious Interference Against the Individual Defendants*

The court now turns to the tortious interference claims against the Individual Defendants.  *See* Compl. at 33–34.  Recall that these claims may only be based on conduct falling outside of the

---

[19] The court does not address any purported false light claim against Williamson because she is not alleged to have committed the false light tort in Count IV of the complaint.  *See* Compl. at 34–35.

government's Westfall Certification, *i.e.,* statements by Defendants to the media, to outside interest groups, or in comment sections on a blog. *See* Westfall Cert. at 2.

The court dismisses the negligent tortious interference claim because Pennsylvania courts generally do not recognize such a cause of action. *See, e.g., Valley Forge Convention & Visitors Bureau v. Visitor's Services, Inc.*, 28 F. Supp. 2d 947, 952 (E.D. Pa. 1998); *see also Wagdy v. Sullivan*, No. 16-cv-2164 (TJK), 2018 WL 2304785, at *2 (D.D.C. May 18, 2023) (no such claim under District of Columbia law). There is a limited exception where a "special relationship" exists among the parties, such as one involving confidentiality, the repose of special trust, or fiduciary responsibilities. *See Valley Forge Convention & Visitors Bureau*, 28 F. Supp. 2d at 952 (citations omitted). Murray alleges no such special relationship here.

As for Murray's tortious interference claim, she states that the Individual Defendants "[i]ntentionally interfered with Plaintiff's contractual arrangement of employment with the Federal government and business relations." Compl. at 34 (Count III). This includes her removal as Whistleblower Protection Coordinator, *id.* ¶ 82, and POGO's decision not to participate in a Whistleblower Education Forum event held by Murray, *id.* ¶ 61; *see also id.*, Ex. 10, ECF No. 1-10.

Pennsylvania law recognizes two different interference torts, one with contract and one with prospective contractual relations, both of which Murray seemingly invokes. *See, e.g., Wurth Baer Supply Co. v. Strouse*, 627 F. Supp. 3d 422, 434 (M.D. Pa. 2022). The complaint ties Murray's tortious interference claim to her false light and defamation claims against various defendants. *See* Compl. ¶¶ 42, 48, 61, 64. Because these claims are not actionable against Shaw and Funnié, neither is her tortious interference claim. *See Farah*, 736 F.3d at 537–40 (dismissing

tortious interference claim based on alleged defamatory statements where the statements did not make out claims of defamation).

As for Williamson, Murray does not clearly allege what actions by her constituted tortious interference. The allegations that POGO declined to participate in Murray's whistleblower event refer solely to statements contained in the WaPo article, none of which are attributed to Williamson. *See* Compl. ¶ 61. And the only factual allegation related to Williamson and Murray's role as Whistleblower Coordinator falls within the scope of the government's Westfall Certification. *See id.* ¶ 80.[20] Accordingly, Murray failed to plausibly plead a claim of tortious interference against Williamson, too.

4.    *Conspiracy Claims Against the Individual Defendants*

The court now arrives at the last of Murray's claims: violations of 42 U.S.C. § 1985(1) and § 1985(2). Specifically, she charges that "Defendants Shaw, Funnié, Williamson, and McGunagle conspired and made overt acts to prevent Plaintiff . . . from performing assigned job duties as Whistleblower Protection Coordinator[,]" and "conspired and made overt acts to deter, intimidate and threaten Plaintiff . . . from continuing with this suit . . . result[ing] in Plaintiff being injured at work and fear of continued injury both to her property (federal employment) and to her person." Compl. at 35.

Section 1985(1) makes it unlawful for "two or more persons . . . [to] conspire to prevent, by force, intimidation or threat, any person . . . from discharging any duties [of public office]; . . . or to injure him in his person or property on account of his lawful discharge of the duties of his office." 42 U.S.C. § 1985(1). In relevant part, Section 1985(2) makes it unlawful for "two or more persons . . . [to] conspire to deter by force, intimidation, or threat, any party or witness in any

---

[20] This same reasoning applies to any tortious interference claim against Shaw and Funnié arising out of this allegation.

court of the United States from attending such court, or from testifying to any matter pending therein[.]" 42 U.S.C. § 1985(2).

"[S]ection 1985 plaintiffs must allege the elements of civil conspiracy." *Barr v. Clinton*, 370 F.3d 1196, 1200 (D.C. Cir. 2004) (quoting *Hall v. Clinton*, 285 F.3d 74, 83 (D.C. Cir. 2002)). These include: "(1) an agreement between two or more persons; (2) to participate in an unlawful act, or a lawful act in an unlawful manner; (3) an injury caused by an unlawful overt act performed by one of the parties to the agreement; (4) which overt act was done pursuant to and in furtherance of the common scheme." *Sculimbrene v. Reno*, 158 F. Supp. 2d 8, 16 (D.D.C. 2001) (citing *Halberstam v. Welch,* 705 F.2d 472, 477 (D.C. Cir. 1983)). Murray must further allege a "meeting of the minds as to some improper purpose," and "a causal connection between the overt act(s) taken in furtherance of the conspiracy and the alleged injury." *Id.* (internal quotation marks and citations omitted).

Murray fails altogether to allege with facts a "meeting of the minds" between Shaw, Funnié, Williamson, and McGunagle. Her contentions are primarily of the conclusory variety. *See* Compl. ¶¶ 42, 48, 51, 74; *id.* at 35. She does allege certain interactions among these Defendants, but they rest largely on their interpersonal relationships. *See id.* ¶ 2 (Williamson is a "long-time friend" of Shaw and Funnié); *id.* ¶ 3 (McGunagle has a "personal relationship" with Williamson and "friendship" with other defendants). That is reason alone to dismiss these counts. *See Bush v. Butler*, 521 F. Supp. 2d 63, 68 (D.D.C. 2007) ("To survive a motion to dismiss a Section 1985 claim, plaintiff must set forth more than conclusory allegations of an agreement[;] . . . plaintiff should allege the existence of any events, conversations, or documents indicating there was an agreement between the defendants to violate his rights.").

Moreover, what limited "overt acts" she specifies do not establish the claimed conspiracy. Murray alleges that (1) Williamson shared a copy of the initial complaint in this action with McGunagle, *id.* ¶ 75; (2) McGunagle sent a copy of the complaint to Charles Hall for his blog, *id.* ¶ 76; (3) Shaw, Funnié, Williamson, and McGunagle left comments or encouraged leaving comments on Hall's blog, *id.* ¶ 79; and (4) Shaw, Funnié, Williamson, and McGunagle approached Congress to "apply pressure on the Inspector General to prevent Plaintiff . . . from preforming [*sic*] the role of Whistleblower Protection Coordinator and to deter, intimidate and threaten Plaintiff from continuing with this suit, including attending court and providing testimony," *id.* ¶ 80.  These allegations fail to plead a plausible § 1985 claim.  The first three do not establish a conspiracy whose object is to interfere with Plaintiff's duties as a federal employee, and the fourth is not a well-pleaded fact; it is a conclusory assertion that the court need not treat as fact.  Because Murray fails to plausibly allege the elements of a civil conspiracy against the Individual Defendants, this claim is dismissed.[21]

## V.    DEFENDANT MCGUNAGLE'S MOTION TO DISMISS

Defendant McGunagle moves to dismiss under Rule 12(b)(5) for failure to serve process. *See* McGunagle Mot. to Dismiss, ECF No. 94 [hereinafter McGunagle Mot.].  Under Rule 4(m), Murray is responsible for timely service of a summons and copy of the complaint.  Unless a defendant waives service, a plaintiff must file proof of service with the court.  Fed. R. Civ. P. 4(l). Relevant here, "an individual may be served in a judicial district of the United States by" (1) following state law for the jurisdiction in which the district court is located; (2) "delivering a

---

[21] The court also notes that "First Amendment protections apply to section 1985 claims like the one presented here." *Barr*, 370 F.3d at 1203.  Allowing a "public official[] to recast defamation claims barred by *New York Times* as section 1985(1) conspiracies [would] chok[e] off the breathing space necessary to safeguard the freedoms protected by the First Amendment." *Id.* (internal quotation marks and citation omitted).  The First Amendment thus arguably also requires dismissal of Plaintiff's § 1985 claims.

copy of the summons and of the complaint to the individual personally;" or (3) leaving a copy of those documents at the person's "dwelling or usual place of abode" with someone of "suitable age and discretion who resides there." Fed. R. Civ. P. 4(e). The District of Columbia allows an individual to be served "by registered or certified mail" with "return receipt requested." D.C. Super. Ct. R. Civ. P. 4(c)(4). A court may dismiss a complaint for insufficient service of process. Fed. R. Civ. Pro. 12(b)(5); *Simpkins v. Dist. of Columbia Gov't*, 108 F.3d 366, 369 (D.C. Cir. 1997).

On March 26, 2024, a summons was issued to Murray for McGunagle. *See* Summons, ECF No. 55. On June 18, 2024, this court issued an Order to Show Cause, requiring Murray to serve McGunagle by June 24, 2024. *See* Order, ECF No. 78. The court later extended that deadline by 45 days to August 15, 2024, warning Murray that failure to complete service within that time may result in dismissal of the claims against McGunagle without prejudice. *See* Minute Order (July 1, 2024).

On August 14, 2024, Murray filed an Affidavit of Process Server. *See* Affidavit, ECF No. 92. The process server attested that on August 9, 2024, at 1:06 pm she delivered a copy of the summons, Amended Complaint, civil cover sheet, and exhibits via certified mail to McGunagle. *See id.* However, the affiant noted that "[t]he domestic return receipt has not yet been returned." *Id.* The affidavit itself included an attached "Investigative Due Diligence Affidavit," which denoted that another process server was unable to personally serve McGunagle on August 3, 6, and 11, 2024. *See* Affidavit, Ex. 1, ECF No. 92-1.

McGunagle's motion is supported by a personally attested affidavit. *See* McGunagle Mot., Def.'s Decl., ECF No. 94-1 [hereinafter McGunagle Decl.]. According to McGunagle, he was traveling outside of District of Columbia on August 3, 6, 9, and 11–18 and thus was unable to

receive personal service or sign a return receipt for certified mail. *Id.* ¶ 2. McGunagle further states that no one of competent age and discretion lives with him, and he did not designate any person to receive process on his behalf. *Id.* ¶¶ 3–4. Lastly, McGunagle attaches the tracking information from USPS regarding this mailing, which states that it was "[d]elivered, left with individual" on August 9, 2024, at 1:06 pm. *Id.*, Attach. 2, ECF No. 94-2. McGunagle attests that he was not the "individual" so referenced. McGunagle Decl. ¶ 5.

Murray argues that her service suffices because McGunagle admits that, on August 18, 2024, he received the certified mailing "with the green card" in his mailbox in the lobby of his residence. *See* Pl.'s Opp'n to McGunagle Mot., ECF No. 97 [hereinafter McGunagle Opp'n], at 1–2; *see also* McGunagle Decl. ¶ 1. The court disagrees.

Other courts in this district have found that "[s]ervice by certified mail may be insufficient . . . if there is no confirmation of receipt by a person authorized to accept service." *Hardy v. Joseph I. Sussman, P.C.*, 953 F. Supp. 2d 102, 107 (D.D.C. 2013). Here, Murray has never produced evidence that the person who received the mailing was qualified to accept service on McGunagle's behalf. *See, e.g., Lemma v. Hispanic Bar Ass'n*, 318 F. Supp. 3d 21, 25–26 (D.D.C. 2018) (finding service defective where plaintiff "failed to produce a return receipt signed by an authorized person" even though plaintiff "did send the [defendant] a copy of the summons and complaint by certified mail"). This would require evidence that the person accepting service was "someone of suitable age and discretion who resides there" or "an agent authorized by law to receive service of process." D.C. Super. Ct. R. Civ. P. 4(e)(2)(B)–(C); *see also* Fed. R. Civ. P. 4(e)(2)(B)–(C); *Anderson v. Gates*, 20 F. Supp. 3d 114, 122 (D.D.C. 2013). Murray has not rebutted McGunagle's attestation that this did not occur. Further, "actual notice" of a lawsuit is insufficient to fix defective service.

*Rowe v. Dist. of Columbia*, 892 F. Supp. 2d 174, 180 (D.D.C. 2012) (internal quotation marks and citation omitted).

Rule 4(m) permits the court to extend time for service when there is "good cause" to do so. *See* Fed. R. Civ. P. 4(m). "Good cause exists when some outside factor . . . rather than inadvertence or negligence, prevented service." *Mann v. Castiel*, 681 F.3d 368, 374 (D.C. Cir. 2012) (internal quotation marks and citation omitted). Murray asserts that McGunagle's declaration shows he "did not travel" on August 10, 2024, "bringing into question whether he opened his mail on that date and then left town so as to claim non-receipt." McGunagle Opp'n, at 3 n.2. According to Murray "[a] reasonable person would surely have checked their mail after they had been traveling extensively and planned to be out of town for another week." *Id.* But Murray's speculation about McGunagle does not establish "good cause" and, in any event, she has not asked for additional time to complete proper service.

Though Murray is a pro se litigant, she is also a licensed attorney who proved herself more than capable of serving the other defendants in this suit. Further, the court previously granted Murray an extension to effect service on McGunagle. An additional *sua sponte* extension is unwarranted. Accordingly, the court grants McGunagle's motion to dismiss and dismisses the claims against him without prejudice.

## VI.    PLAINTIFF'S MOTION FOR SANCTIONS

At long last, the court comes to the final pending motion, Murray's request for sanctions against Defendants Shaw, Funnié, and their attorney, Alexis Pozonsky. *See* Mot. for R. 11 Sanctions, ECF No. 115 [hereinafter Mot. for Sanctions]. According to Murray, sanctions are warranted because of statements in the introduction of both Shaw's and Funnié's respective Motions to Dismiss, asserting that Murray "is not merely one of many individuals who colluded

to punish" Shaw and Funnié but "was the principal orchestrator of this scheme," *see* Shaw Mot., Mem. of P&A in Supp, ECF No. 102-1 [hereinafter Shaw Mem.] at 1; Funnié Mot., Mem. of P&A in Supp., ECF No. 103-1 [hereinafter Funnié Mem.], at 1.  The motions colorfully continue that Murray pursued charges against Shaw and Funnié "with the tenacity and ferocity of a junkyard dog," Shaw Mem. at 1, and "was involved in every step along the way to punish" the whistleblowers, *id.*; Funnié Mem. at 1; and that Murray "directed the Machiavellian scheme" against Shaw and Funnié, Shaw Mem. at 1; Funnié Mem. at 1.  According to Murray, these statements grossly overstate her role and continue to perpetuate the falsehood that she was found to have retaliated against Shaw, a finding these litigants know the MSPB did not make.  Mot. for Sanctions at 4–8.  Murray requests that the offending paragraph be struck and that court admonish counsel and refer her to the bar.  *Id.* at 10–11.

"By presenting to the court a pleading, written motion, or other paper," an attorney or unrepresented party "certifies that" the filing "is not being presented for any improper purpose," and that "the claims, defenses, and other legal contentions are warranted." Fed. R. Civ. P. 11(b). If "the court determines that Rule 11(b) has been violated, the court may impose an appropriate sanction" for the violation.  Fed. R. Civ. P. 11(c).  "[T]he central purpose of Rule 11 is to deter baseless filings." *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 393 (1990) (citation omitted). "'[T]he district court is accorded wide discretion' in determining whether sanctions are appropriate." *Gomez v. Aragon,* 705 F. Supp. 2d 21, 23 n. 2 (D.D.C. 2010) (quoting *Westmoreland v. CBS, Inc.,* 770 F.2d 1168, 1174 (D.C. Cir. 1985)).  "Courts do not impose Rule 11 sanctions lightly; such sanctions are an extreme punishment for filing pleadings that frustrate judicial proceedings, or that are filed to harass another party." *In re Carvalho*, 598 B.R. 356, 363 (D.D.C. 2019) (internal quotation marks and citations omitted).

The court declines to sanction Shaw, Funnié, or Pozonsky. As an initial matter, Shaw, Funnié, and Pozonsky did not present the motion for any improper purpose other than to seek dismissal of Murray's claims against Shaw and Funnié. Though it may be an exaggeration to say that Murray was the "principal orchestrator" or "direct[or]" of whistleblower retaliation against Funnié and Shaw, the court does not find that these statements merit sanctions. *See* Fed. R. Civ. P. 11(b)(3). As discussed, the MSPB judge found that Murray "memorialized the delegations of authority from IG Ennis to Robinson to put [Shaw] on administrative and investigative leave, and to take corrective action against her," and served "as a conduit between IG Ennis and Robinson with respect to the delegation of authority to place [Shaw] on administrative and investigatory leave." MSPB Decision at 12–13. Defendants also forecast that discovery would reveal evidence that presents a reasonable likelihood of Murray's close involvement in these issues. *See* Shaw and Funnié's Opp'n to Mot. for Sanctions, ECF No. 122, at 4; *id.*, Ex. 2, at 47:22–48:3 (deposition testimony of Inspector General Ennis). The court therefore finds that counsel had some good faith basis for the challenged statements.

As for the colorful language used in the briefs, it does not cross the line into sanctionable conduct. "Rule 11 is not meant to chill advocacy or in any way stymie the freedom to litigate creatively and vigorously; rather, it provides standards that a district court may use to determine when 'th[at] line . . . is crossed.'" *Indep. Fed. Sav. Bank v. Bender*, 230 F.R.D. 11, 18 n.8 (D.D.C. 2005) (quoting *Trout v. Garrett*, 780 F. Supp. 1396, 1429 (D.D.C. 1991)). That the offending statements occurred in the introduction of the brief counsel in favor of them as advocacy rather than harassment. *See* Fed. R. Civ. P. 11(b)(1). Still, the court reminds defense counsel to be respectful of her opponent, even if she passionately believes that the claims against her clients are without merit.

*** 

For the foregoing reasons, all pending motions to dismiss, ECF Nos. 53, 54, 82, 85, 88, 94, 102, and 103, are granted.   Murray's Objection to the Government's Westfall Certification, ECF No. 96, and Motion for Sanctions, ECF No. 115, are denied.

The court dismisses with prejudice those claims against WaPo and POGO to the extent the court held that the fair report privilege applies.  Furthermore, insofar as the court has dismissed any claims for which the United States has been substituted as a party, those claims are dismissed with prejudice because the United States has not waived its sovereign immunity as to them. The dismissal of any other claim or portion of a claim is without prejudice.

A final, appealable order accompanies this Memorandum Opinion.

Dated:  March 26, 2025

Amit P. Mehta
United States District Court Judge